Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  2:16-cv-14121-DMM


ERIC MAAR and LINDIANE WESS,          )
individually and on behalf of all     )
other similarly situated,             )
                                      )
            Plaintiffs,               )
vs.                                   )          Volume I
                                      )
BEALL'S INC.,                         )
                                      )
            Defendant.                )
_____)



DEPOSITION OF ERIC MAAR


DATE:              August 2, 2016

TIME:              10:11 a.m.

PLACE:             Atlantic Reporting
                   4164 Okeechobee Road, Suite 75
                   Fort Pierce, Florida

TAKEN BY:          Defendant

REPORTER:          PATRICE C. HENSLEY, RPR, NOTARY PUBLIC
                   State of Florida at Large

e71b2f3e-761b-4e89-9a58-b6516d3756d9

```
 1   APPEARANCES:

 2   FOR PLAINTIFF:    HEPWORTH, GERSHBAUM  ROTH, PLLC
                       192 Lexington Avenue
 3                     Suite 802
                       New York, NY  10016
 4                     BY:  CHARLES GERSHBAUM, ESQUIRE

 5   FOR DEFENDANT:    THOMPSON, SIZEMORE, GONZALEZ
                       & HEARING, P.A.
 6                     201 No. Franklin Street
                       Suite 1600
 7                     Tampa, FL  33602
                       BY:  KEVIN D. JOHNSON, ESQUIRE
 8
     ALSO PRESENT:     CHERYL WOELTJEN
 9                     BEALL'S, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 3

```
 1                       I N D E X

 2   EXAMINATION                                    PAGE

 3   Direct Examination by Mr. Johnson:               4

 4   Cross-Examination by Mr. Gershbaum:            248

 5   Redirect Examination by Mr. Johnson:           256

 6

 7

 8                     E X H I B I T S

 9   Defendant's No. 1 - Job Description            167

10   Defendant's No. 2 - Associate Interview Guide  171

11   Defendant's No. 3 - Payroll Records            175

12   Defendant's No. 4 - Acknowledgement Statement  176

13   Defendant's No. 5 - Employee Handbook          197

14   Defendant's No. 6 - Interrogatories            210

15   Defendant's No. 7 - Signature Verification     210

16   Defendant's No. 8 - Resume                     235

17

18   Certificate of Oath                            268

19   Certificate of Reporter                        269

20

21

22

23

24

25
```

Page 4

```
 1   AND THEREUPON,

 2                       ERIC MAAR,

 3   Called as a witness on behalf of the Defendant herein,

 4   after having been first duly sworn, was examined and

 5   testified as follows:

 6          THE WITNESS:  I do.

 7                    DIRECT EXAMINATION

 8      Q    Would you please state your full name for the

 9   record.

10      A    Eric John Maar.

11      Q    Okay.  Mr. Maar, when were you born?

12      A    XX/XX/XXXX.

13          MR. GERSHBAUM:  Do me a favor.  That's fine.

14      Can you redact that off the record, otherwise --

15      you know, if you ever use the transcript, it has

16      to be redacted anyhow.  Last time you did it

17      right, you just asked him off the record what his

18      date of birth was.  Is that --

19          MR. JOHNSON:  I'm not sure the date of birth

20      has to be redacted.  We can talk about it --

21          MR. GERSHBAUM:  Yeah, with the federal

22      rules -- I'm sorry.  Look, we've never had an

23      issue, but I try to keep it off the record.  Would

24      you agree to redact it and you can write it down

25      and --
```

e71b2f3e-761b-4e89-9a58-b6516d3756d9

```
 1              MR. JOHNSON:  Sure.  In the record we can
 2         redact that.
 3              MR. GERSHBAUM:  All right, please take that
 4         off and just let the record reflect that the date
 5         of birth has been given.
 6    BY MR. JOHNSON:
 7         Q    Okay.  Mr. Maar, where do you currently reside?
 8         A    I live in Fort Pierce.
 9         Q    What address?
10         A    ████████████████████  Fort Pierce, Florida.
11         Q    Is it a house or an apartment?
12         A    House.
13         Q    How long have you lived there?
14         A    Close to a year.
15         Q    Does anyone live there with you?
16         A    No.
17         Q    Have you ever given a deposition before?
18         A    No.
19         Q    Have you ever been part of one before?
20         A    No.
21         Q    Okay.  It's a basic process.  It's a
22    conversation between you and me.  It's designed to get
23    answers about the case so that I know what you're
24    alleging.  It's also designed to prepare us for trial so I
25    know what you might say at trial.  Okay?
```

```
 1              And the way it works is we have a court reporter
 2    who's going to sit here and record everything that we say.
 3    So for her to be able to do her job correctly, it helps if
 4    you and I don't talk over each other.  Your attorney's
 5    already cautioned you about that and it was good advice.
 6    I'll try to respect that and make sure I let you answer
 7    before I start my next question.  If you'll try to let me
 8    finish my question before you answer, that will be great.
 9    And I'm probably going to be the first one to break the
10    rule.  But can you do that for me?
11         A    I can.
12         Q    Okay, good.
13              The other thing is it helps if you use verbal
14    answers such yes or no rather than shaking your head or
15    say uh-huh, because those are very easy to do in normal
16    conversation, but they're hard to translate in the record.
17    It's hard to know whether you meant yes or no.
18              One of the most important things for this to go
19    well is that you and I have to communicate well.  For that
20    to work well, I'd like you to tell me if you don't
21    understand a question that I ask.  Will you do that for
22    me?
23         A    I will.
24         Q    I'll do my best to rephrase it or try to make it
25    more intelligent, and we'll see what we can do.
```

e71b2f3e-761b-4e89-9a58-b6516d3756d9

```
 1            The second thing is if at any point you need a
 2    break, I want you to let me know that so I can give you a
 3    break.  Will you do that for me?
 4        A    Yes, I will.
 5        Q    We'll try to take them about every hour, but if
 6    we go for a while and it looks like you need one and it
 7    doesn't seem like I'm about to give one, just ask.
 8            Also, if you remember something that you want to
 9    go back and add to an earlier answer, feel free to tell me
10    that and I'll give you that opportunity.  Will you do
11    that?
12        A    I will.
13        Q    Okay.  And is there any reason you can't testify
14    accurately and truthfully today?
15        A    No, there's not.
16        Q    All right.  Are you under the influence of any
17    medication that would affect your ability to testify?
18        A    No.
19        Q    Okay.  And where do you currently work?
20        A    Construction Data Company.
21        Q    What do you do there?
22        A    Sales.
23        Q    What do you sell?
24        A    An online subscription.
25        Q    What's your title?
```

Page 8

1          A     Senior sales associate.

2          Q     How long have you had that job?

3          A     One year and five to seven months.

4          Q     Do you manage or supervise anyone there?

5          A     No.

6          Q     Have you worked in any retail stores since

7     leaving Beall's?

8          A     No.

9          Q     Where did you grow up?

10         A     Florida.

11         Q     What part?

12         A     Jupiter.

13         Q     Did you graduate from high school there?

14         A     No.

15         Q     Did you attend high school there?

16         A     No.

17         Q     Okay.  Where did you attend high school?

18         A     Martin County High School.

19         Q     Did you graduate?

20         A     Yes.

21         Q     Do you have any college?

22         A     I have an associate degree and a bachelor's

23    degree.

24         Q     And where is the associate's degree from?

25         A     Both degrees are from IRSC.

Page 9

1       Q       That's Indian River State College?

2       A       Yes, sir.

3       Q       What was the bachelor's in?

4       A       Organizational management.

5       Q       When did you obtain that degree?

6       A       I believe it was 2010.

7       Q       Had you worked in retail anywhere before

8    starting work with Beall's?

9       A       Yes.

10      Q       What other retail jobs had you held?

11      A       Dillard's Department Store, Target, and if it's

12   considered, QVC.

13      Q       Okay.  So which of those did you hold first?

14      A       Target.

15      Q       Okay.  And what years were you at Target?

16      A       I believe 2004 to 2010.

17      Q       Okay.  So it would have been about age 20 to

18   about 26, somewhere in there?

19      A       Somewhere.

20      Q       And what positions did you work in there?

21      A       AP, assets protection, and in-stock team member.

22   Also electronics specialist.

23      Q       What does an in-stock team member do?

24      A       They scan items on the floor to see if the item

25   is in stock or if it needs to be replenished.

1      Q     Okay.  Do they work in a particular department

2   or do they circulate throughout the store?

3      A     They go throughout the store.

4      Q     Is an electronics specialist someone who works

5   in the electronics department?

6      A     That's where I was thinking about what that

7   title was.  It's really, you're assigned to the hardware

8   department.  So you work in electronics, but you work in

9   like sporting goods, the home department, cosmetics.  You

10  just circulate that department.

11     Q     Maintaining the electronics in each department?

12     A     No, it's more electronics like selling

13  cameras --

14     Q     Sell cameras --

15     A     Yeah, I would be stationed there sometimes.

16     Q     So it just depends what different type

17  electronics you're selling as to what department you're

18  in.

19     A     Correct.

20     Q     All right.  I think I understand it.

21           How about asset protection, what does that

22  involve?

23     A     That was deterring theft in the building,

24  checking receipts.

25     Q     Who would you have reported to in the asset

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 11

1   protection role?

2       A    There was a team leader of asset protection, or

3   an executive.

4       Q    Were you given training on asset protection?

5       A    Yes.

6       Q    And was that reporting relationship outside the

7   normal store management reporting relationship of the

8   different departments?

9            MR. GERSHBAUM:  Objection to form.

10           You can answer.

11           Just off the record.

12           (Discussion held off the record)

13           THE WITNESS:  Can you repeat the question.

14  BY MR. JOHNSON:

15      Q    Yeah, let me try to simplify it a little bit.

16  Does Target have a separate line of reporting for the

17  asset protection team as opposed to the people that work

18  in the normal departments?

19           MR. GERSHBAUM:  Objection to form.

20           You can answer.

21           THE WITNESS:  I'm not fully understanding the

22       question.  It's more or less, if you're asking if

23       something was stolen, I would report that to my

24       supervisor, and that supervisor reports to store

25       management.

1    BY MR. JOHNSON:

2         Q    All right.  I guess I was trying to figure out

3    if your supervisor would have been under the control of

4    the store manager.

5              MR. GERSHBAUM:  Objection to form.

6              You can answer.

7              THE WITNESS:  Yes.

8    BY MR. JOHNSON:

9         Q    Okay.  How much training did you get in asset

10   protection?

11        A    There was a seminar.  It was maybe a three- to

12   four-week process.  I'm not entirely sure.  It was a while

13   ago.

14        Q    All right.  When you were working in asset

15   protection, were you typically watching a camera or were

16   you out on the sales floor?

17        A    Both.

18        Q    Did you have any responsibility to apprehend

19   suspects?

20        A    Yes.

21        Q    Did you work with the sales associates on the

22   floor to try to deter shoplifting?

23        A    Yes.

24        Q    Did you try to train them or teach them in terms

25   of ways that they could help to deter shoplifting?

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 13

1           MR. GERSHBAUM:  Objection to form.

2           You can answer.

3           THE WITNESS:  Yes.

4   BY MR. JOHNSON:

5        Q    At the time that you left Target, what role were

6   you in?

7        A    In-stock team member.

8        Q    Okay.  Did you do asset protection any longer at

9   the time that you left?

10       A    No.

11       Q    And why were you out of asset protection?

12       A    I wanted to switch roles.

13       Q    And why was that?

14       A    More opportunity.

15       Q    What kind of opportunity were you looking for?

16           MR. GERSHBAUM:  Objection to form.

17           You can answer.

18           THE WITNESS:  An executive role on the hard

19       lines or soft lines, or any location, department,

20       they had.

21   BY MR. JOHNSON:

22       Q    Okay.  Why did you end up leaving Target?

23       A    Beall's offered a management position.

24       Q    Now, when did you work at Dillard's?

25       A    I'm not entirely sure about the dates, but it

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 14

1   was possibly 2006 to 2008.  But I'm not a hundred percent

2   sure on the dates.

3        Q     Okay.  Did you leave Target to work at Dillard's

4   or did you work at Dillard's in addition to working at

5   Target?

6        A     I always had two jobs at the same time.  So

7   Dillard's and Target or Target and QVC.

8        Q     Okay.

9        A     Or Dillard's and QVC.

10       Q     What did you do for Dillard's?

11       A     I was a shoe sales --

12       Q     Okay.  Did you hold any other roles within

13   Dillard's?

14       A     No.

15       Q     Did you have any management responsibility in

16   Dillard's?

17       A     No.

18       Q     Which store did you work in?

19       A     The Jensen Beach mall.

20       Q     At Target, which store did you work in?

21       A     The Jensen Beach location and the Port St.

22   Lucie.

23       Q     And how was it that you became aware of job

24   opportunities with Beall's?

25       A     My college, IRSC, held a job fair.

Page 15

1       Q    I take it you attended that job fair?

2       A    Yes, sir.

3       Q    And you found out that Beall's was looking for

4   management?

5       A    Yes.

6       Q    And did you apply with them right away?

7       A    I took an application and some information.

8       Q    Did you investigate before applying?

9       A    Yes.

10      Q    What did you look into?

11      A    I looked at their website, career opportunities.

12      Q    And what did you learn from that?

13      A    Just various roles, looking at their

14   merchandise.

15      Q    Okay.  And at Target at the time, you were in a

16   sales role?

17      A    Yes.

18      Q    Or the in-store stock role?

19      A    Yeah.  You would approach customers as a team

20   member.  But as security, you would obviously have a

21   different role.

22      Q    And did, at the time that you went to this job

23   fair, did you have any management responsibility with

24   Target?

25      A    No.

```
 1      Q    Were you looking to get management
 2  responsibility with Beall's?
 3      A    Yes.
 4      Q    Did you apply for a specific position with
 5  Beall's?
 6      A    Yes.
 7      Q    What did you apply for?
 8      A    Area manager.
 9      Q    Did you end up speaking with anyone from Beall's
10  about that position?
11      A    After I spoke at the job fair?
12      Q    Yeah.  Who did you speak to at the job fair?
13      A    Alicia.
14      Q    And what's Alicia's last name?
15      A    Not a hundred percent sure.
16      Q    Hold on a sec.
17           Is that going to be Alicia Koontz?
18      A    That's it, yeah.
19      Q    Do you know whether she was a store manager?
20      A    Yes.
21      Q    Do you know which store?
22      A    I believe the number is 66.
23      Q    When you spoke with her at the job fair, what
24  was the substance of your conversation?
25      A    What the area manager actually was and that it
```

Page 17

1    would require a 40- to 45-hour workweek.

2         Q    What did she explain the area manager's job was

3    supposed to do?

4         A    Working with visuals to set the adjacencies for

5    the floor, customer service, and unloading stock on the

6    floor, cleaning the store, and -- that's about it.

7         Q    Anything else?

8         A    From what I remember.

9         Q    Anything else?

10        A    Not that I can recall.

11        Q    Okay.  Which of those things sounded like

12   management responsibilities to you?

13        A    Working with visuals to set the adjacencies.

14        Q    All right.  And was this a job you were

15   interested in based on the description?

16        A    Yes.

17        Q    Did you look at a copy of the job description

18   either at the job fair or in the course of your research?

19        A    I would -- I'm not sure what materials I

20   received at the job fair.  But when I looked online, if

21   they had a title and a definition of the area manager

22   online, I might have read it there.

23        Q    Okay.  But you understood that the position

24   would be working at least 40 to 45 hours a week?

25        A    Correct.

Page 18

1      Q    Was there a discussion of how those hours would

2   be scheduled?

3      A    Not at that time.

4      Q    Was there a discussion of whether the hours

5   might be different during holidays or peek business hours?

6      A    Not at that time.

7      Q    Okay.  So you submitted an application to

8   Beall's?

9      A    Yes.

10      Q    Did you do that online?

11      A    I don't remember.

12      Q    Okay.  Did you get a call for an interview?

13      A    Yes.

14      Q    Who interviewed you?

15      A    I believe Alicia did the first interview.  But

16   it might have been another area manager.  I'm not sure.

17      Q    Do you remember which area manager it would have

18   been?

19      A    No.

20      Q    Did you have more than one interview?

21      A    Yes.

22      Q    Okay.  Were the other interviews, other than the

23   one with Alicia, were those with area managers?

24      A    I don't believe so.

25      Q    Who were they with, do you recall?

e71b2f3e-761b-4e89-9a58-b6516d3756d9

```
 1      A    I know I did an interview with I believe Alyssa,

 2  the manager from the Port St. Lucie store, and Cindy, the

 3  district manager.

 4      Q    Where was store 66 located?

 5      A    In Stuart, Florida.

 6      Q    And who was the district manager that you

 7  interviewed with?

 8      A    Cindy.

 9      Q    Do you remember her last name?

10      A    Not offhand.

11      Q    How did those interviews go?

12      A    Good.

13      Q    Did the job sound like something you were still

14  interested in?

15      A    It did.

16      Q    Okay.  And did they offer you the position?

17      A    I'm not sure exactly after -- I know it was

18  after Cindy's interview because obviously she had to okay

19  it, but I'm not sure of the date that it was given.

20      Q    Okay.  Was it Cindy that extended the offer to

21  you?

22      A    I don't remember.

23      Q    What do you recall about how the job was

24  extended or how you accepted?

25           MR. GERSHBAUM:  Objection to form.
```

Page 20

1          You can answer.

2          THE WITNESS:  It might have been Alicia from

3     store 66 calling me and letting me know that I had

4     the job.

5  BY MR. JOHNSON:

6     Q    Okay.  And you would have told her that you

7  accepted if that's the person that called you?

8     A    Yes.

9          MR. GERSHBAUM:  Objection to form.

10         You can answer.  Go ahead.

11 BY MR. JOHNSON:

12    Q    Was a salary discussed at that time?

13    A    Not -- yes, it was.

14    Q    Okay.  What was the salary going to be?

15    A    I'm not a hundred percent sure, but I believe it

16 was between 30 and 33,000.

17    Q    Did you have to give notice to Target?

18    A    Yes.

19    Q    Okay.  And when did you start work, do you

20 recall?

21    A    It was I believe in the month of May, but I

22 don't remember the exact date.

23    Q    Do you know what year?

24    A    2011, I believe.

25    Q    Does May 26, 2011 sound right?

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 21

1          A     It could.  Sure.

2          Q     And would Cindy have been Cindy Kennedy?

3          A     I'm still not a hundred percent on her last

4     name.

5          Q     Okay.  Did you go through a training process

6     with Beall's?

7          A     Yes.

8          Q     Before that did you go through an orientation

9     process?

10         A     Yes.

11         Q     During the orientation process, were you given a

12    copy of the employee handbook?

13         A     Yes.

14         Q     Did you have to review certain policies?

15         A     I read the book.

16         Q     Okay.  Did you understand that you were

17    considered to be an exempt executive employee?

18         A     I'm not sure what that means.

19         Q     Meaning that you weren't eligible for overtime.

20         A     Yes, I was, I knew that I was not eligible for

21    overtime.

22         Q     Okay.  You understood that when you took the

23    job; right?

24         A     Yes.

25         Q     Did you receive training on the harassment

Page 22

1   policy?

2         A     Yes.

3         Q     Did you receive training on the discount policy?

4         A     Yes.

5         Q     Did you receive training on the loss prevention

6   policies?

7         A     Yes.

8         Q     Okay.  And how were you trained to be an area

9   manager?

10        A     Well, the orientation and the first week was

11  built around watching videotapes from the '80s where

12  Alicia Koontz was actually in the video.

13        Q     Okay.

14        A     And she bragged about that.

15        Q     All right.  What role did she play?

16        A     She was the shoe associate showing how to stock

17  a shoebox or something.

18        Q     All right.  So you watched the videos to learn

19  all the different expectations of the store?

20        A     Yeah.

21        Q     Okay.  At some point did you end up working

22  alongside other area managers to watch how they performed

23  their job?

24        A     The bulk of the training was being put in

25  different departments with merchandise handlers, cashiers,

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 23

1    the janitor staff.  And I did also walk with area

2    managers.

3         Q    So you got to observe how each of the functions

4    was performed?

5         A    Yes.

6         Q    How much time did you spend with other area

7    managers during training?

8         A    Maybe the first two weeks.

9         Q    Did you also learn from store managers during

10   that time?

11        A    Yes.

12        Q    And how long was it before you were deemed ready

13   to become a full fledged area manager?

14        A    To open the store by myself or close a store,

15   I'm not a hundred percent sure on the time structure on

16   that.

17        Q    Did you spend this training time in store 66 or

18   was it in other stores?

19        A    It might have been a split between 23, Port St.

20   Lucie and Stuart, but I'm not a hundred percent sure if I

21   went to the Port St. Lucie store to train.

22        Q    During your training time, were you paid on an

23   hourly basis for the first six weeks or so?

24        A    The training, I don't know if it was hourly or

25   salary.

Page 24

1        Q     Do you recall there came a time when you were

2    moved from the hourly basis to the salary at the time that

3    you were deemed ready to become a full fledged area

4    manager?

5        A     I don't recall it.

6        Q     So at what point do you think you were actually

7    in store 66 functioning as a full fledged area manager?

8        A     Two to three months, roughly.

9        Q     Okay.  So you started the end of May and my

10   notes suggest that you were switched from hourly to salary

11   somewhere around August 24, 2011.  Does that jog your

12   memory at all?

13       A     It doesn't.

14       Q     All right.  And so as an area manager, were you

15   assigned certain areas to manage?

16       A     Alicia I believe gave me the kids and the shoe

17   department at the time.

18       Q     Did you later add any other departments to your

19   responsibilities?

20             MR. GERSHBAUM:  Objection to form.

21             You can answer.

22             THE WITNESS:  The home department.

23   BY MR. JOHNSON:

24       Q     Was that right away or did that take a few

25   months?

Page 25

1      A    It took a few months, if not years.

2      Q    All right.  So you mentioned opening and closing

3   the store.  Did you have responsibility for opening the

4   store once you became a full fledged area manager?

5           MR. GERSHBAUM:  Objection to form.

6           You can answer.

7           THE WITNESS:  Yes.

8   BY MR. JOHNSON:

9      Q    So what would you have to do when you opened the

10   store?

11      A    I would open the gate, let the employees in.  I

12   would go to the back and do data entry, submitting the

13   numbers that we did for sales into the computer.  I would

14   have the schedule that was already filled out, I would

15   make a copy of that, show it to the employees, and go over

16   the notes that were on the red book.

17           After that, when the employees saw the schedule,

18   they went to their locations.  They cleaned up.  And after

19   that, I would walk the store.  I would have a checklist to

20   see if the store was clean, if there was merchandise on

21   the ground, if there was trash in the bathrooms.

22           After that, I would walk the store, clean up

23   merchandise, talk to customers, bring them to items that

24   they were looking for.  I would get the carts that were

25   outside, bring them inside.  I would cashier.  I would

Page 26

1    work on go-backs that were at the registers and the

2    fitting room.  I would work on the SOS orders, the online

3    orders.  And I would jump on the cashier.  I think I

4    already mentioned that.  And just do that consistently

5    throughout the day.  And work on merchandise that was in

6    the back room, unloading the boxes, putting them on the

7    shelves and hanging clothes on the floor.

8         Q    Okay.  So when you opened the gate, is that a

9    security gate?

10        A    Yes.

11        Q    Did you have a key to do that?

12        A    Yes.

13        Q    Who else had that key?

14        A    The area managers and the store manager.

15        Q    So all the sales associates had to wait until

16   you arrived; right?

17        A    We all pretty much came at the same time.

18        Q    But they couldn't open the gate themselves, they

19   required you to open the gate; right?

20        A    Correct.

21        Q    Once you opened the gate, I assume there was an

22   alarm on the store; right?

23        A    Correct.

24        Q    And did you have to deactivate the alarm?

25        A    Yes, I did.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 27

1       Q      Would that be the first thing you did once you
2   got inside the door?
3       A      Yes.
4       Q      So you wouldn't do any other work until you'd
5   got inside the door and deactivated the alarm; correct?
6       A      Correct.
7       Q      Who had the alarm codes?
8       A      The area managers and the store manager.
9       Q      So I assume when you go in, the store's dark,
10  you have to turn on all the lights?
11      A      Yes.
12      Q      And I assume you don't leave cash in the
13  registers overnight; right?
14      A      Correct.
15      Q      Where was the cash kept?
16      A      It was actually in the safe.
17      Q      Okay.  Did you have a key or code to the safe?
18      A      Yes.
19      Q      Who else had codes to the safe?
20      A      The area managers, the store manager.  I don't
21  think any of the senior members did, but I'm not a hundred
22  percent sure if they did or not.
23      Q      So you would have to open the safe each morning;
24  right?
25      A      Yes.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

1        Q     And once you opened the safe, what would you do

2   with the cash that was inside it?

3        A     The guest service person counted all the

4   drawers, verified the money, and she put them on a baker

5   rack, went to every register and filled them into the

6   drawers throughout the store.

7        Q     Where is the safe located?

8        A     In the back of guest service.

9        Q     Is it in its own particular room?

10       A     Yes.

11       Q     Is there a name for that room?

12       A     I'm not sure, but the cash office.

13       Q     The cash office?

14             And is that a locked office?

15       A     Yes.

16       Q     Who has the key to that office?

17       A     I think it was a code, and which guest service,

18   the area managers and the store manager.

19       Q     So not all the sales associates had that.

20       A     Some sales associates did have it.

21       Q     The ones who were guest service associates?

22       A     There wasn't, I don't believe they were called

23   guest service associates, I think they were just

24   associates.

25       Q     Okay.  But they were the ones that worked in the

Page 29

 1   cash office?

 2        A     They did work in the cash office.

 3        Q     And ordinary associates were not supposed to be

 4   allowed access to the cash office; right?

 5        A     Well, if the guest service were regular

 6   associates, then yes.  Regular associates did have access

 7   to the cash office.

 8        Q     But those who weren't assigned to work there

 9   couldn't just wander into it; right?

10        A     They could actually.

11        Q     Oh, really?

12        A     If you were in there, if they had to, the door

13   was open, they could walk in, start talking to you.

14        Q     Okay.  But they couldn't open it up on their

15   own.

16        A     No.

17        Q     Okay.  I think I understand.

18              So once the guest service person has counted out

19   all the drawers, were there any other things that had to

20   be done in order to get the computers ready to function

21   that day?

22        A     I'm trying to think, it was a while ago.  I

23   think there was a procedure on the computer that you had

24   to type in some codes.  I'm not sure, though.

25        Q     Was that the manager's responsibility to type in

1   those codes?

2        A    It could have been other people, but yes, I

3   remember that there was some kind of code procedure for

4   the registers to open.

5        Q    Did you have a distinctive login code that was

6   assigned to you for the computer system?

7        A    Yes.

8        Q    Were you allowed to share that with anyone?

9        A    No.

10       Q    I think you mentioned you had the responsibility

11  to enter some sales numbers; is that correct?

12       A    Yes.

13       Q    Would those be the previous day's sales?

14       A    Correct.

15       Q    And you had to type those into the computer

16  system so they could be uploaded to the home office?

17       A    Yes.

18       Q    Who would prepare those sales numbers?

19       A    It was generated through the registers at night

20  and it was uploaded into the computer system.

21       Q    When you came in, did you have to generate it

22  from the computer system or would it have been generated

23  the night before?

24       A    I believe it was the morning that the numbers

25  were active.

1       Q     Okay.  And so you would run the sales totals and

2    get a printout from the register?

3             MR. GERSHBAUM:  Objection to form.

4             THE WITNESS:  Yes.

5    BY MR. JOHNSON:

6       Q     Okay.  And that would be using your distinctive

7    login code; right?

8       A     Again, I'm not sure if other people had a code

9    to look at the actual numbers in the system, but I did

10   that as manager.

11      Q     Using your code; right?

12      A     Using a code, yes.

13      Q     Okay.  And you mentioned copying the schedule.

14   Where would the schedule be?

15      A     It was in the red book.

16      Q     What is the red book?

17      A     It's a daily/monthly/yearly planner -- no, I'm

18   sorry, daily and monthly planner of the store's projected

19   sales, projected emails, projected credit cards to be

20   obtained, and any daily or weekly, monthly, promotions

21   that were run.  So it was a guidebook through the week and

22   month and the day how to run the store.

23      Q     Is it also used as a management communication

24   tool?

25      A     Yes.

Page 32

1       Q      Who has access to the red book?

2       A      Everybody.

3       Q      Where's it kept?

4       A      On the guest service desk.

5       Q      Would managers use it to communicate problems to

6    the person who was going to follow them the next day or

7    the next shift?

8               MR. GERSHBAUM:  Objection to form.

9               You can answer.

10              THE WITNESS:  Can you explain problems?

11   BY MR. JOHNSON:

12      Q      Sure.  If you had a particular situation that

13   the next manager needed to be aware of, let's say you were

14   running low on something and you hadn't had time to

15   correct that problem before you left the previous night

16   and it was something they needed to correct the next day,

17   is that something you would mark down in the red book to

18   say "Hey, be aware of this"?

19      A      Not necessarily.

20      Q      What types of things would you use the red book

21   to communicate with other managers about?

22      A      I would get all the emails and the credit cards

23   that were taken throughout the day and put the number in

24   the book.  And if there was an accident that happened in

25   the store, you could say that's some communication

Page 33

1    actually you could leave for the next manager.

2         Q    To let them know "Hey, we had a slip and

3    fall --"

4         A    Right.

5         Q    "-- or somebody hurt themselves on a rack" or

6    whatever?

7         A    Uh-huh.  Yes.

8         Q    Okay.  If something like that happened, what was

9    your responsibility to report it?

10             MR. GERSHBAUM:  Objection.  I'm not sure

11        which part you're talking about.

12             But you can answer.

13   BY MR. JOHNSON:

14        Q    I think the previous question was about an

15   injury.  Did you understand it?

16        A    I do understand --

17             MR. GERSHBAUM:  I'm sorry, I thought you were

18        talking about something else.

19   BY MR. JOHNSON:

20        Q    So if there was an injury, whether it was a slip

21   and fall or somebody, you know, catching their arm on a

22   rack or whatever it was, what was your responsibility as

23   an area manager to respond to that and/or report it to

24   someone higher up?

25             MR. GERSHBAUM:  Objection to form.

Page 34

1          You can answer.

2          THE WITNESS:  Actually everyone had the

3     responsibility to report it.  They could call 911

4     for the incident.  And as a manager, I would

5     approach the customer, ask them if they wanted an

6     ambulance.  But again, every associate would be

7     able to ask the same questions.

8  BY MR. JOHNSON:

9     Q    Would you be expected to take the lead in

10 dealing with a customer as the manager?

11    A    If I was directly in front of that customer,

12 yes.  But if an associate was with them and they were able

13 to obtain information from them, they could also speak to

14 them.

15    Q    I understand they could.

16    A    Okay.

17    Q    I'm trying to figure out what the preferred way

18 of dealing with it is.  If you're sitting next to a sales

19 associate and you both see a customer get hurt, what were

20 you trained by Beall's was your responsibility to deal

21 with that as opposed to the sales associate's

22 responsibility?

23          MR. GERSHBAUM:  Objection to form.

24          You can answer.

25          THE WITNESS:  Well, if in that case, I would

Page 35

1        approach the customer and obtain the information,

2        speak to her, see if they wanted an ambulance.

3   BY MR. JOHNSON:

4        Q    Because you should be taking the lead as the

5   manager and the higher-ranking person on duty?

6             MR. GERSHBAUM:  Objection to form.

7             You can answer.

8             THE WITNESS:  That was given in the training

9        and the procedures in the handbook that I

10       followed.

11  BY MR. JOHNSON:

12       Q    All right.  What was your responsibility to

13  report, and let me be clear here, your responsibility as a

14  manager, to ensure that any injuries were reported to

15  either loss prevention or the home office?

16            MR. GERSHBAUM:  Objection, asked and

17       answered.

18            You can answer.

19            THE WITNESS:  I would approach loss

20       prevention, see if they had videotape of that

21       area.  And if they did, they had to make a copy of

22       that tape and we had to call the 1-800 number to

23       report the incident to our corporate office, that

24       there was an accident in our location.

25  BY MR. JOHNSON:

Page 36

1       Q     Is that something the manager on duty would be
2    expected to do?
3       A     Any of the managers, yes.  Or store manager.
4       Q     Sure.
5       A     But an associate, depending on who they were,
6    also could call corporate and let them know that there was
7    an accident in the store.
8       Q     Sure.
9             And, you know, if you were, for example, dealing
10   with somebody who's injured and you were waiting for help
11   to arrive and staying with them, you might designate
12   someone to go call corporate; right?
13            MR. GERSHBAUM:  Objection to form.
14            You can answer.
15            THE WITNESS:  That could be true.
16   BY MR. JOHNSON:
17      Q     So in terms of the use of the red book, you
18   mentioned using it to report sales and emails and credit
19   cards.  In terms of emails, are you talking about getting
20   customer email addresses so they can be used for marketing
21   down the road?
22      A     Yes.
23      Q     And in terms of credit cards, are you talking
24   about getting credit card applications from customers?
25      A     Yes.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 37

```
 1        Q    And were those something that all sales
 2   associates were expected to ask for?
 3        A    The entire store was able to ask for them.
 4        Q    Okay.  And did the store have set targets each
 5   day as to how many of those they were trying to achieve?
 6        A    From the red book, yes, there were.
 7        Q    Okay.  And was it part of your job duties to try
 8   to make sure that the store met that goal?
 9        A    It was the number that we had in the book, so
10   yes.
11        Q    Okay.  And so when you were dealing with
12   associates, if you heard an associate fail to ask for a
13   credit card application or fail to ask for an email
14   address, is that something you would counsel them or coach
15   them to do better next time?
16             MR. GERSHBAUM:  Objection to form.
17             You can answer.
18             THE WITNESS:  Actually there was cashiers
19        there that they would, we would partner them up
20        with, that they were already working with.  So the
21        cashiers would talk to each other and tell them
22        that they need to approach it this way, that they
23        need to ask for a credit card this way, an email
24        this way, this is the better way to do it.  So
25        they would be teamed up with those cashiers that
```

Page 38

1        were more experienced on how to get credit cards.

2   BY MR. JOHNSON:

3        Q    Are you talking about a training process for new

4   cashiers or new associates?

5        A    No, this was like you said if I saw an example

6   of a cashier not asking properly, that cashier at the

7   other register would just walk up to her and say this is

8   what you need to do.  There wasn't any direct "Stephanie,

9   come here, I need to tell you how to do this, this, this

10  and this."  There were cashiers that spoke to each other

11  and helped train each other.

12       Q    They helped train each other; right?

13       A    Yes.

14       Q    Okay.  Now, once they were fully trained, did

15  the cashier have any responsibility to counsel or

16  discipline another cashier?

17            MR. GERSHBAUM:  Objection to form.

18            You can answer.

19            THE WITNESS:  No.

20  BY MR. JOHNSON:

21       Q    Okay.  And is it just that they were sort of

22  buddied up to help remind each other to ask for those

23  things?  Is that what you're telling me?

24            MR. GERSHBAUM:  Objection to form.

25            You can answer.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 39

```
 1              THE WITNESS:  Not buddied up.  It was
 2         whatever cashier was scheduled for that shift.
 3         But there wasn't set people that you had to be
 4         with every single time at every single register.
 5    BY MR. JOHNSON:
 6         Q    Okay.  So let's say you're watching two cashiers
 7    operate.  One of them fails to ask for the credit card
 8    application or the email.  The other one you're saying has
 9    a duty to go correct that person?
10              MR. GERSHBAUM:  Objection, calls for
11         speculation.
12              You can answer.
13              THE WITNESS:  Not a duty, but they feel
14         morally obligated on their own behalf to approach
15         that cashier.
16    BY MR. JOHNSON:
17         Q    So you're saying that as a good teammate, you
18    would hope that they would try to remind their fellow
19    cashier to do it correctly?
20              MR. GERSHBAUM:  Objection to form.
21              You can answer.
22    BY MR. JOHNSON:
23         Q    Right?
24         A    Yes.
25         Q    But they're not assigned by Beall's to go do
```

Page 40

```
 1    that.

 2        A    Not assigned.

 3        Q    Okay.  So if you saw the first one fail to ask

 4    and you saw the second one fail to remind, are you going

 5    to discipline the second one for failing to remind?

 6            MR. GERSHBAUM:  Objection, calls for

 7        speculation.

 8            You can answer.

 9            THE WITNESS:  I would not discipline.

10    BY MR. JOHNSON:

11        Q    Okay.  But you would try to coach or counsel the

12    first one to do a better job of asking; correct?

13            MR. GERSHBAUM:  Objection, asked and

14        answered.

15            You can respond.

16            THE WITNESS:  I would approach a cashier and

17        ask her what happened and then give her my

18        opinion.

19    BY MR. JOHNSON:

20        Q    Which would be that she ought to comply with

21    Beall's policies?

22            MR. GERSHBAUM:  Objection to form.

23            You can answer.

24            THE WITNESS:  I would remind her and show the

25        handbook on how to approach a customer, how to
```

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 41

1       speak to a customer and obtain a credit card with

2       Beall's policies.

3            MR. JOHNSON:  Okay.  Let's take about a

4       five-minute break and then we'll come right back.

5       I'm going to try to do this about every hour.

6            THE WITNESS:  Okay.

7            (Thereupon, there was a break from 10:54 a.m.

8       to 11:01 a.m.)

9    BY MR. JOHNSON:

10       Q    All right.  Ready to move forward?

11       A    Yes.

12       Q    You mentioned the red book before the break and

13   I wanted to follow up on that.  If you had a situation

14   such as an upset customer who left because they didn't get

15   a discount and were threatening to call their lawyer and

16   sue the store, is that something you would communicate to

17   the store manager or to the next area manager through the

18   red book?

19            MR. GERSHBAUM:  Objection to form.

20            You can answer.

21            THE WITNESS:  I mean, I can't recall a case

22       like that.  I mean, if it did, it would be very

23       rare.  But that is a note that you could put in

24       the red book.

25   BY MR. JOHNSON:

Page 42

1     Q     To communicate things about problematic

2  customers or unusual situations that happened in the

3  store.

4     A     You could put anything in the red book.

5     Q     Okay.  What would the goal of putting it in the

6  red book be?

7     A     Just the numbers, the credit cards, the emails.

8  Really just following what Beall's wanted to be done on

9  that day.

10    Q     What would the purpose of putting a comment like

11 that in the red book be?

12          MR. GERSHBAUM:  Objection to form.

13          You can answer.

14          THE WITNESS:  To relay the message.

15 BY MR. JOHNSON:

16    Q     To whom?

17    A     To the team, to the store manager.

18    Q     To the next manager taking over?

19    A     To the team.

20    Q     Okay.  Is it typically the managers that check

21 the red book?

22    A     No, everyone can.

23    Q     Everyone can; right?

24    A     But particularly the managers and the guest

25 service team members check the book.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 43

1        Q     Okay.   In terms of the ones who routinely check

2    it; right?

3        A     I'm sorry?

4        Q     They are the ones who routinely check it.

5               MR. GERSHBAUM:  Objection to form.

6               You can answer.

7               THE WITNESS:  I would say not even routinely.

8          Every associate would look at the red book.  They

9          would walk by guest service, look at it, see what

10         the numbers were, the emails, the credits.  So all

11         the associates daily looked at the red book.

12   BY MR. JOHNSON:

13        Q     But in terms of what the associates were looking

14   at it for, they're looking at it for those goals and those

15   targets?

16              MR. GERSHBAUM:  Objection to form.

17              You can answer.

18              THE WITNESS:  Like I said, there would be

19         daily promotions, daily activities depending on if

20         it was back to school.  Every associate would walk

21         by and see if there was anything in their

22         department that they had to do.

23   BY MR. JOHNSON:

24        Q     Would you ever put anything that had to do with

25   employee discipline in the red book?

e71b2f3e-761b-4e89-9a58-b6516d3756d9

1        A     Not that I recall.

2        Q     How would you communicate that to other

3    managers?

4        A     What kind of discipline?

5        Q     If you were having a problem with an associate,

6    for example, and you wanted to let other managers know

7    "Hey watch for this, I told this person not to do it again

8    but watch for it and see if it happens again."

9            MR. GERSHBAUM:  Objection to form, calls for

10        speculation.

11            You can answer.

12            THE WITNESS:  I don't recall if I would put

13        that in the red book or not.  It might be a

14        verbal -- sorry.  It might be a verbal

15        communication at that point.

16   BY MR. JOHNSON:

17       Q     That you would make to other managers?

18       A     Yes.

19       Q     Just to let them know to look for it?

20       A     It could.

21       Q     Okay.  And you mentioned a schedule that you

22   would copy and hand out to people.  What kind of schedule

23   is that?

24       A     It was a daily schedule.

25       Q     As opposed to the weekly schedule; right?

Page 45

1      A    Well, the weekly schedule was already made and
2   put on the board for the associates to look at.
3      Q    So what was the daily schedule in comparison to
4   that?
5      A    It was individual people in individual
6   departments.
7      Q    Would it be assignments of what they were going
8   to do for the day or where they would start the day?
9      A    Well, if they were in the home department, they
10  would work in the home department, et cetera, et cetera.
11     Q    What would you, what would an individual learn
12  from the daily schedule once you handed that copy to them?
13     A    That they were in that area.
14     Q    So their assignment to that area?
15     A    That's what the store manager chose for them to
16  be in that area, that's where they would be.
17     Q    Was it always the store manager that made the
18  daily schedule?
19     A    The guest service people made the schedule as
20  well.
21     Q    Is it typically the closing manager would make
22  the daily schedule?
23     A    It was really a mix between the guest service
24  making the schedule, the store managers, and sometimes the
25  managers.

Page 46

1      Q      Okay.  So sometimes the store manager.

2      A      But it was rare when we made the schedule.  It

3   was more or less the schedule was laid out by the store

4   manager for the week and for the day.

5      Q      But sometimes area managers would make that

6   schedule, that daily schedule?

7      A      It was really just the list of people that were

8   in that department scheduled and I would just copy and

9   paste this person is in shoes onto the daily schedule.

10     Q      Okay.  Because the weekly schedule wouldn't give

11  that information?

12     A      No, the weekly would say, for example, Wendy is

13  working Monday.  Wendy is in the shoe department.  So

14  Wendy would go on the daily schedule in the shoe

15  department.  So I would copy and paste from the store

16  manager's weekly schedule onto the daily schedule.

17     Q      What additional information would the daily

18  schedule provide that the weekly schedule did not?

19     A      Credit card and email goals.

20     Q      Would it also discuss when people were to take

21  lunch?

22     A      Yes.

23     Q      That's not something that would be on the weekly

24  schedule; right?

25     A      Correct.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

1      Q    Would it discuss specific assignments that they

2   were supposed to do within their department, such as in

3   your department, you know, so and so should start with

4   recovery and so and so should be working in the back to

5   unload boxes?

6      A    Yeah, I mean, they knew what they were doing

7   when they came into the store.

8      Q    Well, that's something they would learn from

9   that schedule, though; right?

10      A    Well, actually Wendy, for example, in shoes

11   would come in here.  She's already in the shoe department,

12   she's an assigned associate that works in shoes.  It's

13   nothing from the schedule she would learn.  She knows

14   she's in shoes.  She would be in shoes.

15      Q    What if there are two people assigned to shoes

16   that particular day?  Would the daily schedule give them

17   any information as to what their specific assignments

18   were?

19      A    If there were two assigned shoe associates that

20   worked in shoes, they knew to work in shoes.

21      Q    But did they know specifically what to do in

22   shoes?

23      A    There was a routine, yes.

24      Q    Did they get specific assignments at all from

25   the daily schedule?

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 48

1       A    No.

2       Q    Were there any other duties that were specific

3    to opening the store as opposed to just your normal daily

4    routine?

5       A    Not that I can recall.

6       Q    Because it seemed like some of the duties that

7    you described to me earlier would have been things that

8    you would have done as an area manager regardless of

9    whether you had an opening assignment.  Was that correct?

10      A    I don't understand your question.

11      Q    You described to me things like cleaning

12   merchandise, helping customers, get carts, helping out on

13   cash registers.  You would do those types of things

14   regardless of whether you were in an opening shift or a

15   closing shift; right?

16      A    Correct.

17      Q    Okay.  In terms of opening, though, did you say

18   that you would generally do a tour of the store to see

19   what kind of shape it was in as soon as you got your

20   initial duties done?

21           MR. GERSHBAUM:  Objection to form,

22       mischaracterization.

23           You can answer.

24           THE WITNESS:  Beall's had a procedure for an

25       opening checklist that we had to walk up and down

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 49

1        each checklist and perform those list duties.

2    BY MR. JOHNSON:

3        Q    That was a checklist that was used specifically

4    by the manager who opened the store; right?

5        A    Actually a guest service person could walk the

6    checklist.  It's not a manager-only action.

7        Q    But it was something that a manager was expected

8    to do when they opened the store, correct, was to use that

9    list and walk the store?

10            MR. GERSHBAUM:  Objection to form.

11            You can answer.

12            THE WITNESS:  They had the ability to use the

13        checklist or a guest service person could use it.

14        It wasn't a direct action that the manager had to

15        do the checklist every morning.  A guest service

16        person could do the checklist every morning.

17    BY MR. JOHNSON:

18        Q    As a manager, you could walk the store without

19    that checklist; right?

20            MR. GERSHBAUM:  Objection to form.

21            You can answer?

22            THE WITNESS:  Correct.

23    BY MR. JOHNSON:

24        Q    And you knew generally what was on it; right?

25        A    Yes.

Page 50

1      Q    And it would be things like check the condition
2   of the dressing rooms; right?
3      A    That could be one of the things.  I really don't
4   know without looking at the checklist.
5      Q    Okay.  So when you walked the store in the
6   morning as the opening manager and did that first tour,
7   what types of things were you looking for?
8      A    I would look for clothes on the ground,
9   merchandise in the bathrooms, if -- I mean, it's been a
10  while, I don't remember.  There was like 15 or 30 things
11  you had to check.  But shoes that were on the ground, the
12  cashier stations, if they were clean.
13     Q    Okay.  And so would you go take that first tour
14  and make a mental note of all the things that needed to be
15  done?
16          MR. GERSHBAUM:  Objection to form.
17          You can answer.
18          THE WITNESS:  Yeah.
19  BY MR. JOHNSON:
20     Q    And then what would you do after completing that
21  tour?
22     A    I would go, if there was clothes on the ground,
23  I would pick it up in this department.  If there was carts
24  outside, I would go and retrieve them.  If there was a
25  dirty bathroom, toilet paper on the ground, any kind of

Page 51

1    stains, I would clean them.  So I would go around and

2    correct the checklist mishaps.

3         Q    Would you ever delegate any of those duties to

4    sales associates?

5         A    Well, when the sales associates knew they had to

6    be in the shoe department, and they would be in the shoe

7    department and looking at a shoe that was on the ground,

8    it would be part of the routine you picked up shoes that

9    were in the department.  When you were in women's

10   clothing, you'd go around as a routine, pick up clothes

11   that were on the ground, fold them and put them on the

12   table.

13        Q    So their routine should include doing these

14   things anyway; right?

15        A    Correct.

16        Q    And if you saw for whatever reason that they

17   were either distracted or they weren't paying attention to

18   that normal routine and there were clothes on the ground,

19   would you tell them "Hey, would you please take care of

20   that for me"?

21        A    Yes.

22        Q    Okay.  And if you were tied up trying to make

23   sure, let's say you were resolving a problem at a cash

24   register but you knew from your mental checklist that

25   there were carts out in the parking lot that needed to be

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 52

1    brought in, would you ask somebody "Can you go get those

2    carts in from the parking lot for me"?

3             MR. GERSHBAUM:  Objection to form.

4             You can answer.

5             THE WITNESS:  It was rare that we had to get

6         an associate in the morning to direct customers

7         out there because it was slow in the morning.  So

8         I could take care of the whole checklist.

9    BY MR. JOHNSON:

10        Q    How many people typically started work with you

11   in the mornings if you were the opening manager?

12        A    I'm not a hundred percent sure, but 15 to 30

13   employees.  I really don't know, remember.

14        Q    Okay.  And how big was the store overall in

15   terms of either square footage or sales, whatever you can

16   remember?

17        A    Oh, I can't remember either, the square footage

18   or the store size.

19        Q    All right.  Was it considered to be a pretty

20   busy store?

21        A    Yes.

22        Q    Do you know how many total employees were on the

23   payroll at the store?

24        A    Roughly, possibly 30 to a hundred, depending on

25   the year, time of year.

Page 53

1      Q    More during the holidays I take it?

2      A    Yeah, seasonal.

3      Q    You mentioned you had the kids department;

4  right?

5      A    That was one of the areas my store manager gave

6  me, yes.

7      Q    Okay.  How many sales associates were assigned

8  to the kids department?

9      A    I believe one or two, possibly three.

10     Q    Is that at any given time while the store was

11  open or is that the total number of sales associates

12  assigned to the kids department on the payroll?

13     A    On the payroll.

14     Q    So one or two were on the payroll?

15     A    One to three.

16     Q    One to three.

17          So was there generally always a sales associate

18  assigned to work kids when the store was open?

19     A    Commonly.

20     Q    How about shoes?  How many associates were on

21  the payroll that worked in shoes?

22     A    Two to five on the payroll.

23     Q    And then how many associates were assigned to

24  work in the home department?

25     A    Two to five.

Page 54

1      Q    This is something I probably should clear up.  I

2  know you started in May of 2011.  How long did you work

3  with Beall's?

4      A    November 2013.  But check the resume.

5      Q    Okay.  I think what I'd like to do today is to

6  focus on, most of these questions on your last year of

7  employment.  If there's ever a difference between how

8  things were early in your employment compared to the end

9  of your employment, would you tell me that?

10     A    Sure.

11     Q    Otherwise, you know, we'll just assume that

12  these are answers that would be true, regardless of when

13  you were in your employment, this took place.  Is that

14  fair?

15     A    Are you asking me if it was consistent from day

16  one to day --

17     Q    Yeah.  Because if things changed over time, I'd

18  like you to let me know.  For example, say "When I

19  started, it was this way, when it ended, it was that way."

20  Can you do that for me?

21          MR. GERSHBAUM:  I'm going to object.

22          You can try to your ability.  I guess it's

23      hard to keep that in mind, but --

24  BY MR. JOHNSON:

25     Q    All I'm asking is if you remember a distinction,

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 55

1    will you identify that for me?

2         A    I will.

3         Q    Otherwise we're just generally going to focus on

4    the year 2013.

5         A    So we're only focusing on the last year of my

6    employment.

7         Q    Let's focus on that because that's the part

8    that's relevant for terms of this case.

9         A    Why is that?

10        Q    Because that's when the statute of limitations

11   applies.

12        A    Gotcha.

13        Q    Okay.  So that will make it easier on us.  But

14   if you need to tell me that "Hey, we changed and in 2013

15   we were doing things differently, we used to do it this

16   way, now we did it this way," that's fine.  Please tell me

17   that.  Okay?

18        A    Sure.

19        Q    All right.  Now, how many days a week did you

20   typically work as an area manager?

21        A    Five to five and a half days a week.

22        Q    Did you have a set schedule or did those days

23   vary?

24        A    It varied, but it was more common to have a set

25   schedule.

Page 56

1    Q    And who would typically make the schedule?

2    A    Alyssa.  If we're talking in 2013, then Alyssa.

3    Q    Okay.  Because you transferred from store 66 to

4    store 23 in January of 2013; right?

5    A    I'm not a hundred percent on the month, but if

6    it's January, if that's on the paper, then yes.

7    Q    I have it down as being about January 13th.

8    A    Okay.

9    Q    So at that store it would have been Alyssa who

10   was your store manager?

11   A    I believe her last name is Atkinson.

12   Q    Okay, that's right.

13   A    Yeah.

14   Q    And which store was that?  That was store 23?

15   A    Correct.

16   Q    That's Port St. Lucie?

17   A    Yes.

18   Q    So at Port St. Lucie, are the numbers you just

19   gave me about the same in terms of the numbers that you

20   had on the payroll or did you have different departments

21   that you were assigned at Port St. Lucie?

22          MR. GERSHBAUM:  Objection.

23          You can answer.

24   BY MR. JOHNSON:

25   Q    That's a bad question.  Let's limit it to the

 1    second half.  At Port St. Lucie, what departments were you

 2    assigned?

 3         A    I believe I had the home, the men's, shoes, and

 4    possibly kids department.

 5         Q    Why did you transfer from 66 to 23?

 6         A    It was not my decision.

 7         Q    They just needed you at 23?

 8         A    As far as I knew.

 9         Q    So when you got to 23, had you worked with

10    Alyssa Atkinson before?

11         A    I interviewed with her, possibly went to her

12    store to do some training.  I'm not a hundred percent

13    sure.  But I definitely knew her.

14         Q    Okay.  Did you have a good relationship with

15    her?

16         A    I believe I did.

17         Q    Would the opening routine have been the same for

18    store 23 as what you described at store 66?

19         A    Following procedures and protocol, yes.

20         Q    And everything else you described in the first

21    part of this deposition?

22         A    Yes.

23         Q    Okay.  Did store 23 also use the red book?

24         A    Yes.

25         Q    Did it use it in the same way as what you

Page 58

1    described?

2        A    Yes.

3        Q    Okay.  Of what we've talked about so far, are

4    there any things that were different at store 23 than at

5    store 66?

6        A    Not really.  I mean, it was a different manager,

7    different employees.  But it was the same handbook, it was

8    the same procedure.  It was Beall's, it was corporate.

9        Q    Okay.  So at Port St. Lucie in store 23, how

10   many employees were on the payroll in the home department?

11       A    One to three.

12       Q    And how many in the men's department?

13       A    One to four.

14       Q    How many in shoes?

15       A    One to four.

16       Q    And how many in kids?

17       A    One to four.

18       Q    How many other area managers were there at store

19   23?

20       A    When I was there?

21       Q    Yes.

22       A    There was some turnover.  So roughly, there

23   could have been two to five area managers.  But not all at

24   one point.

25       Q    Okay.  Did Nicole Orna work as one of those area

Page 59

1    managers?

2         A    I'm not a hundred percent -- I know there was a

3    Nicole as the operational manager, but I'm not sure if

4    that's the same person I'm thinking of.  We called her

5    Nicki.  I don't know if that's Nicole or not.

6         Q    Okay.  How about a Jennifer Miller?

7         A    Yes.

8         Q    How about Trish Cooper?

9         A    Yes.

10        Q    Both of those were area managers?

11        A    Correct.

12        Q    Did the store have an operations manager the

13   entire time that you were there?

14        A    I'm not sure if that was her title when I

15   started, but I believe that Nicki was the operational

16   manager when I left.

17        Q    Do you remember there being an operations

18   manager before her?

19        A    When I first started there, I wasn't aware of

20   any previous area managers, operational managers.  It

21   wasn't my store, so I don't know.

22        Q    And was there also a merchandise manager?

23        A    Well, merchandise managers -- I'm thinking of

24   handlers, never mind.  I don't know.  I don't recall.

25        Q    Does Nichole Tuff ring a bell?

Page 60

1        A     That's her name, yeah.

2        Q     That was the merchandise manager?

3        A     Well, I'm not sure if she was merchandise or

4    operational.

5        Q     That's Nicki.

6        A     That's Nicki.

7        Q     So Nicole might have been someone else.

8        A     Yeah, I'm not a hundred percent.  It doesn't

9    ring a bell.

10       Q     All right.  So did Alyssa Atkinson make the

11   management schedule?

12       A     I believe it was Alyssa and Nicki, but I never

13   saw who actually wrote the schedule.  It could have been

14   both.

15       Q     All right.  Did the store use what's called a

16   manager on duty rotation?

17       A     I'm not sure the definition of that.  If it's,

18   are you talking about the manager on duty for that

19   specific day?

20       Q     Yes.

21       A     They did have a manager on duty.

22       Q     So there was always a manager on duty?

23       A     Yes.

24       Q     Designated as the MOD or whatever the

25   appropriate acronym was?

Page 61

1        A     Yes.

2        Q     So if you were opening, would you be the MOD

3    because you were the opening manager for that first few

4    hours of the day?

5        A     If I was the only manager at the store, then

6    yes, I would be the manager on duty.

7        Q     And then when other managers arrived, would they

8    then take a turn in the MOD rotation?

9        A     It depends on the actual scheduling of the MOD

10   by the store manager.

11       Q     Okay.  Did the store manager, from what you saw,

12   typically try to balance the MOD assignments among the

13   different area managers?

14              MR. GERSHBAUM:  Objection, form.

15              You can answer.

16              THE WITNESS:  It was common for her to mix it

17       up.

18   BY MR. JOHNSON:

19       Q     Okay.  And if there was only one manager in the

20   store for the last few hours of the day, would that store

21   manager be known as the closing manager?

22       A     If that was the only manager in the building,

23   then yes, that would be the closing manager.

24       Q     And would they be the MOD during the closing

25   period there?

Page 62

1      A    If that was the only manager, then yes, that
2  would be the closing manager.
3      Q    And if there were multiple managers in the store
4  at a given time, would one of those managers be given MOD
5  responsibility by that daily rotation?
6      A    By the store manager, yes.  If there were more
7  than two, one of them would be.
8      Q    And that rotation would switch responsibilities
9  during the day to try to balance the load; right?
10     A    Yes.
11     Q    And that would allow you to go have lunch as a
12  manager?
13          MR. GERSHBAUM:  Objection to form.
14          You can answer.
15          THE WITNESS:  Well, everyone was assigned to
16      lunch.
17  BY MR. JOHNSON:
18     Q    Okay.  Did you have a typical time that you were
19  assigned to take lunch?
20     A    No.
21     Q    Would that just depend on how you were scheduled
22  for the day?
23     A    Well, the morning time, you're not going to take
24  a lunch from four to five if you're leaving at five to
25  six.

Page 63

1       Q     Sure.

2       A     So preferably between eleven and 2:00, in

3   between that window you were supposed to take lunch.

4       Q     Did you typically bring your own lunch or did

5   you buy lunch?

6       A     Typically brought.

7       Q     Okay.  What kind of things would you bring?

8       A     Pizza, meatloaf, chicken, steak.

9       Q     Okay.  And was there a refrigerator at the store

10  that you could store it in?

11      A     Yes.

12      Q     And would you eat it in the breakroom?

13      A     Yes.

14      Q     Was the schedule set up so that managers were

15  expected to take a certain amount of time for their lunch

16  and then they would go back into the MOD rotation?

17      A     Well, just going back to the last question, I

18  had lunch in the breakroom and in the manager's office.

19      Q     Okay.  So you might take it in different places

20  depending.

21      A     Yes.

22            What was the next question?

23      Q     And you would not be the manager on duty during

24  your lunch period; right?

25      A     I would inform the other managers I would go to

Page 64

1    lunch.  So that would take away that responsibility as the

2    manager on duty.

3         Q    I was just trying to figure out if the MOD

4    rotation sort of built that into the system.  So you would

5    finish one of your rotations as MOD, you would then have a

6    couple of hours when you were not MOD and you could work

7    your lunch into that time frame.

8         A    Well, my lunch periods typically didn't last for

9    an hour.  It was, if anything, from 15 to possibly 30

10   minutes for my lunch breaks.  And at that time, if there

11   was a call for the MOD, I would stop eating, go back on

12   the floor, and either go into cashiering, help with

13   go-backs, help with the online orders.  If there was an

14   accident, I would stop eating.  So to say I had an hour

15   lunch is definitely not true.

16        Q    Well, you typically wouldn't take lunch when you

17   were on MOD rotation, right, when you were in the middle

18   of an MOD period?

19        A    Well, you're asking if I never took lunch if I

20   was the MOD?

21        Q    No.  My understanding of MOD is that if you're

22   scheduled during a given day -- let's say you're the

23   opening manager.  You come in, you're MOD for the first

24   several hours.  At, let's say, 12:00, another manager

25   arrives.  That manager typically becomes MOD for the next

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 65

1    two or three hours.

2        A    I get what you're saying.

3        Q    And you have some time there where you can take

4    lunch without having to worry about the MOD duties.  Is

5    that accurate?

6        A    Commonly you would give up responsibility as the

7    MOD if a closing manager, that would be the closing

8    manager or MOD.  Typically if you're the opening, you have

9    it for the entire shift.  But it's not set in stone that

10   if you have a closer manager, that person takes over.

11       Q    Okay.  Is it possible that it would bounce back

12   and forth to you twice in one day, that you might start as

13   MOD and then you might have a period that you were off and

14   then you would have MOD once more before you went home for

15   the day?

16            MR. GERSHBAUM:  Objection to form.

17            You can answer.

18            THE WITNESS:  Yes.

19   BY MR. JOHNSON:

20       Q    Okay.  Did you ever leave the store to go to

21   lunch?

22       A    Yes.  Rarely.

23       Q    Where would you go?

24       A    There was a Denny's and a Checkers in the plaza.

25   I would go there sometimes.

Page 66

1       Q     Would you walk or would you have to drive?

2       A     Walk.

3       Q     Did you ever meet anyone for lunch?

4       A     No.

5       Q     Did you ever have appointments that you had to

6  take care of during your lunch period?

7       A     No.

8       Q     Did you ever go to the doctor during the

9  workday?

10      A     No.

11      Q     Did you ever have any other responsibilities

12  that you had to take care of?  Paying a traffic ticket,

13  anything like that?

14      A     Taking out the dog, this and that?  No.

15      Q     So at least during 2013, once you went to work,

16  you would remain at work until the end of your shift and

17  not leave unless you were going down to the Denny's or the

18  Checkers or somewhere within walking distance for lunch.

19  Is that accurate?

20            MR. GERSHBAUM:  Objection to form.

21            You can answer.

22            THE WITNESS:  To the best of my memory, I

23        would not leave the store unless I went rarely to

24        the Denny's or Checkers.

25  BY MR. JOHNSON:

Page 67

1        Q    Okay.  So if you were the closing manager, would

2    you describe for me what the closing duties were.

3        A    So you would come in, look at the red book, see

4    if there was any accidents, any notes or any verbal

5    communication from the other managers.  You would look at

6    the credit cards and the emails to see what the numbers

7    were actually at.

8             Then you would start walking the store and help

9    with go-backs, jump on a register, help with the online

10   orders.  And I would go in the back and take out items

11   from boxes, put them on the shelves in the back.  I would

12   put out items from the back room onto the floor, and

13   continue the process.

14       Q    Was there a set of duties that had to be

15   accomplished before the store closed for the night?

16       A    Yes, there was the closing checklist.

17       Q    What types of things were on the closing

18   checklist?

19       A    Make sure merchandise was off the ground, make

20   sure the bathrooms were clean, there was no empty boxes in

21   the bathrooms.  Make sure the registers were clean.  No

22   carts outside.  And there was a couple other things, but I

23   can't remember.

24       Q    Was there vacuuming and things like that?

25       A    No, that was done in the morning.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

 1        Q     Okay.

 2        A     But in the closing routine, too, I mean, there

 3   was the cash management as well.

 4        Q     So you had to get the registers entered and all

 5   the cash back into the cash room?

 6        A     Well, the guest service people have the ability

 7   to remove all the registers from the tills, bring them in

 8   the back with a push cart unsupervised, into the cash

 9   office, count and balance the registers, and then put

10   those items in the bank.  And they could input the actual

11   dollar amounts in the computers in the cash office.

12        Q     As a closing manager, is that something you

13   would check to make sure they did appropriately?

14        A     It was procedure that we would check over the

15   paperwork, but I did not have to double count the

16   registers after they count them.

17        Q     Okay.  Would it generally be your responsibility

18   to make sure that they had properly emptied the tills out

19   of all the registers and there wasn't cash sitting in the

20   registers somewhere?

21             MR. GERSHBAUM:  Objection to form.

22             You can answer.

23             THE WITNESS:  A part of the checklist that

24        I'm thinking of is that you had to make sure all

25        the register doors were open.  So if one was

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 69

1        closed, you had to make sure it was closed and

2        there was no money in the till.  But any associate

3        could walk by, see the register closed, it was

4        still active on the computer, and let us know.

5    BY MR. JOHNSON:

6        Q    Sure.  But if money was left in a drawer

7    overnight, is that something that a closing manager would

8    expect to receive counseling on from a store manager?

9        A    Because of procedures, doing the checklist of

10   seeing all the registers with the dollar amounts listed,

11   there wasn't that possibility of having a register that I

12   can recall.

13       Q    Okay.  But that's because people had

14   responsibility to go look for it and make sure it wasn't

15   still there; right?

16            MR. GERSHBAUM:  Objection to form, calls for

17       speculation.

18            You can answer.

19            THE WITNESS:  Well, there was paperwork that

20       would show every register from one to five.  If

21       there was an empty spot on four, we would know

22       that four is missing.  So again, there wasn't

23       responsibility for anyone, it was the procedure,

24       the checklist showed that register was stuck.

25   BY MR. JOHNSON:

Page 70

1      Q    As a closing manager, was it your job to make

2   sure that procedure was followed?

3      A    That the registers were in the safe, yes.

4      Q    Okay.

5      A    Or the cash tills.

6      Q    How long before the store actually closed its

7   doors would you start these closing procedures?

8      A    Well, the registers being, the cash tills being

9   taken out of the registers happened throughout the day.

10     Q    Okay.

11     A    But the closing procedures, doing the checklist,

12  it could happen 15 minutes before closing to an hour, hour

13  and a half after closing.

14     Q    Okay.  Did the closing manager generally try to

15  get those duties under way to the extent possible before

16  the store actually closed so that that way you wouldn't

17  have to spend a lot of time after the store actually

18  closed in doing those duties?

19     A    It could, you could actually do that before the

20  store actually closed.

21     Q    Okay.  And certainly once the store closed, the

22  associates would typically be anxious to get out of there

23  as soon as possible; right?

24     A    Not at all.  They love it there.

25     Q    Wanted to stay all hours of the night?

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 71

1       A     Exactly.

2       Q     I sense a little sarcasm in that.

3       A     A little bit.

4       Q     So what were the hours of the store during 2013

5    that you recall?

6       A     That I recall, the morning shift was from seven

7    to five.  And again, this is because seasonal, I'm not a

8    hundred percent sure like what those hours were during

9    like Memorial Day, Valentine's, back to school.

10      Q     Sure.

11      A     So general seven to five.  And the closing was

12   from twelve to nine.  But on a Sunday, they had a

13   different morning opening and a different closing for

14   Sunday.

15      Q     Okay.  When did the store itself open its doors

16   for business typically?

17      A     I believe it's nine a.m., or eight a.m. I'm not

18   a hundred percent sure.  I haven't been to a Beall's in a

19   while.

20      Q     Okay.  So typically nine to nine during the

21   weekday?

22      A     I believe so, nine to nine.

23      Q     Different on Sundays then?

24      A     Yes.  I believe that's from ten to eight.  But

25   it might have changed now, I'm not sure.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 72

1       Q     All right.  And there might be variations in

2    that for holidays or things like that.

3       A     Exactly.  We were 24 hours at one point when I

4    worked there for Christmas.  They were open until eleven,

5    twelve, 1:00 at some points.

6       Q     Okay.

7       A     And open early for customers that were Beall's

8    reward customers.  So the hours were very scattered

9    throughout the year.

10      Q     But that was typically during December around

11   the Christmas holidays when it was open 24 hours?

12      A     No, it was when whatever seasonal advertising

13   was going on, if they chose to extend the hours they would

14   do that.  But it's all based on their promotions.

15      Q     Can you remember any specific times when the

16   store was open 24 hours during 2013?

17      A     I don't remember if it was during Black Friday

18   or Christmastime, but it was in that, those couple months.

19      Q     And you left by November of 2013; right?

20      A     It could have been before that.  But I know I

21   worked there when there was a 24-hour shift.

22      Q     Okay.  I have your resignation as being about

23   November 30th of '13.  Does that sound right?

24      A     I'm not a hundred percent sure.

25      Q     All right.  So you would typically be scheduled

Page 73

1    either five or five and a half shifts per week?

2         A    Typically.

3         Q    On what occasions would you be scheduled for a

4    half shift?

5         A    Well, I mentioned the half in regards to if they

6    had a move that they were trying to complete, if they were

7    following an adjacency from Beall's that they had to

8    completely augment the floor, that I would come in, help

9    them in any way I could.  So I would volunteer my time, my

10   hours, to come in and help.

11        Q    Okay.  But that wasn't a typical weekly thing;

12   right?  That was just on rare occasions when that was

13   needed?

14        A    Well, the adjacencies were, I wouldn't say

15   random, but if there was something to move or if there was

16   a new red book direction, if the district manager, the

17   regional, the president, walked in and said they wanted

18   something different, it could be that day, the next day.

19        Q    I'm trying to get an estimate of how often that

20   happened.  Is that three to four times a year, is that

21   more?

22        A    Like I said, a rough, rough estimate, it could

23   be -- let me think.  At least six to twelve times a

24   quarter.  I'm trying to think the adjacencies that we had.

25   I would say six to twelve times a quarter, and then spread

Page 74

1   that out throughout the year.

2       Q    Well, there's thirteen weeks in a quarter;

3   right?

4       A    You tell me.  I'm not --

5       Q    Okay.  So I'm trying to figure out during an

6   average quarter.  Let's assume there's thirteen weeks.

7   How often are you going to be working five and a half days

8   as opposed to five days during those weeks?

9       A    Okay, I got what you're saying.  If it was a big

10  enough move, it would be -- it would be rare that I would

11  come in for the half day.  But possibly three times.

12      Q    Okay.  As manager on duty -- I'm sorry, I'm not

13  sure I'm done with closing.  Let's make sure.  So at the

14  end of performing all these closing duties, did you have

15  the responsibility to lock the store?

16      A    Yes.

17           MR. GERSHBAUM:  Objection to form.

18           You can answer.

19           THE WITNESS:  Yes.

20  BY MR. JOHNSON:

21      Q    And did you have to arm a code, arm the alarm

22  system using a specific code?

23      A    Yes.

24      Q    And lock the outside gate?

25      A    Yes.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 75

1       Q    And was that the last thing that was done before

2   leaving the store, was to arm the alarm system?

3       A    Yes.

4       Q    So there wouldn't be any other work performed

5   after the alarm system was armed; correct?

6       A    Correct.

7       Q    Was it your job to make sure that the safe was

8   locked up at the end of the night if you were the closing

9   manager?

10      A    Yes.

11      Q    Would you check to make sure the cash office was

12  closed and locked?

13      A    Well, the guest service person that closed the

14  registers had the ability to lock the safe and the cash

15  room door.  I would verify that it was locked.  But we

16  both had the ability to do both activities.

17      Q    Okay.  But would you double check each other?

18      A    Yes.

19      Q    Would you make sure the back door was locked

20  before leaving the store?

21      A    Yes.  And the locks on the receiving doors.

22      Q    Okay.  Were there special keys or codes for

23  those locks?

24      A    Yes.

25      Q    And where were those kept?

Page 76

1       A     I believe the back doors were a part of the

2   management keys.  The keys for the rolling doors, I'm not

3   sure if that was an individual key.  I think it was.

4       Q     Was there a lock box in the back you would use

5   to get that key out of?

6       A     Yes.

7       Q     And the manager was the one who had access to

8   that, the store manager or the area managers?

9       A     Yes.

10      Q     Not the sales associates, though; right?

11      A     Correct.  But the box was typically left open.

12      Q     The lock box?

13      A     Yes.

14      Q     So that anybody could go in there and get the

15  back door key out?

16      A     Yes.

17      Q     While you were supervising the store, that was

18  happening?

19      A     Well, myself, the other area managers and the

20  store manager.

21      Q     That's not the way it's supposed to work; is it?

22            MR. GERSHBAUM:  Objection to form.

23            You can answer.

24            THE WITNESS:  According to policy, no.

25  BY MR. JOHNSON:

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 77

1        Q     Okay.  That was just for convenience?

2        A     Yes.

3        Q     All right.  But typically speaking, let's say

4   when a truck came and you needed to open the back

5   receiving doors, it would be the manager's job to go get

6   the key out of the lock box and open those back doors so

7   the truck could be unloaded?

8        A     Well, this is a while ago, so I'm trying to

9   remember.  But if the store manager came in and she opened

10  the box, the back room associate would have the ability to

11  grab the key and open the doors for the drivers.

12       Q     But the expectation would be that the key would

13  then be returned to the box and locked up again?

14       A     Correct.

15       Q     All right.  Did you ever get involved in

16  unloading the truck?

17       A     Yes.

18       Q     How often would the truck come to the Port St.

19  Lucie store?

20       A     Depending on the time of year, the promotions,

21  it could be one time a week, it could be two to three

22  times a week.

23       Q     Was there a typical time of day when it

24  typically arrived?

25       A     It was really at the driver's discretion, but

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 78

1    the morning was the best time for it to come before

2    opening.

3        Q    Did it have, would the trucks that visited your

4    store typically have other stops to make once the goods

5    were unloaded from the truck that went to your store?

6              MR. GERSHBAUM:  Objection to form.

7              You can answer.

8              THE WITNESS:  Yes.

9    BY MR. JOHNSON:

10       Q    When the truck arrived, would the manager on

11   duty, or if there was more than one manager -- let me

12   rephrase it, it's getting way too complicated.  Would

13   there always be a manager out supervising the unloading of

14   the truck?

15             MR. GERSHBAUM:  Objection to form.

16             You can answer.

17             THE WITNESS:  There would be a manager or

18        back room associate supervisor.

19   BY MR. JOHNSON:

20       Q    If you were there and a truck came to the store,

21   was it your general practice to always try to be out back

22   observing and/or participating in the unloading of the

23   truck?

24       A    If a truck was there, I was always in the back

25   unloading the truck.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 79

```
 1       Q    Okay.  Were you trained by Beall's that a
 2  manager also needed to supervise unloading of the truck?
 3       A    I don't recall if it was in the procedures in
 4  the handbook if a manager had to be in the back.  So I'm
 5  not sure.
 6       Q    Okay.  If you did it, was there a particular
 7  reason that you went to unload the truck?
 8       A    We all worked as a team to unload the truck as
 9  fast as possible because the truck had other locations it
10  had to go to.
11       Q    When you were unloading the truck, would it also
12  be your responsibility to make sure that all of the items
13  that came off the truck went actually into the store?
14       A    No, not my responsibility.  We were all
15  responsible for getting our merchandise from our location
16  off the truck and either putting it on the shelves in the
17  back room or on the floor.
18       Q    Would it be your responsibility to prevent any
19  loss or shrinkage that might occur during the unloading
20  process?
21       A    It would be all our responsibility to ensure
22  there was no shrink from our box.
23       Q    As a store manager, would you have greater
24  responsibility for observing that than the average sales
25  associate?
```

Page 80

1              MR. GERSHBAUM:  Objection to form.

2              You can answer.

3              THE WITNESS:  I think you called me the store

4       manager.

5    BY MR. JOHNSON:

6       Q    I'm sorry, area manager.

7       A    What was your question again?

8       Q    Whoever the manager on duty was or whichever

9    manager that was out there unloading, that person would be

10   expected by Beall's to be more observant of possible loss

11   prevention issues than the average sales associate; right?

12             MR. GERSHBAUM:  Objection.

13             THE WITNESS:  Not correct.  If everyone was

14       opening a box and a box went into the shoe

15       department, if a box went into the home goods

16       department, they opened the box, they would see

17       the merchandise empty in the box, that particular

18       employee would make that, no.  But there was no

19       additional steps I took to ensure --

20   BY MR. JOHNSON:

21       Q    You didn't have to go around and check all the

22   boxes.

23       A    No.

24       Q    But let's say one of the things Beall's wants to

25   prevent is it wants to prevent someone unloading the

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 81

1   truck, and as they unload a box, throwing that box to

2   their friend and their friend puts it in the friend's

3   trunk and drives off with it, and then that box is gone

4   forever.  Is that something you would try to prevent if

5   you were out there as a store manager helping unload a

6   truck?

7             MR. GERSHBAUM:  Objection to form, calls for

8        speculation.

9             You can answer.

10            THE WITNESS:  It would really be everyone's

11       responsibility that that wouldn't take place.  But

12       it was an enclosed area where there wouldn't be

13       the opportunity, from my opinion, for that to

14       happen.

15   BY MR. JOHNSON:

16       Q    What was the physical environment where the

17   truck was unloaded?

18       A    The back of the store where the two rolling

19   doors were.

20       Q    Is there a loading bay?

21       A    Yes.

22       Q    Would the truck pull inside the doors to unload?

23       A    Yes.

24       Q    So the back of the truck would be backed in?

25       A    Yes.

Page 82

1      Q    Okay.  And those doors opened out to the parking

2   lot; right?

3      A    Not to the parking lot, to the back of the

4   location, the back of the store where all the businesses'

5   back entrance was.

6      Q    So the access road behind the shopping center?

7      A    Exactly, yes.

8      Q    And it would be important to make sure that

9   associates didn't hide a box right outside those doors;

10  correct?

11          MR. GERSHBAUM:  Objection to form.

12          You can answer.

13          THE WITNESS:  It would be important that that

14      didn't happen.

15  BY MR. JOHNSON:

16      Q    And that would be something as a store manager

17  you would be expected to make sure did not happen; right?

18      A    I'm not the store manager.

19      Q    I'm sorry, I keep calling you that.  Area

20  manager.

21      A    Yes.  It would be everyone's responsibility that

22  wouldn't happen.

23      Q    Do managers bear a responsibility for ensuring

24  that there is not shrinkage or loss in the stores?

25      A    From the handbook and the procedures I know from

Page 83

1    Beall's, it's everyone's responsibility that everyone

2    prevents theft and shrink from the store.

3        Q    Do managers have responsibility to supervise the

4    associates to make sure the associates are not stealing

5    from the store?

6        A    Can you reask the question?

7        Q    Sure.  As a manager, would it be your

8    responsibility to make sure that your associates were not

9    stealing from the store?

10            MR. GERSHBAUM:  Objection, asked and

11        answered.

12            You can answer again.

13            THE WITNESS:  There is loss prevention that

14        works at the store.  That is their primary duty to

15        ensure that the employees do not steal from the

16        store.

17   BY MR. JOHNSON:

18        Q    But they're not there at all times; right?

19        A    I never knew that.  We don't know their

20   schedule.  So they could be there every single day, I

21   don't know.

22        Q    Did you ever know what hours loss prevention

23   worked?

24        A    That wasn't privy to us, no.

25        Q    Okay.  Do you know how many loss prevention

Page 84

1    people were assigned to your store?

2        A    It could be typically one to three associates

3    from different locations to our own location.

4        Q    Would you ever communicate with them about what

5    your loss prevention duties were?

6        A    They gave meetings in the morning to let us know

7    what our team's responsibility was to prevent theft in the

8    store.

9        Q    Did they meet with everyone at the same time?

10       A    Yes.

11       Q    Did they ever meet with management separately?

12       A    Yes.

13       Q    Okay.  When they met with management separately,

14   what would the substance of your conversations be?

15            MR. GERSHBAUM:  Objection to form.

16            You can answer.

17            THE WITNESS:  Almost identical to the same

18       effect, but adding that it's not outside theft but

19       it's inside theft as well.  It would be maybe a

20       slight variation on the speech that they gave to

21       the whole team as far as the management team.

22   BY MR. JOHNSON:

23       Q    Because -- why would management need that

24   additional information?

25            MR. GERSHBAUM:  Objection to form, calls for

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 85

1        speculation.

2             You can answer.

3             THE WITNESS:  I'm not sure.  That's their

4        procedure, that's how they were told to train us.

5        I didn't have their handbook.

6   BY MR. JOHNSON:

7        Q    What additional information did they give you

8   that they weren't giving the sales associates?

9        A    I'm not a hundred percent sure, but it could

10  have been just possible employees that had, they had

11  suspicion of stealing in the store.

12       Q    And they would ask you to keep an eye on those

13  employees for any suspicious activity?

14            MR. GERSHBAUM:  Objection to form.

15            You can answer.

16            THE WITNESS:  They would let us be aware of

17        their suspicion.

18  BY MR. JOHNSON:

19       Q    Okay.  And after they made you aware of that,

20  would you take it upon yourself to pay closer attention to

21  those associates?

22       A    I wouldn't follow them or track them.  That's

23  what their job was.  My job was to walk the store, make

24  sure everything was off the ground, to clean the store,

25  and to make sure everything ran smoothly.  But I did not

Page 86

1    specifically follow an employee because LP told me to do

2    so.

3        Q    I'm not saying you followed them, I'm saying

4    would you exercise heightened awareness whenever you were

5    around that sales associate?

6             MR. GERSHBAUM:  Objection to form.

7             You can answer.

8             THE WITNESS:  Possibly.

9    BY MR. JOHNSON:

10       Q    I mean, I'm trying to imagine what's going on

11   here.  The LP guy comes to you and says "Hey, I think Joe

12   Blow might be stealing from the store, would you keep an

13   eye on him."  Is that the substance of what those

14   conversations were?

15            MR. GERSHBAUM:  Objection to form.

16            You can answer.

17            THE WITNESS:  Possibly, yes.

18   BY MR. JOHNSON:

19       Q    Okay.  And if they did that, would you actually

20   try to do your best to keep an eye on that person within

21   the amount it was possible?

22       A    Sure.

23       Q    Okay.  What other responsibilities did you have

24   as far as loss prevention?

25       A    Like I said, if we saw an empty package, there

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 87

1    was actually a folder at guest service that all the

2    associates had access to that we would write the

3    description of the item, the bar code, and then if it was

4    a large enough item or something very obvious, we would

5    call loss prevention's extension and let them know that

6    that item was in their little loss bucket.

7         Q    As a manager, do you have the ability to make an

8    apprehension on behalf of the store?

9         A    I was told that I could be an assistant to the

10   LP, that I could participate in the apprehension.

11        Q    Okay.  Could you do an apprehension on your own?

12        A    No.  Not to the best of my ability.  And I

13   wouldn't.

14        Q    Could the sales associates do apprehensions on

15   their own?

16        A    No.

17        Q    And how were they made aware of that?

18        A    It must be, I'm thinking it was in the handbook

19   or the procedures that they could not take it upon

20   themselves to restrain a customer based on their belief

21   that they're stealing.

22        Q    Did you ever participate in any training of

23   sales associate?

24        A    What kind of training?

25        Q    Orientation, initial training.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 88

1     A     Well, I directed them to the breakroom where I
2  put the videotapes.  I handed them papers from the store
3  manager on what the policies and procedures were.  In that
4  respect.
5     Q    Did you explain the policies and procedures to
6  them to the extent they had questions?
7     A    If they had questions, they could approach the
8  employees, the managers, the store manager.  But they
9  would have access to anyone to ask that.
10    Q    Did you ever explain the loss prevention
11 policies to any new associates?
12    A    If it was in the handbook, it was explained that
13 way.  But typically that was an LP directive for them to
14 take on that role.
15    Q    If LP was not in the store during the time the
16 associate was being trained and the associate came to you
17 with a question about the LP policy, would you answer that
18 question?
19    A    If I didn't know the answer to it, if it was
20 very specific and not in the handbook, I would tell them
21 to wait for the LP person to be present for them to get
22 the best direction.
23    Q    What if an associate came to you and said "Am I
24 allowed to stop people if I see somebody running out with
25 a bag?"

Page 89

1        A     I would go to our policy and procedure and see

2    if it was in the handbook.  If it wasn't, I would ask the

3    store manager if that was a possibility.

4        Q     So you would explain to that associate that

5    you're not allowed to do that?

6        A     I would hand them the handbook, we would look

7    through it.  If it wasn't in the handbook, I would go to

8    the store manager and figure out if that was the issue.

9        Q     But you knew they weren't allowed to do that;

10   right?

11       A     I'm not a hundred percent -- I haven't looked at

12   the handbook in over five or six years.  I really don't

13   remember what it said about stopping people.

14       Q     Do you remember LP making very clear to people

15   that only LP was supposed to make a stop or only the store

16   manager?

17       A     I'm sure they made it clear, but I'm not a

18   hundred percent sure if they ever directly said that.  I

19   don't remember.

20       Q     Would that have been part of your duty to

21   communicate and reinforce that responsibility to sales

22   associates?

23             MR. GERSHBAUM:  Objection.

24             You can answer.

25             THE WITNESS:  My responsibility was to direct

Page 90

1        any LP questions that they had to the LP

2        specialist.

3    BY MR. JOHNSON:

4        Q    Okay.  And in terms of LP, did you also have the

5    responsibility of trying to observe whether there were any

6    customers acting suspiciously on the sales floor?

7        A    Yeah.  I mean, if I saw in the middle of summer

8    that a guy had three jackets on and puffy pants, I would

9    definitely say that's a suspicion behavior.

10       Q    Okay.  Would you say "Hey, would you go give

11   that guy some extra customer service and just stay close

12   to him so he knows we're there"?

13       A    It's actually every employee's responsibility to

14   identify that if there was something and communicate

15   throughout the whole team that this person is in their

16   department, they need to keep an eye on them.

17       Q    Let's say you're the manager on duty and you're

18   walking the store and you see someone meeting that

19   description and the sales associate appears to be

20   oblivious to that.  Would you go over to that sales

21   associate and say "Hey, look at this guy, he's got way too

22   much clothing on, he looks suspicious, why don't you go

23   give him some extra customer service"?

24            MR. GERSHBAUM:  Objection, calls for

25       speculation.

Page 91

1           You can answer.

2           THE WITNESS:  I would first call LP and let

3      them know that that person was in the store.  If

4      LP gave me direction not to say anything to the

5      associates, I would follow their command.

6  BY MR. JOHNSON:

7      Q    But typically if LP wasn't there, would you

8  expect that you would either direct a sales associate to

9  go provide extra customer service or that you would go

10 provide extra customer service yourself?

11     A    If I felt comfortable having an associate

12 approach somebody that I didn't feel that was a direct

13 threat to them, I would let them know that there was a

14 person with a particular look that they should be aware

15 of.

16     Q    All right.  And that's based on your training;

17 right?  You knew what to look for?

18     A    From LP's meetings and their direction that they

19 gave to everyone, that's what I came to believe.

20     Q    And so you would exercise some judgment in terms

21 of whether you would ask somebody to go over there in that

22 you wouldn't ask them to go provide customer service to

23 someone who appeared dangerous; right?

24           MR. GERSHBAUM:  Objection to form.

25           You can answer.

Page 92

1              THE WITNESS:  I would not tell people to

2         approach somebody that looked dangerous.

3    BY MR. JOHNSON:

4         Q    Okay.  But if in your judgment the person didn't

5    look dangerous, then you might ask the associate to go

6    provide extra customer service?

7              MR. GERSHBAUM:  Objection, form.

8              You can answer.

9              THE WITNESS:  I would communicate that person

10        with LP.  And if LP wasn't present, I would let

11        the employee know that that person is present.

12        But if they feel comfortable giving customer

13        service, they can.  If not, I would provide it.  I

14        would never give a person direction to approach

15        somebody if they felt uncomfortable.

16   BY MR. JOHNSON:

17        Q    Sure.

18             Under Beall's system, did LP have the authority

19   to directly supervise employees, sales associates?

20             MR. GERSHBAUM:  Objection to form.

21             You can answer.

22             THE WITNESS:  I don't believe so, but I'm not

23        sure.

24   BY MR. JOHNSON:

25        Q    The sales associates did not report to the LP

Page 93

1    agents; right?

2        A    I don't believe so.

3        Q    Okay.  So if the LP agent needed to communicate

4    or needed to direct a sales associate to do something,

5    they typically had to work hand-in-hand with management

6    and get management to issue that direction?

7             MR. GERSHBAUM:  Objection to form.

8             If you know.

9             THE WITNESS:  I don't know exactly the

10           employee who went into the LP office, but at times

11           the LP agent would bring somebody in the office to

12           either use the camera system to help them track

13           somebody in the store without me knowing.

14   BY MR. JOHNSON:

15       Q    Okay.  So they might bring an employee in there?

16            MR. GERSHBAUM:  Objection to form.

17            You can answer.

18   BY MR. JOHNSON:

19       Q    Is that what you're telling me?

20       A    If there was an arrest to be made or an

21   apprehension by them that was a female customer and only

22   male managers were in the office, they directed the

23   employee to go into the office and sit with them until the

24   police came to the store.

25       Q    Okay.  So they might ask someone to serve as

Page 94

1    basically the witness to sit in the room and make sure

2    that nothing happened before the police got there.

3            MR. GERSHBAUM:  Objection to form.

4            You can answer.

5            THE WITNESS:  They would do in that

6        situation.  Or if they had somebody sit in the

7        office and track them on the camera system while

8        they were on the floor.  Those are two situations

9        I'm aware of that happened.

10   BY MR. JOHNSON:

11       Q    Other than that, are you aware of any instances

12   where LP had the authority to directly command a sales

13   associate to do something?

14           MR. GERSHBAUM:  Objection to form.

15           You can answer.

16           THE WITNESS:  Directly command, I would say

17       actively look for stolen merchandise in the store.

18   BY MR. JOHNSON:

19       Q    Okay.  Other than that, can you think of

20   anything?

21       A    Not off the top of my head.

22           MR. JOHNSON:  All right.  It's probably a

23       good time for another break.  It's noon right now.

24       What's your preference on lunch?  I'm anticipating

25       that we're going to be here a couple more hours.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 95

1        So we can do lunch now, we can wait and do it a

2        little bit later.  It's really up to you all.

3        Your call.  I don't know what time you ate

4        breakfast.

5             THE WITNESS:  I'm not hungry right now.  We

6        can go another hour.

7             MR. JOHNSON:  You want to do another hour and

8        take it at one?

9             THE WITNESS:  Sure.

10            MR. JOHNSON:  Let's take a five-minute break

11       then.

12            (Thereupon, there was a break from 11:58 a.m.

13       to 12:06 p.m.)

14   BY MR. JOHNSON:

15       Q    All right.  Are you ready to pick up again?

16       A    Let's do it.

17       Q    Okay.  So if you were closing and the store

18   closed at nine, how late would it typically be before you

19   actually left the store and armed the alarm system?

20       A    It would be rare that I left at 9:00.  But most

21   occasions it would be closer to ten, sometimes 11:00.

22       Q    Would the nights when it was 11:00 be typically

23   nights where either you had a big promotion going on or it

24   was a holiday or something like that so there was

25   excessive traffic?

Page 96

1      A     That, or if the store was short staffed from

2   customers, I mean from employees, where they couldn't keep

3   up with any of the recovery and we just had to work all

4   night until the go-backs were complete, online orders were

5   complete, the store was manageable for the next day.

6      Q     Okay.  So what would short staffed be in

7   context?  How many employees down is that?

8      A     Let's say there's eight departments.  If we only

9   had two cashiers and maybe one or two sales associates

10  when we were supposed to have ten or twelve, definitely

11  short staffed.

12     Q     Okay.  How many employees would you typically

13  expect to be there when you open for business on an

14  average day?

15     A     Hopefully all.  But typically you might have one

16  or two callouts.  Emergencies come up.

17     Q     What would the typical number of employees on

18  the schedule be on an average day?  If you had to go

19  through it and say one in shoes, two in kids, whatever,

20  how many would you typically have there?

21     A     I'm not sure entirely what the schedule looked

22  like because there was back room associates, men's,

23  janitors, so many different people, and whatever the

24  weekly schedule, however it was made, I don't have a

25  typical number for you.

Page 97

1       Q    Would there probably be 15 people there when you
2   opened?
3       A    Possibly.
4       Q    How many departments were there?
5       A    I mean, I could count them out.
6       Q    Sure.
7       A    Men's, women's, shoes, jewelry, misses
8   department or the juniors, young men's, kids department.
9   Home department if I didn't already say that.  Guest
10  service, the maintenance staff.  I know that's not a
11  department, but actual people there.
12      Q    That's fine.
13      A    And back room associates.  And depending on the
14  year, gift wrap.  And LP.
15      Q    So you mentioned a couple areas of the store
16  that I wanted to follow up on.  One was guest services.
17  Is that sort of considered the office?
18      A    Yeah.
19      Q    And those are people that would help people,
20  customers with, what, returns?  Gift wrapping?
21      A    It was interchangeable between the home
22  department and guest service.  They could do both jobs.
23  Anyone really could be stationed at guest service because
24  it would be gift wraps, returns, online orders.  When they
25  were completed, we put them back there and the guest

1    service prepped them before putting them in the back room.

2        Q    Okay.  Who were the maintenance people?

3        A    I'm not entirely sure what their names were, but

4    there was two men.

5        Q    Okay.  And did they just have duties in terms of

6    keeping the store clean, keeping the bathrooms functional?

7        A    They had their routine of mopping if they were

8    going to do that, cleaning the toilets, I think changing

9    the garbage bags outside.  That might have been a plaza

10   thing, but I'm not sure.

11       Q    Okay.  You mentioned back room associates.  How

12   many of those were on the payroll?

13       A    I don't know if they were categorized as back

14   room people or if they were just associates that worked in

15   the back room for that particular day.  So I don't think

16   there was a very specific back room team member.  I could

17   be wrong, but I'm not sure.

18       Q    Are those different than merchandise handlers?

19       A    Yes.

20       Q    Okay.  What's the difference?

21       A    An associate works on the floor, they fold the

22   clothes and they followed the direction of the merchandise

23   handlers, the adjacencies, the procedures.  The

24   merchandise handlers, they particularly work in the

25   morning.  They work on stock.  But they follow the same

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 99

1    adjacencies and follow the same protocols.

2        Q    Okay.

3        A    It's more of the schedule that dictates the

4    merchandise handlers.

5        Q    Sure.

6             Do the merchandise handlers typically report to

7    the merchandise manager?

8        A    They report to a number of people.

9        Q    Who do they report to?

10       A    The visual team, the merchandise manager, the

11   area managers and the store management team.

12       Q    And who do the back room associates typically

13   report to?

14       A    Depending on what the issue is, but there's not

15   really a back room manager.  So it could be the area

16   managers, the visuals, visual management team, and the

17   store managers.

18       Q    And are those typically associates that are

19   assigned to one of the normal departments but then they're

20   just, for that given day they work in the back room?  Is

21   that what you were trying to tell me earlier?

22       A    More or less, yeah.  More or less.

23       Q    All right.  So you said you had about four

24   departments assigned to you; right?

25       A    Depending on the store and -- store 23 --

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 100

1      Q     At store 23.

2      A     It could have been four departments.

3      Q     And does that mean that the other area manager

4    probably would have had four or five?

5      A     It could have been broken up as far as

6    operational manager even had a department.  The store

7    manager possibly had a department.  I just knew what my

8    four departments that were given to me were.

9      Q     Okay.  Do you know whether the other area

10   manager performed duties and had responsibilities that

11   were similar to yours?

12     A     Yes.

13     Q     Do they do more than what you did?

14     A     I would say we did our fair share.

15     Q     Okay.  So you both had about the same

16   assignments or responsibilities overall?

17     A     I could say yes.

18     Q     Well, do you say yes?  Or did that other person

19   have more?

20     A     Yes, we had the same amount.

21     Q     Okay.

22     A     And I said could say yes because depending on

23   the season, sometimes they had more chores, sometimes we'd

24   have more chores.

25     Q     Okay.  I think I understand now.

1          So as a manager on duty, I'd like to talk about

2    what additional responsibilities that meant compared to

3    what you did as an ordinary area manager.

4          So let's start with what you did as an area

5    manager during the day, okay.  What were your

6    responsibilities if you were not a manager on duty?

7          A    If I was not an area manager --

8          Q    If you're not a manager on duty.

9          A    Right, if I'm not a manager on duty, I would

10   walk the store.  I would fold clothes.  I'd walk into all

11   the departments, see if they need help with anything.  I

12   would go in the back room, work on merchandise that were

13   in all the departments.  I would cashier, do go-backs.  In

14   the morning time we had SOS orders and I would just grab

15   stacks and stacks of those orders and typically that would

16   take up half, if not more than half a day.

17         Q    Okay.  So there's a couple terms we need to

18   understand.  What are go-backs?

19         A    Go-backs are items that customers no longer

20   want, either they hung them at the go-back racks that are

21   at the fitting rooms, so items they don't want, or items

22   that they changed their mind at the registers that we had

23   to put back in the departments.

24         Q    So they have to be properly hung again and they

25   have to be sized --

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 102

1      A     Folded and colorized.

2      Q     And what's an SOS order?

3      A     Those are online orders placed by customers

4  either on the computers or inside the store.  And those

5  were sheets of papers that had the quantity and the color

6  of the item that we had to locate in our store based on

7  wherever they ordered it that we had to stock.  I had to

8  find the item, verify it was the correct size and color,

9  bring it back to the back room.  I would have to fold and

10  package the item, wrap the item sometimes if it was for a

11  baby gift or a Christmas gift, and I would weigh it, input

12  the order in the computer system, and create the label and

13  ship out the item.

14     Q     Where would you be doing that?

15     A     That was in a dedicated room in the back room.

16     Q     Who else worked in that room?

17     A     Everyone.

18     Q     So at any given time while you were back there,

19  would there be other people around you doing other things?

20     A     They would be doing the same thing.

21     Q     Doing the same thing.

22     A     Yeah.

23     Q     So it wasn't purely a management responsibility

24  to go pick or pull SOS orders.

25     A     No.

Page 103

1       Q     Everyone could do that.

2       A     Everyone.

3       Q     All right.  Was the store held to any particular

4    targets or goals in terms of how quickly they had to turn

5    around SOS orders?

6       A     There were time limits and restrictions that

7    they wanted them completed by.  And we had a UPS truck or

8    the mail truck that would pick up the items at certain

9    points throughout the day, that we had to make sure that

10   we got as many as possible.  And orders that had to be

11   completed that night and ready to be shipped in the

12   morning.

13      Q     Okay.  So these are all things you would do if

14   you are not the manager on duty; right?

15      A     That would be items I would do as the manager on

16   duty and not the manager on duty.

17      Q     Okay.  Are there things that you would only do

18   if you were the manager on duty, other duties?

19      A     I would collect emails and credit cards that

20   were on the registers and report them in the red book so

21   the closing manager would know what our number was.  But

22   typically it was the same exact thing.

23      Q     As manager on duty, did you have a greater area

24   that you were expected to cover?

25      A     Well, the manager on duty, it really was a

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 104

1    title, but you were working in all the departments,

2    cleaning, cashiering.  You were never in that store

3    walking around not doing anything.

4         Q    Okay.

5         A    You were approaching customers -- go ahead.

6         Q    Is it fair to say if you were the area manager,

7    you were responsible for your four departments, but if you

8    were the MOD, you were responsible for the entire front

9    end?

10             MR. GERSHBAUM:  Objection to the form.

11             You can answer.

12             THE WITNESS:  As the area manager, you're

13        given four departments by the store manager.  You

14        work on those departments with all the other

15        employees.  But I worked in the entire store as

16        the area manager putting out merchandise in every

17        location.

18   BY MR. JOHNSON:

19        Q    Okay.  But you would have specific

20   responsibility for the sales associates in your four

21   departments, right, at all times?

22        A    Because those departments were given to me by

23   the store manager, I worked on that merchandise alongside

24   everyone else's merchandise.

25        Q    And you had supervisory responsibility for the

Page 105

1    associates in those departments; right?

2        A    Well, we all worked together to move the

3    merchandise from the back room, take the items out of the

4    box and put them on the floor.

5        Q    Okay.  I'm trying to figure out if you're having

6    trouble understanding my question --

7        A    Sure.

8        Q    -- or if you're avoiding my question.  Did you

9    have supervisory responsibility for the associates in your

10   four departments?

11           MR. GERSHBAUM:  Objection to form, asked and

12       answered.

13           You can answer again.

14           THE WITNESS:  I guess as a supervisor role, I

15       would work with the employees in those departments

16       and move the merchandise in those areas.  But if

17       it was a supervisor action, I would just help them

18       put out the stock.

19   BY MR. JOHNSON:

20       Q    I still don't think you've necessarily answered

21   this question.  Do you think you had supervisory

22   responsibility for the associates in your four

23   departments?

24           MR. GERSHBAUM:  Objection to form, asked and

25       answered.

Page 106

1          You can answer again.

2          THE WITNESS:  Can you give me what, like

3     examples, of supervisory roles in those

4     departments were?

5  BY MR. JOHNSON:

6     Q    What do you understand supervisory

7  responsibility to be?

8     A    You have to give direction, give exact detailed

9  information on the employee on what to put the merchandise

10  onto the floor.

11     Q    Okay.  Is there anything else that you

12  understand to be supervisory responsibility?

13     A    While in that department, just making,

14  approaching the customer, asking them for help.  But as

15  far as supervising activities on the sales floor, it's

16  retail.  You put out merchandise, you approach customers.

17     Q    Did you control or direct or teach or counsel

18  the associates in your four departments?

19          MR. GERSHBAUM:  Objection to form.

20          You can answer.

21          THE WITNESS:  As far as coaching, if they had

22     trouble folding a shirt, I would walk up beside

23     them, I would fold the shirts with them, how to do

24     that.  But as far as disciplining -- if that was

25     part of your question?

1   BY MR. JOHNSON:

2        Q    Did you direct their work?

3        A    Direct their work?  No, we all knew what we were

4   doing.

5        Q    If they weren't doing it correctly, would you

6   direct them to do it correctly?

7             MR. GERSHBAUM:  Object to the form of the

8        question.

9             You can answer.

10            THE WITNESS:  I would say if they're not

11       doing it correctly, I would look at them.  If

12       they're putting different colors mixed in, I would

13       say "Hey, just make sure you separate the colors,"

14       if that's a direction.

15  BY MR. JOHNSON:

16       Q    If they didn't understand a Beall's policy,

17  would you help them find the correct policy and make sure

18  they understood it?

19            MR. GERSHBAUM:  Objection to form.

20            You can answer.

21            THE WITNESS:  If it's a policy as far as

22       dress code, I would show them the handbook and we

23       would go over the handbook.

24  BY MR. JOHNSON:

25       Q    Okay.  And you would make sure they complied

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 108

1   with that going forward?

2          MR. GERSHBAUM:  Objection to form.

3          You can answer.

4          THE WITNESS:  If they continued not to dress

5      appropriately, I would bring that to the store

6      manager.

7   BY MR. JOHNSON:

8      Q    Okay.  And tell the store manager you've

9   addressed this with that person and they continued to

10  violate it?

11         MR. GERSHBAUM:  Objection to form.

12         You can and.

13         THE WITNESS:  I would.

14  BY MR. JOHNSON:

15     Q    Okay.  And what would typically be done in that

16  case?

17     A    It was up to the store manager's discretion.

18     Q    All right.  And would you do other things that

19  involved you supervising or directing the work of your

20  associates?

21         MR. GERSHBAUM:  Objection to form, asked and

22      answered.

23         You can respond.

24         THE WITNESS:  Not necessarily.

25  BY MR. JOHNSON:

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 109

1      Q    Is that the only thing you can think of that you

2  did that involved supervising associates, what you've

3  described so far?

4      A    As far as making sure the back room was empty,

5  as far as making the SOS orders were empty, making sure

6  the cashiers were all lined up, making sure the go-backs

7  were done.

8      Q    You would do all those things?

9      A    Those are what everyone can do.

10     Q    But somebody has to check to make sure they are

11 done and has that responsibility for the team; right?

12          MR. GERSHBAUM:  Objection to form.

13          You can answer.

14          THE WITNESS:  I mean, it's more than likely

15      it's the store manager that's taking on that

16      responsibility.

17 BY MR. JOHNSON:

18     Q    The store manager is not there every hour that

19 the store's open, is she?

20     A    That is true.

21     Q    And so when you are the area manager, isn't the

22 store manager relying on you to make sure your area is

23 running correctly?

24          MR. GERSHBAUM:  Objection to form.

25          You can answer.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 110

1           THE WITNESS:  She's relying on me to follow

2       procedures and the layout of what Beall's wants to

3       be done every single day in the store.

4   BY MR. JOHNSON:

5       Q    Okay.  And she's also relying on you to make

6   sure your associates do that, too; right?

7           MR. GERSHBAUM:  Objection to form.

8           You can answer.

9           THE WITNESS:  She relies on me to make sure

10      that they follow the procedures and practice that

11      Beall's put in place.

12  BY MR. JOHNSON:

13      Q    Okay.  Is there anything else you can think of

14  that you did as an area manager that was supervisory in

15  nature?

16          MR. GERSHBAUM:  Objection, asked and

17      answered.

18          You can answer again.

19          THE WITNESS:  I'm sure it will come up, but

20      at this point, no.

21  BY MR. JOHNSON:

22      Q    Did you participate in assigning work to the

23  sales associates in terms of directing them what

24  specifically they should be working on at a given point in

25  the day?

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 111

1          MR. GERSHBAUM:  Objection to form.

2          You can answer.

3          THE WITNESS:  I mean, we typically came in,

4     we knew what we had to do.  If there was

5     merchandise in the back, we put it out.  It was

6     really just taking item A, putting in item B.

7     There wasn't really a ton of direction because it

8     was all based on the adjacencies that Beall's gave

9     us and the direction that the red book or Alyssa

10    gave us in her notes.

11 BY MR. JOHNSON:

12    Q    When you came in and started the day in your

13 department, let's say there was merchandise that needed to

14 go out to the sales floor from the back and you had two

15 people working in a given department, would you tell them

16 both to go back and do that and leave the sales floor

17 empty or would you say "Why don't you, person A, go back

18 and bring stuff out, and you, person B, stay out here and

19 work the floor"?

20          MR. GERSHBAUM:  Objection to form.

21          You can answer.

22 BY MR. JOHNSON:

23    Q    How would you handle that situation?

24    A    Because the schedule was already made and

25 dictated for the employees to do their job, there was

Page 112

1    notes left by the store manager or the operational manager

2    on which employee had to do which task.  I simply held the

3    paper with them, told them that these were the policies or

4    these were the items that they had to complete today.

5        Q    I thought you told me earlier that the daily

6    schedule did not involve specific assignments.  Is the

7    answer now changing?

8            MR. GERSHBAUM:  Objection, form.

9            You can answer.

10           THE WITNESS:  It wasn't on the actual

11       schedule, but there was notes left by the store

12       manager and the operational managers.

13   BY MR. JOHNSON:

14       Q    Or whoever made that daily schedule; right?

15           MR. GERSHBAUM:  Objection to form,

16       mischaracterization.

17           You can answer.

18           THE WITNESS:  Which is typically the store

19       manager or the operational manager.

20   BY MR. JOHNSON:

21       Q    But sometimes was an area manager; correct?

22           MR. GERSHBAUM:  Objection to form.

23           You can answer.

24           THE WITNESS:  No.

25   BY MR. JOHNSON:

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 113

1      Q    Okay.  You told me earlier that sometimes area

2  managers made that schedule.  Are you walking that back

3  now?

4           MR. GERSHBAUM:  Objection to form.

5           THE WITNESS:  I said that the schedules were

6      made by the store managers, not the tasks to be

7      given.

8  BY MR. JOHNSON:

9      Q    So area managers never made specific

10 assignments, is that your testimony?

11          MR. GERSHBAUM:  Objection to form.

12          You can answer.

13 BY MR. JOHNSON:

14     Q    Or never made notes and put them on the daily

15 schedule?

16          MR. GERSHBAUM:  Objection to form.

17          You can answer.

18          THE WITNESS:  The only notes that we could

19     make and would make is that there was stock in the

20     back, and all the departments and the next person,

21     manager, would look at that and then dictate that

22     to the next people on that list.

23 BY MR. JOHNSON:

24     Q    All right.  Let's assume you come in for the

25 morning and you see that there's stock in the back, but

Page 114

1   whoever the closing manager was or whoever wrote up that

2   daily schedule didn't leave any specific notes.  Was it

3   then your responsibility to direct who should go take care

4   of that stock?

5           MR. GERSHBAUM:  Objection to form.

6           You can answer.

7           THE WITNESS:  If it was in their department,

8       I didn't have to tell them to do it, they would go

9       in the back and make sure that their items were

10      taken out from the back.

11  BY MR. JOHNSON:

12      Q    But we're going back to the situation where you

13  were two employees.  Do you want both employees to go back

14  there and take it back and leave the department, the floor

15  uncovered?

16          MR. GERSHBAUM:  Objection to form, asked and

17      answered.

18          You can answer.

19          THE WITNESS:  It was really whatever worked

20      best.  If they worked together better putting out

21      the stock, they would work together.

22  BY MR. JOHNSON:

23      Q    If you saw both of them in the back and you saw

24  them leaving the department uncovered, would that be

25  perfectly okay with you or would you want to do something

Page 115

1    about that?

2            MR. GERSHBAUM:  Objection to form.

3            You can answer.

4            THE WITNESS:  It was never uncovered because

5        they're literally just grabbing the merchandise

6        and going into the front.  So the department was

7        never empty.

8    BY MR. JOHNSON:

9        Q    If you disagreed with how the employees had

10   chosen to split up the duties, would you direct them to

11   handle it differently?

12       A    No, because they already knew what they were

13   doing.  They were just putting out the merchandise.

14       Q    Okay.  So even if you're totally unhappy with

15   how they've chosen to handle this particular work

16   assignment, are you telling me you had no authority and no

17   power to say "No, I want you to do that differently"?

18           MR. GERSHBAUM:  Objection,

19       mischaracterization.

20           You can answer.

21           THE WITNESS:  Well, if they were merchandise

22       handlers and they knew what they were doing,

23       they'd been there for years, if it got the job

24       done, I'm not going to do anything to make them

25       stop putting out the merchandise.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

1    BY MR. JOHNSON:

2        Q    If you thought they were doing it wrong, did you

3    have the authority and the power to tell them to do it

4    differently?

5            MR. GERSHBAUM:  Objection to form, asked and

6        answered.

7            THE WITNESS:  I mean, the authority and the

8        power, if I chose to say not to do it, then --

9    BY MR. JOHNSON:

10       Q    You had that power; right?

11           MR. GERSHBAUM:  Objection, form.

12           You can answer.

13           THE WITNESS:  Yes.

14   BY MR. JOHNSON:

15       Q    And if you thought it was something that needed

16   to be changed, you would direct them to do it differently;

17   right?

18       A    Not necessarily.

19       Q    You would just let it go.

20       A    Well, it wasn't exactly their opinion on what

21   they wanted to be done.  It was the adjacencies, it was

22   the planograms.  They followed it by looking at the

23   pictures and putting the products on the paper.  It wasn't

24   my opinion that they were doing it wrong.  It was the

25   adjacencies and the planograms that they had to follow.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

1       Q       Okay.  Now you're changing it on me, okay,

2  because what we were talking about earlier was not

3  following the planogram.  What we were talking earlier was

4  about whether employees could just divide up the labor

5  however they wanted or whether you as the manager retained

6  some authority over who did what and when they did it.  So

7  did you retain that authority?

8       A       I really don't understand the question.

9       Q       Did you have authority to control what employees

10  did and when they did it that worked under you?

11       A       I controlled making sure that we all worked on

12  the adjacencies and the planograms with the merchandise in

13  the back.

14       Q       All right.  And so you would make sure everyone

15  was following those; right?

16               MR. GERSHBAUM:  Objection, form.

17               You can answer.

18               THE WITNESS:  Yes.  If it was in any

19       department, if there was a adjacency, if they were

20       putting out stock, we would both look at it,

21       everyone would look at it, and we would make sure

22       it would match the picture and the brand styles on

23       those racks, on those tables.

24  BY MR. JOHNSON:

25       Q       Were all the employees that worked for you

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 118

1    perfect?

2              MR. GERSHBAUM:  Objection to form.

3              You can answer.

4              THE WITNESS:  I -- sure.  Yes.

5    BY MR. JOHNSON:

6         Q    They never made mistakes.

7         A    Rarely made mistakes.

8         Q    If and when they did make mistakes, was it your

9    responsibility to ensure those mistakes were corrected?

10             MR. GERSHBAUM:  Objection to form.

11             You can answer.

12             THE WITNESS:  I mean, it was rare when they

13        made a mistake because we literally just looked at

14        the papers and put out the product.  But we worked

15        together and we, again, looked at the paper, made

16        sure we put out the product.

17   BY MR. GERSHBAUM:

18        Q    I understand.  And what happened when a mistake

19   was made?

20        A    As far as discipline, nothing.

21        Q    Whose responsibility was it to make sure that

22   the mistake in laying out the merchandise was corrected?

23             MR. GERSHBAUM:  Objection to form.

24             You can answer.

25             THE WITNESS:  It was really anyone.  The

1        visuals, the merchandise managers, the area

2        managers, and even the merchandise handlers had

3        the responsibility to make sure that it was all

4        correctly done and put out and displayed.

5   BY MR. JOHNSON:

6        Q    If you saw a mistake, would you correct, would

7   you get that associate to correct that mistake?

8        A    I would approach the merchandise and the visual

9   managers, the store manager, and see if this was something

10  that was planned that I wasn't aware of.  If I typically

11  walked up to something and saw something was wrong, I

12  would make sure it was done like that either on purpose or

13  out of mistake.

14       Q    So there might be adjustments that were made

15  from time to time?

16       A    That was up to the store managers or the visual

17  or the operational managers.

18       Q    Okay.  Well, it sounded to me like you had to

19  check with them to make sure they had not given a specific

20  instruction to the contrary.  Did I understand that

21  correctly?

22       A    Can you repeat that?

23       Q    The way you just said it is you would go check

24  with the store manager or check with the merchandise

25  manager or the visual to make sure whatever the associate

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 120

1   was doing that looked wrong was not, in fact, something

2   they'd been told to do by that other person; right?

3       A    By what other person?

4       Q    By the store manager or the merchandise manager

5   or the visual.

6       A    So what's the question?

7       Q    The question is, you would check with that other

8   management person to find out if they had given a

9   different direction to the sales associates; right?

10      A    If it wasn't following procedure and the

11  adjacency, I would ask other people why it wasn't being

12  followed by the procedure in the adjacency.

13      Q    Because it's possible that the store manager or

14  the area manager who was working there might have given a

15  different instruction?

16      A    The store manager or the visual team or the

17  operational manager had the ability to make different

18  changes in the department.

19      Q    Okay.

20      A    If they wanted to.  Rarely that happened.

21  Mostly stuck to the adjacencies and planograms.

22      Q    But they had the ability to alter it when

23  necessary?

24      A    Only the store manager and visuals had that

25  responsibility.

Page 121

1      Q    And if it was being laid out by an area manager

2  when the store manager was not present, then the area

3  manager would have had that same responsibility in the

4  store manager's absence; correct?

5           MR. GERSHBAUM:  Objection to form.

6           You can answer.

7           THE WITNESS:  Well, if the store manager

8      wasn't there, my responsibility was to follow the

9      adjacency and the procedures.  It wasn't my

10     responsibility to create something different from

11     that.

12  BY MR. JOHNSON:

13     Q    But if the adjacency itself could not answer the

14  question or could not resolve the problem, then it was up

15  to you to resolve that problem; right?

16           MR. GERSHBAUM:  Objection to form.

17           You can answer.

18           THE WITNESS:  Not my responsibility.  I would

19     reach out to the store manager or the operational

20     or the visual manager to see what they wanted to

21     do to make sure that it fit the planogram based on

22     their ideas of their store.

23  BY MR. JOHNSON:

24     Q    But it would be you that would be recognizing

25  and dealing with that problem as the area manager?

e71b2f3e-761b-4e89-9a58-b6516d3756d9

1          MR. GERSHBAUM:  Objection to form.

2          You can answer.

3          THE WITNESS:  If it was in a department that

4      was given to me and I saw something that wasn't

5      fitting because either the shelf was too long or

6      too short, I would address it to the store manager

7      letting her know there's something wrong in the

8      department that I was given.

9   BY MR. JOHNSON:

10      Q    Okay.  Was there any level of change that you

11   could make that did not require you to go to the store

12   manager?

13      A    Based on the handbook, procedures, I followed it

14   black and white how it needed to be completed in the

15   store.

16      Q    Okay.  So let's assume that the adjacency

17   doesn't give a black and white answer to whatever the

18   particular problem is like you just described, maybe the

19   shelf is too long, maybe it's too short.  Are you saying

20   that if the store manager is not there, that you are

21   always going to call the store manager, or was there some

22   level of problem that's within your jurisdiction to

23   handle, that you might nonetheless communicate that to the

24   store manager when she gets back to the store, but you're

25   going to solve it in the first instance rather than

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 123

1    waiting for that store manager or calling her?

2            MR. GERSHBAUM:  Objection to form.

3            You can answer.

4            THE WITNESS:  I mean, it was rare even if

5        that did happen because before any adjacency and

6        before any plans came in, before merchandise came

7        in, it was all planned and walked through by the

8        store manager as the visual team how it needed to

9        be laid out.  If it did need to be changed or if I

10       saw something that didn't fit their plans or

11       blueprints, I wouldn't change it because I'd wait

12       for them to communicate what they wanted to do

13       because it's not fitting due to their plans.

14   BY MR. JOHNSON:

15       Q    Would the area managers participate with that

16   walk-through with the store managers and the visuals?

17       A    Rarely.

18       Q    But sometimes you did; right?

19       A    Yes.

20       Q    And so you would be able to give feedback on

21   whatever the issues were that came up during that

22   walk-through; right?

23       A    Yes, I would recognize that this didn't work

24   based on the notes or blueprints they laid out.  I would

25   bring them to that location and show them what happened.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 124

1      Q     And try to get some consensus of management as

2    to how that would be dealt with before the problem

3    occurred; right?

4      A     Well, I would just present the problem and the,

5    I guess the lack of equipment, the lack of folders, and

6    after giving her that information, she would make her own

7    plan, blueprints, how she wanted me to proceed.

8      Q     So you come to her and say, for example, the

9    adjacency assumes we're going to have X number of this

10   type of rack, our store's running a little low on those

11   racks, is it okay if we use these racks instead?

12             MR. GERSHBAUM:  Objection to form.

13             THE WITNESS:  Well, the managers get the

14         adjacencies.  They walk the floor.  They know what

15         racks that we have in the back.  They make

16         drawings of individual circles, folders,

17         everything that they want laid out specifically.

18   BY MR. JOHNSON:

19     Q     Okay.  Because you have to adjust what you get

20   from corporate based on things like that; right?

21             MR. GERSHBAUM:  Objection to form,

22         mischaracterization.

23   BY MR. JOHNSON:

24     Q     Like the number of racks that are available and

25   the amount of shelf space available in your specific

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Page 125

1    store, the flow within your specific store; right?

2              MR. GERSHBAUM:  Objection to form.

3              You can answer.

4              THE WITNESS:  Well, I mean, we don't get --

5         we do get branded merchandise, like racks to put

6         merchandise on.  But typically it's not we get 20

7         new quads on a truck or we get ten new folding

8         tables.  It's already set equipment and

9         merchandise items that we already have available.

10        So it's not like it's new fixtures on the floor.

11   BY MR. JOHNSON:

12        Q    Sure.  Because you typically use the same

13   fixtures over and over again; right?

14        A    Correct.

15        Q    Okay.  And if the adjacency that's delivered

16   from corporate assumes that you're going to have X amount

17   of a particular type of rack, but your store doesn't have

18   that rack, then it's management's responsibility to adjust

19   for that; right?

20             MR. GERSHBAUM:  Objection, calls for

21        speculation.

22             You can answer.

23             THE WITNESS:  It's the store manager's to

24        look at the floor plan, look at our fixtures, and

25        make the best possible outcome for what they have

1          based on what they gave us for the adjacencies.

2     BY MR. JOHNSON:

3          Q     And if you're an area manager and you see a

4     problem like that, that's something you will discuss with

5     a manager and you may even recommend a solution to the

6     manager; right?

7                MR. GERSHBAUM:  Objection, asked and answered

8          multiple times.

9                You can answer again.

10               THE WITNESS:  The blueprint was already set

11         by her.  But if there was a problem, I would let

12         her know.  She would come over and tell us what to

13         do to resolve that problem.

14    BY MR. JOHNSON:

15         Q     Did you ever make suggestions to her as to

16    possible solutions to those types of problems?

17         A     Ever?

18         Q     Ever.

19         A     Yeah.

20         Q     Okay.  And were those suggestions that you made

21    followed sometimes?

22         A     Rarely.

23         Q     She never liked any of your suggestions?

24               MR. GERSHBAUM:  Objection to form.

25               You can answer.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 127

1              THE WITNESS:  No.

2    BY MR. JOHNSON:

3         Q    Never?

4         A    I can't say never, but rarely.

5         Q    Okay.  Was that because you were making bad

6    suggestions?

7              MR. GERSHBAUM:  Objection to form.

8              THE WITNESS:  No, it's her store, it's what

9         she wanted to be presented, and that's the way she

10        wanted it.

11   BY MR. JOHNSON:

12        Q    Okay.  Would she sometimes tell you okay, that's

13   fine, go ahead and do that?

14             MR. GERSHBAUM:  Objection to form.

15             You can answer.

16             THE WITNESS:  Do what?

17   BY MR. JOHNSON:

18        Q    Whatever you suggested to her.

19        A    Yes.

20        Q    Okay.

21        A    Rarely.

22        Q    But there would be other times where she might

23   want to go a different route with it.

24        A    Nine out of ten times it would be her way.

25        Q    Did you learn from that?

Page 128

1           MR. GERSHBAUM:  Objection to form.

2           You can answer.

3           THE WITNESS:  I learned to let her know what

4      the problem was and that she would give me

5      directions on how to resolve or to fix the problem

6      that we had.

7  BY MR. JOHNSON:

8      Q    Okay.  So what if -- and let's go back to what

9  we talked about earlier in terms of number of employees in

10 the store.  I think we said when you opened, you might

11 have, what, anywhere from 15 to 30 employees when the

12 store opened its doors?  Is that correct?

13          MR. GERSHBAUM:  Objection to form.

14          You can answer.

15          THE WITNESS:  It possibly was less than that.

16     It could have been five to 15, five to 30,

17     depending on -- I would say that's more an

18     accurate number from five to 15, five to 30.

19 BY MR. JOHNSON:

20     Q    You described for me probably nine or ten

21 different departments in the store?

22     A    Correct.

23     Q    Would it be typical when the store opened for

24 business there would be at least one sales associate in

25 each of those departments?

Page 129

1    A    Not typically.

2    Q    Okay.  How often would you open without a sales

3    associate in a given department?

4    A    Common.

5    Q    All right.  How would that department be covered

6    if there was no sales associate there?

7    A    If there was a shoe department associate, it was

8    close to the jewelry department.  So that shoe associate

9    would look at the shoes and the jewelry department.

10   Q    How would they know to do that on that given

11   day?

12   A    It was just common practice before I got there.

13   Q    And you as a manager, when you came in, would

14   say "Hey, we don't have someone in jewelry today, I need

15   you to keep an eye on that, too;" right?

16   A    Well, we all looked at the schedule, we knew who

17   was in what department.  So it was already known that if

18   you're in shoes, you're going to be doing jewelry.

19   Q    Why wouldn't it be someone from the department

20   on the other side of jewelry?

21   A    Because it was the closest department to that

22   department.  So it was already known that shoes, they

23   cover shoes and jewelry if the jewelry associate wasn't

24   there.

25   Q    And what if shoes isn't there?

e71b2f3e-761b-4e89-9a58-b6516d3756d9

1       A    Then the jewelry person would cover shoes.

2       Q    But what if there's no one in shoes and no one

3    in jewelry?  Who's covering those departments?

4            MR. GERSHBAUM:  Objection to form.

5            You can answer.

6            THE WITNESS:  It could be somebody in misses,

7        men's.  As long -- the only thing that we had to

8        be very cautious about was making sure that there

9        was a cashier at the men's department and the

10       misses department.  If those two places were

11       covered and we had lack of callouts, lack of

12       personnel in the building, if that's what it -- it

13       was what it was if we had to have empty

14       departments in those locations.  But there always

15       had to be two cashiers.

16   BY MR. JOHNSON:

17       Q    So if your shoe department associate called out

18   and you're the opening manager -- I'm sorry, if the men's

19   associate calls out, don't you as the opening manager have

20   to decide who's going to work in men's?

21           MR. GERSHBAUM:  Objection to form.

22           You can answer.

23           THE WITNESS:  No, it would be whoever -- if

24       the men's department called out, then the shoe

25       department, because they were closer to men's,

e71b2f3e-761b-4e89-9a58-b6516d3756d9

1       would know they would be covering the registers

2       until the next cashier came in.

3  BY MR. JOHNSON:

4       Q    How would they know so and so didn't show up in

5  men's?

6       A    They had the schedule.  It was crossed out on

7  the schedule.  They looked at it in the back room and they

8  knew they had to be in the men's department and cashier.

9       Q    Would associates sometimes call in on short

10 notice?

11      A    Call out?

12      Q    Call into the store and say I'm not showing up

13 today.

14      A    Yes.

15      Q    And when they did, would it be your

16 responsibility to indicate that to the rest of the team?

17           MR. GERSHBAUM:  Object to the form.

18           You can answer.

19           THE WITNESS:  It would be before the store

20      even opened because we would have people all

21      scheduled there.  They would have the schedule in

22      front of them.  If the men's department wasn't

23      there, obviously we don't have to figure out that

24      I have to tell that person.  The shoe department

25      would know that they would have to go to the men's

1       department.

2   BY MR. JOHNSON:

3       Q     You would never mention it to shoes, "Hey, so

4   and so called in, they're not going to be here today, can

5   you watch it until the next person gets here"?

6       A     It was common practice, if somebody wasn't

7   there, they had to jump into the register.

8       Q     Does management communicate with the sales

9   associates about absences and about coverage patterns?

10  You're making this sound like it all happens by

11  assumption.  Did you ever actually communicate with any of

12  your sales associates about this or did you just trust all

13  this was going to happen based on assumption?

14          MR. GERSHBAUM:  Objection to form.

15          You can answer.

16          THE WITNESS:  Like I said, it was typical, it

17      was routine.  If somebody wasn't there, the name

18      was crossed off the list, the shoe department knew

19      to go to the men's department.  There wasn't an

20      explanation to be had that this person had to be

21      in the men's department to cover the register.

22  BY MR. JOHNSON:

23      Q     Did you ever communicate with the associates to

24  make sure they knew that so and so was missing?

25          MR. GERSHBAUM:  Objection.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 133

1          Go ahead and answer.

2          THE WITNESS:  My communication was built on

3     crossing their name off the list during the

4     morning huddle letting them know that person was

5     out.

6   BY MR. JOHNSON:

7     Q    Okay.  So you would communicate during the

8   huddle by crossing it off.

9     A    Yes.  That person didn't show up to the morning

10  huddle, cross the name off the list, and the shoe

11  department went to the men's.

12    Q    And so by sharing it with people during the

13  huddle, that triggered certain coverage patterns?

14    A    By crossing the name off the list, yes.

15    Q    Okay.  And so that was part of what you did when

16  you shared the schedule with people in the mornings.

17    A    Yes.

18    Q    Okay.  I think I understand now.

19         When you were the manager on duty, would you get

20  called by sales associates to deal with customer concerns?

21    A    Yes.

22    Q    Was that one of the primary functions of the

23  manager on duty role?

24    A    It depends on the customer complaint.  Any

25  associate could handle a customer complaint depending on

Page 134

1   what it was.

2        Q    Let's say it was something that required the

3   authorization of a return or a void of a sale or maybe a

4   dispute as to what the correct advertised price was versus

5   what was coming out on the computer.  Is that something

6   typically a manager on duty would be called to deal with?

7             MR. GERSHBAUM:  Object to form.

8             You can answer.

9             THE WITNESS:  Typically if an associate saw

10       something that was damaged or a customer had a

11       complaint about over 90 days or over the return

12       policy, the cashiers, the guest service people had

13       discretion to do those overrides on their own.

14   BY MR. JOHNSON:

15       Q    Okay.  Was there any type of particular return

16   or cash back transaction that did require management

17   approval?

18       A    If a customer had a pair of shoes that

19   completely didn't match of what the box was and the

20   cashier did not feel comfortable returning different

21   merchandise in the box, I would be called to overlook that

22   transaction.

23       Q    What other types of transactions required

24   management approval before a cashier could execute them?

25       A    If they wanted a discount over a reasonable

Page 135

1    amount.  If they wanted 90 percent off and the cashier's

2    like I can't do that, they would call the managers.

3        Q    What other types of transactions would require

4    management approval?

5        A    I can't think of any right now, but I'm sure

6    there's more.

7        Q    Okay.  So generally anytime there was a customer

8    problem that was beyond what a sales associate was

9    authorized to deal with, that sales associate was trained

10   to call the manager on duty and get the manager on duty

11   involved?

12       A    The store managers or the area managers.

13       Q    Okay.  But typically is that something the

14   manager on duty would be looked to first?

15       A    Yes.

16       Q    Now, you mentioned having to get on the

17   registers and ring from time to time.  How often do you

18   think you did that?

19       A    Depending on the time of year, it could have

20   been 50 percent of my day, it could have been -- I'm

21   sorry, it could have been five percent of my day,

22   10 percent.  It could have been 90 percent of my day.

23       Q    Every time you ring on the register you have a

24   specific code that you log in with; right?

25       A    Correct.

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 136

1      Q      And so Beall's knows when you've run a

2   particular transaction based on your use of that code;

3   correct?

4      A      Yes.

5      Q      And you're not supposed to ring under anyone

6   else's code; right?

7      A      Correct.

8      Q      Do you have any idea how many transactions you

9   rang during your entire time in the store?

10     A      No clue.

11     Q      Okay.  What circumstances would lead you to step

12  away from doing your other area manager duties and to jump

13  on a register?

14     A      What was the question one more time?

15     Q      What type of circumstances would cause you to

16  step away from your other area manager duties and go jump

17  on a register?

18     A      Are you saying if there was backup, like more

19  than five people in the line or --

20     Q      Yeah, what would cause you to jump on a

21  register?

22     A      Oh, if there was more than three people.  There

23  was a policy put in place if there was, I believe, I could

24  can wrong about the numbers, but if there was more than

25  two or three people waiting in line, you had to jump on a

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 137

1    register.

2         Q    Okay.  Are there any other circumstances under

3    which you would feel compelled to jump on a register?

4         A    Besides backup purposes, I don't believe so.

5         Q    And what do you mean by backup purposes?

6         A    If there was more than three people waiting in

7    line to be checked out.

8         Q    Where is merchandise typically rung up within

9    store 23?

10        A    You could ring it up at guest service, but

11   typically the men's and the women's department.

12        Q    That's where the primary checkouts are located?

13        A    Yes.

14        Q    Are they within the department or are they at

15   the front of the store?

16        A    They're located by the front of the doors, front

17   of the store.

18        Q    How many registers are in men's?

19        A    From what I remember, three to six.  But I

20   haven't been there in so long I don't know.

21        Q    Are all of those located near the front of the

22   store or are some of those spaced throughout the rest of

23   the department?

24        A    No, I believe it's an L shape with the

25   registers.

Page 138

1      Q     Okay.  So how many registers would be in that L

2   shape?  The three to six?

3      A     Three to six.  Probably not six.

4      Q     Three to four?

5      A     Three to four possibly.

6      Q     Are there registers located in any other

7   departments?

8      A     Yes.

9      Q     And how many are located in other departments?

10     A     I'm getting a little mixed up between Stuart and

11  Port St. Lucie, how the layout was.  I believe there was

12  one in the jewelry department and one in the home

13  department and I believe one in the lingerie department

14  from what I remember.  It could be switched around from

15  different stores, I'm not a hundred percent sure.

16     Q     Would all the registers typically be open

17  throughout the day or would there ever be circumstances

18  where a register was not open for part of the day?

19     A     Typically most registers were not open for the

20  day.

21     Q     Which ones were particularly open during the

22  day?

23     A     The misses and the men's and jewelry.  And guest

24  service.  I forgot guest service.

25     Q     Those are the ones that were typically always

e71b2f3e-761b-4e89-9a58-b6516d3756d9

1  open.

2      A    Yes.

3      Q    Okay.  Now, if you are ringing because there is

4  a line of people waiting, how long does it typically take

5  you to clear that backlog?

6      A    It's really random times.  It could be ten

7  people with one item, it could be ten people with 50

8  items.

9      Q    So it just depends on whatever the backlog is?

10     A    Exactly.

11     Q    Sometime it might be five minutes of ringing,

12 other times it might be half an hour?

13     A    Yeah.

14     Q    When you're ringing, are you alert to the other

15 things that are going on around you while you're dealing

16 with those customers?

17     A    We do have walkies.  So if there was something

18 that needed to be communicated, I did have a walkie.

19     Q    That's a walkie-talkie?

20     A    Yes.

21     Q    Okay.  And so anybody could communicate with you

22 about that even if you were at the register?

23     A    Yes.

24     Q    What types of things would you typically get

25 called on the walkie-talkie about?

Page 140

1      A     That people are getting credit cards or emails,

2  that there was backup needed at guest service, if there

3  was carts outside that we need to take in from the

4  outside, if a certain area was being really wrecked and we

5  needed to all jump into that department and clean it.

6      Q     Okay.  Who had the walkie-talkies?

7      A     Everybody.

8      Q     Every associate or every manager?

9      A     No, if we had enough for all the associates in

10  the store, all the associates including the managers had a

11  walkie-talkie.

12      Q     How many walkie-talkies did you typically have

13  at 23?

14           MR. GERSHBAUM:  Objection to form.

15           You can answer.

16           THE WITNESS:  I'm not sure.

17  BY MR. JOHNSON:

18      Q     All right.  Was it typical for sales associates

19  to each have one in addition to the managers?

20      A     Typical, yes.

21      Q     And would the sales associates use those

22  walkie-talkies to communicate with their area managers or

23  managers on duty?

24      A     Yes.

25      Q     Would they use those walkie-talkies to ask for

Page 141

1    answers or direction from area managers?

2         A    As far as directions, yes.

3         Q    And that way even if you're stuck at a cash

4    register, you can make a quick response on a walkie-talkie

5    to fix something that's happening away from the cash

6    register; right?

7              MR. GERSHBAUM:  Objection to form.

8              You can answer.

9              THE WITNESS:  If an employee wanted to call

10        me and say this person needs help in the shoe

11        department but I'm in the misses department, is

12        there anyone in the shoe department that can help

13        them, that's something that we could say "Okay,

14        Carlos, meet XYZ person in the shoe department."

15   BY MR. JOHNSON:

16        Q    Okay.  And while you're listening, I'm sorry,

17   while you're working at the cash registers, would there

18   sometimes be other employees working at the cash registers

19   right next to you?

20        A    Yes.

21        Q    And would you be able to listen to whether they

22   were properly asking for credit card applications or

23   emails?

24        A    I mean, I was concentrating at the time

25   cashiering.  If it did come up, it did.  But the cashiers

Page 142

1    that we worked with always, always asked for the credit

2    cards and the emails.

3        Q    And how were they so good at always asking for

4    that?

5            MR. GERSHBAUM:  Objection to form.

6            You can answer.

7            THE WITNESS:  They were trained when they

8        first were hired.

9    BY MR. JOHNSON:

10       Q    And who did the training for them particularly?

11       A    We partnered them up with the cashiers that

12   worked there.

13       Q    Okay.  And who was responsible for training the

14   associates that worked in your departments?

15           MR. GERSHBAUM:  Objection to form.

16           You can answer.

17           THE WITNESS:  They were partnered with

18       employees that were already present in those

19       locations.

20   BY MR. JOHNSON:

21       Q    Did you take any of your time to speak to new

22   associates who worked in your departments about their

23   training?

24       A    Well, I partnered them up with people that were

25   working there and I would work alongside them folding

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 143

1    clothes.  We would talk about the day, talk about the

2    merchandise.  That's about it.

3         Q    How would you know when you could take them off

4    that partnership relationship with the existing sales

5    associates, when they were ready to be on their own?

6         A    It wasn't that common that we had new employees

7    throughout the year that needed direct or weekly training.

8    So it wasn't that common that I had to figure out when

9    they had their own time to be on the floor.

10        Q    Did you have new employees that would start with

11   you throughout the year from time to time?

12        A    Yes.

13        Q    And how long would it typically take a new sales

14   associate to be trained?

15        A    It depends on the person.

16        Q    If they were hired to work in your department,

17   would you be in charge of figuring out which sales

18   associates to partner them up with to learn from?

19        A    No, because there were already people there that

20   were merchandise handlers in my department.

21        Q    I'm not sure that was the question I asked.

22   Let's make sure we're communicating right.  So if you have

23   a new sales associate that's assigned to your department,

24   when they start there, would you direct them to shadow an

25   existing sales associate to learn from that experienced

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 144

1    sales associate?

2            MR. GERSHBAUM:  Objection, asked and

3        answered.

4            You can answer it.

5            THE WITNESS:  The store manager or

6        operational manager would make that partnership

7        for that training.

8    BY MR. JOHNSON:

9        Q    Would you ever participate in saying "Hey, why

10   don't you partner them up with so and so"?

11       A    No.

12       Q    Once they were partnered up with so and so,

13   whoever that was, the experienced person, would you follow

14   up with that experienced person to see how the new sales

15   associate was doing?

16       A    The operational or store manager would typically

17   approach them and make sure they were competent in those

18   departments.

19       Q    Would you ever get feedback from the person they

20   were shadowing as to how they were doing?

21       A    They told the store manager and operational

22   manager and myself.

23       Q    And if you heard specific things from those

24   experienced people about how the new person was doing,

25   would you share that with the store manager and the ops

Page 145

1    manager?

2         A    It would all be shared together with the store

3    manager, myself and the operation manager.

4         Q    Okay.  And once it was all shared together,

5    would the group then make a judgment as to whether that

6    employee was successfully completing their orientation

7    period or whether that employee needed to be let go?

8         A    It wasn't my direction at all that was given for

9    that employee.  It was up to the store manager and

10   operational.

11        Q    I understand.  Would the group discuss that

12   employee?

13        A    No.

14        Q    Would you ever participate in discussing the

15   progress of any of your associates with the store manager?

16        A    Yes.

17        Q    When would that take place?

18        A    During reviews.

19        Q    When would that take place?

20        A    I believe they had monthly and quarter and

21   yearly reviews.

22        Q    What was your responsibility with relation to

23   those reviews?

24        A    We would be given a piece of paper that had

25   various forms of questions.  I haven't done one forever.

Page 146

1   But I think it was a one through five, how did they

2   perform this or how many emails did they get in the month,

3   the year.  And we had to fill those out, just fill out the

4   paper.  I gave it to my store manager.  She looked it

5   over, if she wanted to make corrections on it or add notes

6   to it.  I would then sit with the employee and then go

7   over what myself and the store manager put down for the

8   review.

9       Q    Okay.  Is this the piece of paper that has the

10  little, like, one through five out to the side and you can

11  circle how they're doing?

12      A    I haven't seen one in a while, so I think that's

13  what it looked like.

14      Q    And would you just give your preliminary ratings

15  to the store manager as to this is how I think this

16  person's doing?

17      A    Yeah, I would write down, you know, this is what

18  I filled out for Stephanie, does it look good, what do you

19  want to change with it, either erase, add new stuff, rip

20  it up, make her own, give it back to me.

21      Q    So sometimes she would change those rankings or

22  say "I want you to make this note in addition to the

23  ranking"?

24           MR. GERSHBAUM:  Objection to form.

25           THE WITNESS:  That, and it wasn't my

1        responsibility to do all employees in my

2        department all the time.  If I had twelve people

3        in the departments given to me, I might only do

4        two or three reviews and then be handed the

5        reviews by the store manager and the operational

6        manager and told to go over what they wrote.

7   BY MR. JOHNSON:

8        Q    Okay.  And how would the store manager, if you

9   know, how would the store manager decide which reviews you

10  did and which reviews she did?

11            MR. GERSHBAUM:  Objection to form.

12            You can answer.

13            THE WITNESS:  Handwriting, or she would just

14       tell me these are the two people that you can do

15       this month or this year and we'll take care of the

16       rest.

17  BY MR. JOHNSON:

18       Q    Okay.  Was there any logic to the ones that she

19  would choose to do versus the ones that she would assign

20  to you?

21       A    Not that I know of.

22            MR. JOHNSON:  All right.  It's about 1:00.

23       Should we break for lunch?

24            MR. GERSHBAUM:  Sounds good.

25            MR. JOHNSON:  All right.  You want to try to

e71b2f3e-761b-4e89-9a58-b6516d3756d9

Page 148

```
1        come back around 1:45, see if we can get it done

2        by then?

3              MR. GERSHBAUM:  Sure.

4              (Thereupon, the deposition recessed for lunch

5        at 12:57 p.m.)

6                        (End of Volume I)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 149

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 2:16-cv-14121-DMM

ERIC MAAR and LINDIANE WESS,        )
individually and on behalf of all   )
other similarly situated,           )
                                    )
            Plaintiffs,             )
vs.                                 )        Volume II
                                    )
BEALL'S INC.,                       )
                                    )
            Defendant.              )
_____ )

DEPOSITION OF ERIC MAAR

DATE:          August 2, 2016

TIME:          10:11 a.m.

PLACE:         Atlantic Reporting
               4164 Okeechobee Road, Suite 75
               Fort Pierce, Florida

TAKEN BY:      Defendant

REPORTER:      PATRICE C. HENSLEY, RPR, NOTARY PUBLIC
               State of Florida at Large

```
 1   APPEARANCES:

 2   FOR PLAINTIFF:      HEPWORTH, GERSHBAUM  ROTH, PLLC
                         192 Lexington Avenue
 3                       Suite 802
                         New York, NY  10016
 4                       BY:  CHARLES GERSHBAUM, ESQUIRE

 5   FOR DEFENDANT:      THOMPSON, SIZEMORE, GONZALEZ
                         & HEARING, P.A.
 6                       201 No. Franklin Street
                         Suite 1600
 7                       Tampa, FL  33602
                         BY:  KEVIN D. JOHNSON, ESQUIRE
 8
     ALSO PRESENT:       CHERYL WOELTJEN
 9                       BEALL'S, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 151

1           (Thereupon, the deposition resumed at 2:02

2      p.m.)

3           DIRECT EXAMINATION - CONTINUED

4  BY MR. JOHNSON:

5      Q     All right.  So we're now back on the record.

6           Can you tell me what kind of efforts you made as

7  an area manager to engage in training and development of

8  employees.

9      A     The efforts?  More or less just making sure that

10 they watched the videos, that they were given direction by

11 the store manager who we should team the members up with

12 in those departments, and have them sign the paperwork

13 that they needed to sign and put that in their employee

14 file.

15     Q     What did you do personally in terms of

16 one-on-one development of employees?

17     A     If it was one-on-one employee training, it would

18 just be more or less we're in the department, we're

19 putting clothes away, putting shoes away.

20     Q     And you would teach them the correct way to do

21 things?

22     A     I would teach them how to look at the adjacency,

23 the planograms, and follow directions on that.

24     Q     What is an adjacency for someone who doesn't

25 know anything about that term?

Page 152

1       A    So the shoe department, the home department, any

2  department, there's a layout of brands by color, by style,

3  by featured products depending on what time of year it is,

4  how it needs to be merchandised and presented.

5       Q    And this is an overall plan that's delivered to

6  the store from corporate headquarters?

7       A    Yes.

8       Q    Okay.  And it comes out three or four times a

9  year?

10      A    Minimum.  Or it could just be whatever planogram

11  or whatever promotion they're running at that particular

12  time.  So it could be more or less.

13      Q    But the fall adjacency book is for a season;

14  right?  Like fall or spring?

15      A    From what I remember, it was quarterly, but it

16  could be more.

17      Q    Okay.  And somebody who's a new sales associate

18  has to learn how to read and follow that adjacency; right?

19      A    Well, a cashier wouldn't have to learn an

20  adjacency.  Somebody that was on the floor would have to

21  learn the adjacency.

22      Q    Okay.  Is that what you would spend time

23  developing them on, is teaching them how to read the

24  adjacency?

25           MR. GERSHBAUM:  Objection to form.

                                                      Page 153

1            You can answer.

2            THE WITNESS:  I wouldn't say developing their

3       understanding of the adjacency.  I would say they

4       were partnered with somebody that would explain it

5       and develop the adjacency with them.

6  BY MR. JOHNSON:

7       Q    What did you do in order to analyze

8  productivity?

9       A    I'm sorry, what?

10      Q    What would you do to analyze productivity?

11           MR. GERSHBAUM:  Objection to form.

12           You can answer.

13           THE WITNESS:  As far as like the employee or

14      productivity for sales being --

15  BY MR. JOHNSON:

16      Q    Productivity of your departments, your areas.

17      A    I would walk in the back room and see if there's

18  merchandise on the floor for all the departments, if there

19  was shoes in my department in the back room.  Then we

20  would put it all together.  So it just had to be

21  completed.

22      Q    I'm not sure I understand what you're expressing

23  there.  Can you be more detailed?

24      A    Well, productivity in that department, how to

25  improve it, if there was merchandise that wasn't filled

Page 154

1    from the back room to the front of the store, we would

2    walk in the back and make sure that it was all complete.

3         Q    Okay.  What about sales, how would you analyze

4    sales?

5              MR. GERSHBAUM:  Objection to form.

6              THE WITNESS:  There was a -- and I'm not sure

7         how long it lasted or how in depth we followed it

8         and gave direction for the employees.  But there

9         was possibly a weekly or monthly spreadsheet of

10        sales that came in through the entire store of all

11        the brands and merchandise that there was.

12   BY MR. JOHNSON:

13        Q    Would that be distributed to the management

14   team?

15        A    Yes.

16        Q    And were you expected to review that and see how

17   the products in your particular areas were selling?

18        A    I did review it and I did see that.  If there

19   was a brand that was struggling, I'd bring it up to my

20   store manager.

21        Q    And what would the discussion typically be if

22   there was a brand that was struggling and you would bring

23   it up to your store manager?

24        A    I would say "Clark shoes isn't selling because

25   it's negative four percent this month.  The adjacency says

Page 155

1    that we have to keep the shoe there, what would you like

2    to do," for example.

3         Q    Okay.  What if you noticed there was something

4    else that was selling really quickly, that appeared to be

5    in demand?  Would you suggest that maybe that should be

6    moved over to replace it?

7         A    No.

8         Q    What if something was selling very quickly to

9    the point where you might run out of it sooner than

10   anticipated?  Is that something you would review and

11   communicate to your store manager?

12        A    Well, I would get the report, the store manager

13   would get the report.  Typically she would tell, she would

14   already look at the paperwork and direct me what to do if

15   there was an outage because she walked the store every day

16   and noticed the out as well.

17        Q    What did she expect of you in terms of you

18   communicating to her about things that you saw in those

19   reports?

20        A    Her expectations, I'm not sure exactly what she

21   expected me to do.

22        Q    What did she communicate to you in terms of what

23   her expectations were?

24             MR. GERSHBAUM:  I'm going to object to the

25        form.

Page 156

1          You can answer.

2          THE WITNESS:  Take a look at the paper.  If I

3     saw a negative number, approach her about it and

4     say this is what Clark shoes is doing this week,

5     this month.

6   BY MR. JOHNSON:

7     Q    Okay.  Did she ask you to come up with ways to

8   increase sales in your department?

9     A    No.

10    Q    Was that communicated to you at any point during

11  the time that you worked for Beall's, that part of your

12  job was to identify ways you could increase sales in your

13  departments?

14    A    Not necessarily.  It was all the store manager's

15  duty and her responsibility as her store that she

16  controlled how she wanted the look of the store partnering

17  with the adjacencies and the planograms.

18    Q    Okay.  You mentioned the word partnering.  Were

19  you partnering with the store manager to help run that

20  store?

21    A    I was following her lead, her direction.

22    Q    Did you take any responsibility at all on your

23  own?

24    A    To show up to work, yes.

25    Q    Okay.  What about to take the initiative to try

Page 157

1    to increase sales or productivity of the store?  Did you

2    ever do that?

3        A    I approached customers, I asked them if they

4    wanted to add more merchandise into the basket.  From what

5    I saw them asking for or saw, what I saw in their baskets,

6    I would suggest other items.

7        Q    Were there ever any discussions among management

8    about possible ways to increase sales in the store?

9        A    Possibly to -- I can't think of a situation.  If

10   we did, it was rare.

11       Q    Did you have management meetings?

12       A    Between the area managers by ourselves, no.

13       Q    Were there management meetings that included the

14   area managers along with the store manager and the

15   merchandise manager?

16       A    Yes.

17       Q    How often did those take place?

18       A    It wasn't like a scheduled weekly manager

19   meeting.  It was rare when we had them throughout the

20   year.

21       Q    How often would you have them?

22       A    Maybe one to two times -- well, I'll say maybe

23   three times a quarter.  Maybe five times a quarter.

24       Q    And what would be discussed at those meetings?

25       A    Adjacencies coming up, floor plans that would

Page 158

1   have to change in certain departments and her expectations

2   on how quickly she wanted them to be completed.

3        Q    And were you then expected to carry out those

4   changes within your departments?

5        A    I was given direction by the store manager and

6   the operational manager to follow their directions on the

7   plan.

8        Q    In terms of making sure that that plan was

9   executed within your department?

10       A    Yes.

11            MR. GERSHBAUM:  Objection to form.

12            You can answer.

13  BY MR. JOHNSON:

14       Q    And making sure it was executed in your

15  department would include supervising your employees to

16  make sure that they executed; correct?

17            MR. GERSHBAUM:  Objection to form.

18            You can answer.

19            THE WITNESS:  We were supervised by the store

20       manager and the operational manager.

21  BY MR. JOHNSON:

22       Q    I didn't ask you that.  I asked whether

23  executing it included you making sure your employees got

24  that plan done.

25            MR. GERSHBAUM:  Objection to form.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 159

```
 1              You can answer.

 2              THE WITNESS:  I'm not understanding.  One

 3         more time.

 4    BY MR. JOHNSON:

 5         Q    You said you were responsible for executing the

 6    plan in your departments, correct, in your areas?

 7              MR. GERSHBAUM:  Objection,

 8         mischaracterization.

 9              You can answer.

10    BY MR. JOHNSON:

11         Q    Is that correct?

12         A    I said that I was following the lead of the

13    execution from the store manager and the operations

14    manager.

15         Q    And she expected that plan to be executed in

16    your areas; correct?

17         A    Yes.

18         Q    And it was your responsibility to ensure that it

19    was executed in your areas; correct?

20              MR. GERSHBAUM:  Objection to form.

21              You can answer.

22              THE WITNESS:  Yes.

23    BY MR. JOHNSON:

24         Q    And that included not just your individual role

25    in moving things or putting things out, but also your role
```

Page 160

1    in supervising others to make sure things ended up in the

2    right place and that the expectations were met; correct?

3              MR. GERSHBAUM:  Objection to form.

4              You can answers.

5              THE WITNESS:  The merchandise managers and

6         the visual managers were given more direction and

7         more floor plans, layouts, than I was provided,

8         and their expectations were to supervise me and

9         the employees to follow up that direction.

10   BY MR. JOHNSON:

11        Q    Okay.  You have this thing you're doing from

12   time to time where I ask you whether you had a

13   responsibility and you tell me what other people's

14   responsibilities were.  Did you have responsibility for

15   executing in your department the wishes of the store

16   manager?

17             MR. GERSHBAUM:  Objection, asked and

18        answered.

19             You can answer again.

20             THE WITNESS:  It was the, the executions that

21        had to be performed in my department were

22        supervised and laid out by the store manager and

23        the operational manager.

24   BY MR. JOHNSON:

25        Q    And it was your job to make sure those happened;

Page 161

1    right?

2              MR. GERSHBAUM:  Objection to form.

3              You can answer.

4              THE WITNESS:  By their direction, yes.

5    BY MR. JOHNSON:

6         Q    Okay.  But they weren't having to come in and

7    direct your employees because you were refusing to direct

8    your employees, were they?

9              MR. GERSHBAUM:  Objection to form.

10             THE WITNESS:  I wasn't refusing.  We were

11        following a sheet, a layout that gave us

12        directions, and we all looked at it and followed

13        it together.

14   BY MR. JOHNSON:

15        Q    And you were responsible for making sure that

16   they understood it and carried it out properly; right?

17             MR. GERSHBAUM:  Objection to form.

18             You can answer.

19             THE WITNESS:  We were given direction by the

20        operational and the visual managers on how to

21        fulfill her needs and her wants for the store.

22   BY MR. JOHNSON:

23        Q    There you go again.  You were given the

24   responsibility for making sure it was carried out in your

25   department; right?

                                                      Page 162

1              MR. GERSHBAUM:  Objection, asked and

2         answered.

3    BY MR. JOHNSON:

4         Q    Including supervising people to make sure it

5    happened.

6              MR. GERSHBAUM:  Objection, asked and answered

7         multiple times.

8              You can answer.

9              THE WITNESS:  If we were given direction from

10        the store manager and blueprint layouts, the

11        merchandise and the visual managers partnered with

12        the store manager and they dictated the layout and

13        the direction for myself and the employees.

14   BY MR. JOHNSON:

15        Q    Okay.  So is it your position you were a

16   glorified sales associate?

17        A    Yes.

18        Q    Is it your position that you had no

19   responsibility for supervising your department?

20        A    To an extent.

21        Q    Is it your theory that the only people who

22   supervised employees in that store were the store manager,

23   the merchandise manager and the operations managers?

24        A    And the visual manager.

25             MR. GERSHBAUM:  Objection to the form.

Page 163

1    BY MR. JOHNSON:

2         Q    And the visual manager.

3              And you didn't do any supervising and you didn't

4    have a primary duty of management?  That's your theory?

5              MR. GERSHBAUM:  Objection to form.

6              You can answer.

7              THE WITNESS:  If people had a question for me

8         and it related to a schedule change or if they

9         needed an override, I would help them out with

10        that.

11   BY MR. JOHNSON:

12        Q    But that was just purely gratuitous on your

13   part?

14             MR. GERSHBAUM:  Objection to form.

15             You can answers.

16             THE WITNESS:  Can you rephrase.

17   BY MR. JOHNSON:

18        Q    Do you understand the word gratuitous?

19        A    No.

20        Q    It means something that's just not necessary,

21   not required.  It's done purely voluntarily, purely out of

22   the goodness of your heart.  That's the way I'm using it.

23        A    Gotcha.

24        Q    Is that what you were doing?

25        A    That I was doing it out of the goodness of my

Page 164

1    heart?

2        Q    Yeah.  You were just running around offering

3    advice out of the goodness of your heart?

4             MR. GERSHBAUM:  Objection to form.

5    BY MR. JOHNSON:

6        Q    Not because that's what you were hired to do as

7    an area manager?

8             MR. GERSHBAUM:  Objection to form.

9             You can answer.

10            THE WITNESS:  I was following the lead of the

11        direction my manager, my store manager wanted me

12        to act in the store.

13   BY MR. JOHNSON:

14       Q    Okay.  And I understand that people give you

15   direction to accomplish things.  The question is, did

16   accomplishing those things require efforts of anyone

17   beyond you?

18       A    I'm not understanding.

19       Q    If the store manager gives you direction, is the

20   store manager telling you "Hey, go stock that shelf for

21   me"?

22       A    Yes.

23       Q    Did the store manager ever say "Hey, make sure

24   that everyone in your department stocks their shelves

25   correctly"?

Page 165

```
 1              MR. GERSHBAUM:  Objection to form.

 2              You can answer.

 3              THE WITNESS:  She would give the direction to

 4         the operational and individual managers alongside

 5         me.  Those people would be over top of me.  They

 6         would dictate the actions to myself and the

 7         employees.

 8    BY MR. JOHNSON:

 9         Q    Again, you're trying to push responsibilities

10    out and tell me about responsibilities of other people.

11    What was your responsibility when the store manager gave

12    you a direction that your department should look a certain

13    way?

14              MR. GERSHBAUM:  You can answer.

15              Objection to form.

16              THE WITNESS:  If she specifically gave me

17         something to do, I would follow her direction.

18    BY MR. JOHNSON:

19         Q    So your theory is you just did individual stuff

20    like a sales associate.

21              MR. GERSHBAUM:  Objection, asked and

22         answered.

23              You can answer again.

24              THE WITNESS:  Yes.

25
```

Page 166

1   BY MR. JOHNSON:

2        Q     Why were you called a manager?

3        A     That was my title.

4        Q     Why'd you stay in this job for three years if

5   you didn't have any management responsibilities?

6        A     I needed a job, I had to pay bills.

7        Q     And you wanted to be a manager, that's what you

8   told me; right?

9        A     Yes.

10       Q     And yet you stayed in this job in which you

11  didn't actually do any management.

12       A     I needed a job, I needed to pay my bills.

13       Q     You left Target because you didn't have

14  management responsibilities and you wanted them somewhere

15  else; right?

16       A     That is true.

17       Q     Why didn't you leave Beall's if you weren't

18  getting any management responsibilities?

19       A     It was a secure job.  I was working, I was

20  paying my bills.

21       Q     And you'd had other jobs before that were secure

22  jobs and helped you pay your bills and you left those;

23  right?

24       A     That's true.

25       Q     But you never left Beall's for three years.

Page 167

1      A     But I did leave Beall's, though.

2      Q     Where did you end up going?

3      A     Oxford International.

4      Q     What did you do there?

5      A     I was a technical recruiter, IT.

6      Q     Did you do any management?

7      A     No.

8      Q     Okay.  Now, I'm going to hand you the area

9    manager job description.  This is going to get marked as

10   Exhibit 1.

11           (Thereupon, Defendant's Exhibit Number 1 was

12           marked for identification.)

13   BY MR. JOHNSON:

14      Q    All right.  Before we talk about this, Mr. Maar,

15   you and I don't know each other that well, I know nothing

16   about your background or your character.  So I'm going to

17   ask you to describe yourself to me.  By nature, are you

18   someone who is lazy?

19           MR. GERSHBAUM:  Objection to form.

20           You can answer.

21           THE WITNESS:  No.

22   BY MR. JOHNSON:

23      Q    Are you someone who will lie when it serves your

24   interests?

25           MR. GERSHBAUM:  Objection to form.

Page 168

1            You can answer.

2            THE WITNESS:  No.

3    BY MR. JOHNSON:

4        Q    Are you someone who will exaggerate when it

5    serves your interests?

6            MR. GERSHBAUM:  Objection to form.

7            You can answer.

8            THE WITNESS:  No.

9    BY MR. JOHNSON:

10       Q    Okay.  So let's look at this job description.

11   Do you see how it has a date on it of April 27, 2012?

12       A    Yes.

13       Q    And is this the job description for the area

14   manager you were working under during your last year of

15   employment?

16       A    With the dates, yes.  If there's a revised one

17   in 2013, I don't know.  But this --

18       Q    Are you aware of there being a revised one

19   between April 27, 2012, and the end of your employment?

20       A    I do not.

21       Q    Okay.  And where would this job description be

22   kept?

23            MR. GERSHBAUM:  Objection.

24            You can answer.

25            THE WITNESS:  This job description would be

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 169

```
 1       kept at the store location.
 2   BY MR. JOHNSON:
 3       Q    Okay.  Is it in a policy manual or a book in the
 4   office?
 5       A    I don't know.
 6       Q    All right.  Did you ever go look for it?
 7       A    No.
 8       Q    Okay.  Were you trained on your job description
 9   when you started?
10       A    Yes.
11       Q    Okay.  Do you see the summary of duties and
12   responsibilities there?
13       A    Yes.
14       Q    Okay.  Do you see how the first one mentions
15   people, and then there's a group for disciplines, then
16   there's a group for process; right?
17       A    Yes.
18       Q    Okay.  Let me ask you generally, did you ever
19   participate in the training of merchandise handlers or
20   visual merchandisers?
21       A    Well, it -- participate as far as if I'm on the
22   floor, I'm folding shirts, we're looking at the
23   adjacencies, we're putting clothes out according to the
24   paperwork, then if you want to call that training, then
25   yes.
```

Page 170

1      Q    You would have facilitated the training to the
2    extent that someone needed to be trained in your
3    department?
4              MR. GERSHBAUM:  Objection to form.
5              You can answer.
6              THE WITNESS:  Is that the same question?
7    BY MR. JOHNSON:
8      Q    I'm just trying to make sure in terms of how the
9    word facilitate here is used.  I understand facilitate to
10   mean something like to make happen.
11     A    Okay.
12     Q    Okay.  So if the merchandise manager wanted a
13   merchandise handler to be trained in your department,
14   would you make that happen?
15             MR. GERSHBAUM:  Objection to form.
16             You can answer.
17             THE WITNESS:  That would be up to the visual
18        managers or the store managers or the operational
19        managers.
20   BY MR. JOHNSON:
21     Q    And if they said will you find me a sales
22   associate who knows what they're doing to train this
23   merchandise handler, would you give them a sales associate
24   to do that?
25     A    That wasn't my direction to find a person to

Page 171

1    train a person for that new employee to be a merchandise

2    handler.

3        Q    You never did that?

4        A    That was not my responsibility.

5        Q    Okay.  What about participate in the talent

6    selection process for merchandise handlers and visual

7    merchandiser.  Did you ever interview those people?

8        A    No.

9        Q    As to sales associates, did you ever participate

10   in their training?

11       A    Like I said, if we were doing sales training on

12   the floor, cashiering, could be on the floor following the

13   adjacencies, folding the clothes, doing day-to-day

14   operations.

15       Q    Okay.  Did you ever participate in the talent

16   selection process for sales associates?

17       A    No.

18       Q    Did you ever participate in interviewing at all

19   for any employee?

20       A    It was very rare, but if it happened, it was

21   maybe once in a blue moon.  I did check a reference I can

22   recall for a couple interviews.  But like I said, it was

23   very rare I ever did that.

24            MR. JOHNSON:  This is going to be Exhibit 2.

25            (Thereupon, Defendant's Exhibit Number 2 was

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 172

 1          marked for identification.)

 2    BY MR. JOHNSON:

 3          Q    On the occasion you did participate in the

 4    interview process, did you use Exhibit 2?

 5              MR. GERSHBAUM:  Let him take a look at it

 6          first.

 7              MR. JOHNSON:  That's why I handed it to him.

 8              THE WITNESS:  Okay, I just -- is there

 9          another page?  Okay.

10              What was your question?

11    BY MR. JOHNSON:

12          Q    The question was, when you did participate in

13    the process of interviewing potential new associates, did

14    you use this interview guide?

15          A    I do not remember using this sheet.

16          Q    Did you use a different sheet?

17          A    Not that I can recall.

18          Q    Did you just come up with your own questions?

19          A    Not that I can recall.

20          Q    Okay.  What questions did you ask that new

21    associate?  Do you recall?

22              MR. GERSHBAUM:  Objection to form.

23              You can answer.

24              THE WITNESS:  I honestly don't remember

25          giving specific interviews because it was so long

Page 173

1       ago, or what questions I asked.

2    BY MR. JOHNSON:

3       Q    Okay.  Would you have just communicated the

4    general impression of the candidate to the store manager?

5             MR. GERSHBAUM:  Objection to form.

6             You can answer.

7             THE WITNESS:  As far as quickly speaking to

8       somebody and then giving my opinion to the store

9       manager, I may have done that.

10   BY MR. JOHNSON:

11      Q    Okay.  And you said you also participated in

12   reference checks?

13      A    Yes.

14      Q    If someone was going to be hired to work in your

15   particular area, would you be involved in the interview

16   process for them?

17      A    No.

18      Q    Who would be involved in the interview process?

19      A    Store managers and operational managers.

20      Q    Okay.  And was there a set number of interviews

21   that had to take place?

22      A    Not that I'm aware of.

23      Q    Would the store sometimes do group interviews

24   where more than one manager would interview the candidate

25   at a time?

Page 174

1      A     Not that I'm aware of.

2      Q     So if you did participate in the interview

3   process, you would have done so as the only person talking

4   to that candidate during that particular time period?

5            MR. GERSHBAUM:  Objection, calls for

6       speculation.

7            You can answer.

8            THE WITNESS:  That would most likely be what

9       happened, a one-on-one.

10  BY MR. JOHNSON:

11     Q     All right.  Let me talk about how you were paid

12  very briefly here.  After you became a full fledged sales

13  manager, were you always paid on a salary basis?

14     A     I believe so, yes.

15     Q     And you always received the same amount of

16  salary for each workweek regardless of how many hours you

17  worked; correct?

18     A     I believe so, yes.

19     Q     And you never suffered any deductions from that

20  based on the quantity or the quality of your work; did

21  you?

22     A     No.

23     Q     Do you recall what you were paid?

24     A     Like I said, it was between 30 or 33,000.

25            MR. JOHNSON:  This is the next exhibit.

Page 175

1              (Thereupon, Defendant's Exhibit Number 3 was

2         marked for identification.)

3    BY MR. JOHNSON:

4         Q    I'm handing you Exhibit 3.  Have you ever seen

5    that before?

6         A    Not laid out like this, but it reflects a pay

7    period.

8         Q    Would this information that's on here for each

9    particular workweek typically appear on the pay stub for

10   your paycheck?

11        A    I would have to say yes if this was --

12        Q    Just the categories.  I'm not asking about

13   specific numbers necessarily.

14        A    Oh, okay.

15        Q    Just these are the types of categories that

16   would show up on the pay stub; right?

17        A    401, vacation -- yes.  The typical stuff, yes.

18        Q    And this shows in March of 2013, you were

19   earning $1,309.84, and that's for a two-week pay period;

20   right?

21             MR. GERSHBAUM:  Which --

22             MR. JOHNSON:  The very first entry.

23             MR. GERSHBAUM:  228?

24             MR. JOHNSON:  3-21-13 is the date.

25             THE WITNESS:  Yes, that looks accurate.

Page 176

1   BY MR. JOHNSON:

2       Q    Okay.  And for the remainder of your employment,

3   you would have been paid at least that in regular earnings

4   each time that you worked a full two-week pay period;

5   right?

6       A    If there was no issue with my job title, this

7   and that, then yes, that would be my pay.

8            (Thereupon, Defendant's Exhibit Number 4 was

9        marked for identification.)

10  BY MR. JOHNSON:

11      Q    Okay.  I'm handing you Exhibit 4.  Do you

12  recognize this?

13      A    Yes, I do.

14      Q    Okay.  And is this an employee acknowledgement

15  statement?

16      A    Yes, it is.

17      Q    Does it contain a summary of some important

18  company policies and then ask the employee to initial out

19  to the side?

20           MR. GERSHBAUM:  Objection to the form,

21       document speaks for itself.

22           You can respond.

23           THE WITNESS:  Yes.

24  BY MR. JOHNSON:

25      Q    And are those your initials out to the side?

Page 177

1      A    Yes.

2      Q    Did you sign this in May 2011 when you started

3  with Beall's?

4      A    Yes, it does.

5      Q    And do you know whether Beall's continued to use

6  similar acknowledgement statements with other employees

7  throughout your employment?

8           MR. GERSHBAUM:  You can answer over my

9      objection.

10          THE WITNESS:  As far as I know.

11  BY MR. JOHNSON:

12     Q    Okay.  And do you know if the form of this

13  statement was the same regardless of whether it was being

14  signed by an hourly or by a manager?

15          MR. GERSHBAUM:  Objection.

16          You can answer.

17          THE WITNESS:  I honestly don't know.

18  BY MR. JOHNSON:

19     Q    Did you ever have to have any of the employees

20  that started in your department complete this?

21     A    I'm sure they did, but I'm not a hundred percent

22  sure.

23     Q    I want you to look at number two there, which is

24  code of ethical conduct.  Who does it tell the employee to

25  report violators to?

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 178

1          MR. GERSHBAUM:  Note my objection.  The

2      document speaks for itself.

3          You can respond.

4          THE WITNESS:  It says, "My manager, the next

5      level manager, Corporate Human Resource, Loss

6      Prevention, Internal Audit or SAMTIPS."

7  BY MR. JOHNSON:

8      Q    So for any of the employees in your department,

9  you would have been one of the avenues for them to file

10 complaints about ethical conduct issues; right?

11         MR. GERSHBAUM:  Objection to form.

12         THE WITNESS:  That along with the next level

13     manager, corporate human resources, loss

14     prevention, internal audit or SAMTIPS.

15 BY MR. JOHNSON:

16     Q    Sure.  But you would have been one of the

17 avenues; right?

18     A    According to the paper, yes.

19     Q    As to four, which is the sex harassment policy,

20 does that also inform employees that they can report

21 violations of the company's harassment policy to their

22 manager?

23         MR. GERSHBAUM:  Same objection.

24         You can respond.

25         THE WITNESS:  That is true.

Page 179

1   BY MR. JOHNSON:

2        Q    As to working off the clock, does it tell

3   employees that if they are given a lunch period and then

4   that lunch period is interrupted, they should bring that

5   fact to their supervisor and receive pay for the lunch

6   break?

7             MR. GERSHBAUM:  Objection, the document

8        speaks for itself.

9             You can respond.

10            THE WITNESS:  Yes.

11  BY MR. JOHNSON:

12       Q    And you would have been one of the people they

13  could have brought this problem to; right?

14       A    Yes.

15       Q    As to eight, which is, has to do with the trade

16  partnership against terrorism program, did you understand

17  that employees were instructed that they could report

18  security breaches to you as their manager?

19            MR. GERSHBAUM:  Same objection.

20            You can respond.

21            THE WITNESS:  Yes.

22  BY MR. JOHNSON:

23       Q    On thirteen, it mentions employee inspections.

24  Did you ever conduct any employee inspections?

25       A    Yes.

Page 180

```
 1        Q     And what occasions did you conduct employee

 2   inspections on?

 3        A     Actually at closing, the employees had to open

 4   up their bags if they had purses, backpacks, and --

 5   because this was in the policy I'm reading now, as I

 6   remember, they opened their bag, I looked inside to see if

 7   there was any merchandise, and that is what the inspection

 8   included.

 9        Q     And the purpose of that is to make sure they're

10   not walking out with anything in their bag; right?

11        A     Correct.

12        Q     And you signed off here that your job

13   responsibilities had been reviewed with you, correct, in

14   number 15?

15              MR. GERSHBAUM:  Same objection.

16              You can respond.

17              THE WITNESS:  Yes.

18   BY MR. JOHNSON:

19        Q     And in number 16, you acknowledged that if you

20   were hired as a salaried exempt employee, you would be

21   receiving a fixed weekly salary; correct?

22        A     Yes.

23        Q     And you acknowledged there that you would not be

24   paid overtime for hours in excess of 40; correct?

25        A     Yes.
```

Page 181

```
 1        Q     You acknowledged that you understood that your

 2   salary was intended to compensate you for all the hours

 3   that you worked no matter how many or how few; right?

 4              MR. GERSHBAUM:  Objection, the form speaks

 5        for itself.

 6              You can respond.

 7              THE WITNESS:  Yes.

 8   BY MR. JOHNSON:

 9        Q     And it says there, "I understand that if I have

10   any questions about the application of these provisions to

11   the work that I am performing for the Company, I should

12   contact the Director of Human Resources at corporate

13   headquarters."  Did you ever contact the director of human

14   resources and say I don't think the work that I'm doing

15   should make me exempt from overtime?

16        A     I did not contact.

17        Q     Okay.  That's it for Exhibit 4.  You can put it

18   aside if you'd like.

19              Now, how many hours a week was the store open to

20   customers?

21        A     If it was from -- it all depends on the seasonal

22   traffic, seasonal hours.  But typically I believe it was

23   from nine to nine p.m.

24        Q     And then ten to eight on Sundays?

25        A     Correct.
```

Page 182

1       Q    So twelve hours six days a week and then ten
2   hours on the seventh day.
3       A    Yes.
4       Q    So a total of, what, 84 hours if I'm doing my
5   math right.
6       A    If you're doing your math right.
7       Q    It's not my strong point.  I'd say 84 hours.
8       A    Mine either.
9       Q    Okay.  So during that time you would be
10  splitting manager on duty responsibilities with another
11  area manager and who else?
12      A    The guest service person, or if there was
13  somebody that was assigned to be the MOD at that day,
14  would be able to have that actual responsibility.
15      Q    Okay.  How often was that the case?
16      A    Occasionally.
17      Q    So not on the same basis as you and another area
18  manager; right?
19      A    Correct.  She was not the same title.
20      Q    So you and the other area manager would
21  typically split the MOD responsibilities, except that
22  there would be occasional supplementation by this guest
23  services person?
24      A    There would be often splitting of the shift
25  between the area managers and guest service employees.

Page 183

```
1        Q     Okay.  In terms of MOD responsibilities?

2        A     Yes.

3        Q     And what percentage of the hours do you think

4    were covered by guest service associates?

5        A     Depending on what was happening that day or if

6    it was seasonal traffic, it could be from 30 percent to a

7    hundred percent.

8        Q     So there might be some days where they were

9    doing all the MOD work?

10       A     Yes.

11       Q     Would that be because the managers were engaged

12   in special projects?

13             MR. GERSHBAUM:  Object to the form.

14             You can answer.

15             THE WITNESS:  Or that it was just stock in

16        the back room.  I wouldn't call it special

17        projects, it was just getting out stock, working

18        on online orders, and just doing typical work.

19   BY MR. JOHNSON:

20       Q     During the average workweek, is it fair to say

21   you would probably take at least 40 percent of the MOD

22   hours, with the assumption that the other 40 percent would

23   be handled by the other area manager and then 20 percent

24   would be other employees?

25       A     I don't want to give a specific percentage to
```

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 184

1    the employees, certain days or anything.  It depended on

2    the store manager, who she wanted for the MOD that day and

3    if she wanted the guest service person to be the MOD for

4    that day.  But I don't know the percentage throughout the

5    week.

6         Q    I'm talking about over the course of your

7    employment, are you able to make estimates over the course

8    of your employment as to how often you did stuff?

9         A    If it's specific to my understanding, yes, I

10   could make an estimate.

11        Q    And you know roughly what the MOD schedule

12   looked like each day that you were there; right?

13        A    It changed, it could change daily depending on

14   what the store manager wanted.

15        Q    Sure.  But based on your overall experience, can

16   you reach an estimate as to how often you performed the

17   MOD task?

18        A    No.

19        Q    Then how is it that you're able to make an

20   estimate as to how often you did any of the other tasks in

21   the store, sir?

22             MR. GERSHBAUM:  Objection to form.

23             You can answer.

24             THE WITNESS:  Can you tell me my other

25        estimates that I made?

Page 185

1    BY MR. JOHNSON:

2         Q    Sure.  I think in your interrogatories you made

3    an estimate as to how often you were doing things that

4    were not management in nature.  You've made estimates as

5    to how many hours you worked.  How is it that you're able

6    to make those estimates, but you can't make an estimate as

7    to how often you were MOD?

8              MR. GERSHBAUM:  Asked and answered.

9              You can answer it.

10             THE WITNESS:  Well, because management MOD

11        duty was dictated on a daily basis.  It was if

12        you're not going to be it -- you could be it for

13        three hours and then it completely stops and then

14        you can do it for the next two hours, it could be

15        the next 20 minutes, 30 minutes.  It's so random

16        and so out of place there's no percentage I'd feel

17        comfortable putting to give you an accurate

18        statement.

19   BY MR. JOHNSON:

20        Q    How often do you think you did it in a range,

21   okay, in an average workweek?  You can say I did it as

22   much as this or as little as that.

23             MR. GERSHBAUM:  You can answer over my

24        objection.

25             THE WITNESS:  How often I was --

Page 186

1    BY MR. JOHNSON:

2         Q    How often you were MOD.

3         A    How often I was MOD?  I could say a range that I

4    was MOD throughout a week would be maybe two to five times

5    a week.

6         Q    And how long would each of those shifts be as an

7    MOD?

8         A    It was random.

9         Q    How many days were there where you were at work

10   but had no MOD responsibility?

11        A    It could be from two to five days a week.

12        Q    Really?

13        A    Or if it was in those days, you would get

14   certain hours that you'd be the MOD.  It was very random.

15             MR. JOHNSON:  Let's take a break.

16             (Thereupon, there was a break from 2:41 p.m.

17        to 2:50 p.m.)

18   BY MR. JOHNSON:

19        Q    Just before we get started again, I need to

20   correct my math.  I think I said 84 hours.  We've done the

21   math now.  It's actually 82 hours.  I stand corrected.

22             But when we were talking about this, you were

23   saying there were associates somehow that would

24   participate in the management on duty rotation in your

25   store?  Is that what I'm understanding correctly?

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 187

1      A    There would be one or two specific people that

2    was given that responsibility to walk and cover the floor,

3    give overrides, get change from the cash office to the

4    employees, and make those discounts with us, without us

5    giving supervision.

6      Q    What were the names of those employees?

7      A    The only one that I can recall is Maria.

8      Q    What's Maria's last name?

9      A    I do not know.

10     Q    What position did she hold?

11     A    As far as I knew, she was a cashier/sales

12   associate.

13     Q    Did she work in the cash office?

14     A    No.

15     Q    Was she a key holder?

16     A    No.

17     Q    Did she have any other management authority?

18     A    She set the lunches.

19     Q    She set lunches?

20     A    Yes.

21     Q    For the sales associates?

22     A    Yes.

23     Q    Okay.  Do you know how long she worked there?

24     A    No, I do not.

25     Q    Was she a long-term sales associate to your

Page 188

 1   knowledge?

 2        A    To my knowledge, I believe she was.

 3        Q    Now, one of the primary responsibilities of

 4   manager on duty would be to resolve customer disputes;

 5   right?

 6             MR. GERSHBAUM:  Objection to the form.

 7             You can answer.

 8             THE WITNESS:  That would be one of the

 9        responsibilities.

10   BY MR. JOHNSON:

11        Q    And is it not true that it was Beall's policy

12   that an associate was not permitted to say no to a

13   customer?

14             MR. GERSHBAUM:  Objection to form.

15             You can answer.

16             THE WITNESS:  It depends on the request.  If

17        we -- what was the question, if we could --

18   BY MR. JOHNSON:

19        Q    Is it Beall's policy that a sales associate

20   cannot say no to a customer?

21        A    It depends on the request.

22        Q    If they need to say no, aren't they supposed to

23   call a manager so the manager can say no?

24        A    If that's what the handbook says, then that is

25   the direction.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 189

1       Q    Okay.  So if you were to put an associate in MOD

2    rotation, that associate would not be able to say no to

3    customers, would they?

4            MR. GERSHBAUM:  Objection to form, calls for

5        speculation.

6            You can answer.

7            THE WITNESS:  If that person was able to give

8        an answer yes or no without questioning or asking

9        the manager, then, without our knowledge, she

10       would do that function.

11   BY MR. JOHNSON:

12       Q    I'm just trying to find out whether you're

13   telling me that this particular store had an MOD rotation

14   practice that did not fit with Beall's policies.  Are you

15   aware?

16           MR. GERSHBAUM:  Objection to form.

17           You can answer.

18           THE WITNESS:  Yes.

19   BY MR. JOHNSON:

20       Q    To the best of your knowledge, was it compliant

21   with Beall's policies?

22           MR. GERSHBAUM:  Objection to form.

23           You can answer.

24           THE WITNESS:  No.

25

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 190

1    BY MR. JOHNSON:

2        Q    Okay.  So this would be an outlier, this would

3    be different than the way Beall's policy says it should be

4    done?

5            MR. GERSHBAUM:  Objection to form.

6            You can answer.

7            THE WITNESS:  For this particular instance,

8        yes.

9    BY MR. JOHNSON:

10       Q    Okay.  Now, how often did Maria work in that

11   capacity?

12       A    I'm not a hundred percent sure if she was a

13   40-hour person, but if she was scheduled five days, she

14   might possibly do it one to five days.

15       Q    One to five days?

16       A    Depending on the projects, who was there, she

17   could do it.

18       Q    You think she might have been part of the MOD

19   rotation during some weeks on every day that she worked?

20       A    I don't want to -- I don't a hundred percent

21   know because I wasn't there at the days -- if I was off

22   and she was working there, I don't know if she was part of

23   that rotation.

24       Q    Okay.

25       A    So it's possible.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 191

1       Q    All right.  During the days that you were there,
2   how often was she also a member of the MOD rotation with
3   you?
4       A    It was frequent.
5       Q    Was there any other hourly employee that you
6   remember being part of the MOD rotation?
7       A    Not to my recollection.
8       Q    Did Maria take a larger share of the MOD
9   rotation than the other area manager or did she take less
10  than the other area manager?
11          MR. GERSHBAUM:  Objection.
12          You can answer.
13          THE WITNESS:  I wasn't there every day that
14      she worked, so I don't know.  But when I worked
15      there, it was random.
16  BY MR. JOHNSON:
17      Q    Was it usually more one way or more the other?
18          MR. GERSHBAUM:  Objection, asked and
19      answered.
20          You can answer again.
21          THE WITNESS:  It could be a couple hours at
22      this point, it could be the first half of the day.
23      It was a mixed bag.
24  BY MR. JOHNSON:
25      Q    I'm asking what your observation was over the

Page 192

1    run of experiences that you had there.  You worked there

2    for more than a year in that store; right?

3         A    Yes.

4         Q    Even though it may be more on a given day, over

5    the run of all of those days, did she work more or less

6    MOD than the other area manager?

7         A    Equal or less.

8         Q    Okay.  And did the other area manager typically

9    work more or less MOD shifts than you did or the same?

10        A    The same.  Equal or less.

11        Q    And you told me earlier that some days you were

12   an MOD the whole day; right?

13        A    That could have been a possibility.

14        Q    So getting back to this, what is your estimate

15   on the average day that you were there of how many hours

16   you would have worked as an MOD?

17             MR. GERSHBAUM:  Asked and answered.

18             You can answer again.

19             THE WITNESS:  It was random.  There's no

20        estimate that I feel comfortable giving because

21        every single day was different.  Between the

22        hourly or the half shifts, I don't have an

23        estimate.

24   BY MR. JOHNSON:

25        Q    Over the course of the week, those MOD

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 193

1   responsibilities would have been split between you, the

2   other area manager and Maria; right?

3       A    And the operational manager and the store

4   manager participated in the MOD program as well.

5       Q    Who was the ops manager?

6       A    I believe she was either the merchandise or the

7   op manager, but Nicki.

8       Q    Nicki.  How often did Nicki participate in the

9   rotation?

10      A    Not that often.

11      Q    How often did the store manager participate in

12  the rotation?

13      A    Occasionally.

14      Q    I assume she also had to make schedules and do

15  all these other things that you said she had to do that

16  were management duty?

17           MR. GERSHBAUM:  Objection, form.

18           You can answer.

19           THE WITNESS:  The operational and the store

20       manager perform those duties.

21  BY MR. JOHNSON:

22      Q    Right.  I assume they had less time to spend as

23  MOD; is that correct?

24           MR. GERSHBAUM:  Objection to the form.

25           You can answer.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 194

1              THE WITNESS:  Yes.

2    BY MR. JOHNSON:

3         Q    Because under your telling of the story, they do

4    all the management work and you don't do any; correct?

5              MR. GERSHBAUM:  Objection to form.

6              You can answer.

7              THE WITNESS:  You can be called the MOD, but

8         you're still not -- the MOD consists of walking

9         around the store and what I said previously of

10         just picking up trash, folding shirts, folding

11         clothes, responding to calls.  If there was one

12         call a day, then the store manager, if she was the

13         MOD, she would make that response.

14   BY MR. JOHNSON:

15        Q    We're not going to rehash everything we've

16   learned about what the MOD does, but it's fair to say the

17   MOD was responsible for the overall guest experience in

18   the front of the store; right?

19             MR. GERSHBAUM:  Objection to form.  That's

20        not his testimony.

21             You can answer.

22             THE WITNESS:  It was everyone's

23        responsibility to have the overall satisfaction of

24        every single customer.

25   BY MR. JOHNSON:

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 195

1      Q    Okay.  If the store manager comes into the store

2    and finds that it is a wreck, who is the person that she

3    is going to hold most accountable for that at that

4    particular moment in time?

5      A    The closing manager.

6      Q    What if the closing manager isn't even there

7    yet?  What if it's during the first part of the day?

8      A    You can't hold somebody responsible for

9    something they didn't complete.

10      Q    What if she gets there at 11:00 and you're the

11    opening manager and she finds the store is a wreck.  Isn't

12    it true that she's going to hold you most accountable for

13    that?

14      A    If I'm the manager on duty and she sees a messy

15    store when she comes in, she would approach me.

16      Q    And she would hold you accountable; correct?

17      A    She would approach me and figure out who needs

18    to be accountable for that.

19      Q    And it's also fair to say she would hold you

20    more accountable for that than just the random store

21    associates that happen to be working with you that day;

22    right?

23             MR. GERSHBAUM:  Objection.  You're asking him

24        to testify to someone else.

25             You can answer.

```
 1              THE WITNESS:  Again, she would assess the
 2         situation and then hold that person or those
 3         parties responsible for the destruction of the
 4         store.
 5    BY MR. JOHNSON:
 6         Q    I'm trying to find out what your assumptions
 7    were when you were working there, okay.  I'm trying to
 8    figure out if you thought during the time you were serving
 9    as an area manager, that if you let the store just
10    degenerate into a total disaster on one of your MOD
11    shifts, whether the store manager was equally likely to
12    come in and hold the associate on the cash register
13    responsible or whether she was likely to come in and start
14    with you because you are the manager on duty.
15              MR. GERSHBAUM:  Object.  Same objection as
16         before.
17    BY MR. JOHNSON:
18         Q    What was your understanding?
19              MR. GERSHBAUM:  You can answer.
20              THE WITNESS:  There would be -- again, she
21         would have to assess the situation.  If there was
22         multiple managers, multiple visual operational
23         managers there, she would look at the overall
24         picture and then she would discipline and speak to
25         that person or that group.
```

Page 197

```
 1   BY MR. JOHNSON:

 2        Q     Is that what your expectation was?

 3        A     Depending on what was put in place for the

 4   schedule, the event, that's what I would expect.

 5              (Thereupon, Defendant's Exhibit Number 5 was

 6        marked for identification.)

 7   BY MR. JOHNSON:

 8        Q     I'm handing you Exhibit 5.  Do you recognize

 9   that?

10        A     I do recognize it, but it was a blue book.

11        Q     Okay.  That was probably the original color

12   before it got copied.

13        A     Correct.

14        Q     But these are the same policies you received in

15   the employee handbook; correct?

16        A     They look it, yes.

17        Q     I'd like you to turn to page 21.  If you look at

18   meal periods there, it says, "Your manager will inform you

19   of your work hours and meal periods."  Did you inform your

20   employees of their work hours and meal periods?

21        A     The store managers, Maria, myself, and other

22   people, informed the employees of their lunch breaks.

23        Q     Okay.  It says, "If your manager asks you to

24   remain on the clock, your meal time will count as work

25   time."  Were there times you asked people to stay on the
```

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 198

1    clock and not take their lunch?

2         A    Well, like the policy says, in case of

3    emergency, you don't leave that situation, you have to

4    delay your lunch before you can go on lunch.  That's in

5    the handbook.

6         Q    Okay.  And were there times when you had to tell

7    employees "Look, I know we've scheduled you to leave at

8    1:00, but we're really slammed right now, I need you to

9    push that back until 2:00"?

10        A    There was times, yes.

11        Q    Okay.  Under rest periods, it says, "At the

12   discretion of management, hourly employees may be given

13   one paid rest period up to fifteen minutes per five hours

14   worked or two paid rest periods up to fifteen minutes each

15   per eight hours worked."  Did you decide when people could

16   take their rest breaks?

17        A    Not really.

18        Q    Did people that worked for you get rest breaks?

19        A    Yes.

20        Q    And how were those scheduled?

21        A    It wasn't scheduled.  I'd be on the

22   walkie-talkie.  I'd get a call from a cashier, myself,

23   Maria or the other area managers, the store manager, would

24   get a call saying "This is Ted, I'm taking my first

25   15-minute break."

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 199

1       Q    Okay.  And it was up to you to say okay, that's
2    fine, or to say no, you can't go right now, we need you
3    back on the floor?

4       A    It was up to me, Maria, the other area managers
5    or the store manager to say no.

6       Q    All right.  Let's look at page 23 which talks
7    about orientation periods.  This one tells new employees
8    that they're in an orientation period during their first
9    90 days of employment.  Were you involved in evaluating
10   how they performed during the first 90 days in order to
11   determine whether they made it out of the orientation
12   period?

13      A    No.

14      Q    Did you have any input at all in advising the
15   store manager or the ops manager how they performed during
16   the orientation period?

17      A    Well, if I saw they weren't making emails, I
18   would make note of that.  If they came in late, we would
19   keep track of that and I would give the store manager that
20   information.

21      Q    Okay.  Let's go to dress code which is on page
22   26.  In the third paragraph, it says, "If any questions or
23   discrepancies exist, management will make a decision about
24   what constitutes appropriate, businesslike appearance.
25   Your manager has the right to send you home to change,

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 200

1    without pay, if you're not wearing appropriate attire."

2    Is this the provision that you were relying on earlier

3    when you told me that you sometimes had to make decisions

4    about whether employees were in compliance with the dress

5    code?

6              MR. GERSHBAUM:  Objection,

7         mischaracterization.

8              You can respond.

9              THE WITNESS:  As far as making decisions on

10        how they were dressed, I would go up to somebody

11        if they had holes in their jeans and say you can't

12        wear those.  And if we need to look at the

13        handbook, I can tell you where it says that.

14   BY MR. JOHNSON:

15        Q    And this is where it says that essentially.

16        A    Yes.

17        Q    That you get the final call on what's

18   appropriate, businesslike appearance.

19             MR. GERSHBAUM:  Objection to form.

20             You can answer.

21   BY MR. JOHNSON:

22        Q    That's what the policy says; right?

23        A    It's the store manager -- really, anyone can

24   approach somebody, an associate can approach an associate

25   and say you know you're not supposed to wear that, don't

1   wear ripped jeans tomorrow.

2        Q    Under loss prevention on page 28, in the fourth

3   paragraph, it says, "If you observe suspicious behavior or

4   the act of concealment, notify a member of management or

5   Loss Prevention immediately."  Isn't it true that this

6   instruction meant that you were authorized to receive

7   reports from sales associates about suspicious behavior or

8   customers who were concealing merchandise?

9        A    Right.  They could report to myself, other

10  employees, other management and the LP department.

11       Q    There's a safety provision here that talks about

12  potential safety hazards on page 29.  That requires an

13  associate to "report situations that may require emergency

14  maintenance to your manager."  You would have been an

15  appropriate person for them to report safety hazards to;

16  wouldn't you?

17       A    They could report that to me, yes.

18       Q    When we look at the next page, which is accident

19  reporting, it says, "If an employee or non-employee has an

20  accident, no matter how minor, report it immediately to

21  management."  You would have been someone they could have

22  reported accidents to; right?

23       A    Correct.

24       Q    And then it says, "If a work-related injury

25  requires medical attention, management will arrange for

Page 202

1    treatment at an authorized medical facility and provide

2    any necessary documentation."  You were authorized to

3    arrange for treatment at an authorized medical facility;

4    were you not?

5              MR. GERSHBAUM:  Objection to form.

6              You can answer.

7              THE WITNESS:  I was authorized.  But did it

8         happen?  Rarely.

9    BY MR. JOHNSON:

10        Q    Okay.  Were there morning meetings that were

11   held with associates?

12        A    Yes.

13        Q    And did you lead those on a regular basis?

14        A    Myself, Maria, the store managers, the

15   operational managers, all took place, all took part.  Even

16   the associates took part in the morning meetings.

17        Q    What would your role typically be in a morning

18   meeting?

19        A    Again, we would have the schedule prepared, that

20   was prepared by the store manager.  It would be shown to

21   the employees.  I would let them know what our dollar

22   amount that we did last night would be.  If there was any

23   direction from the red book or from the notes from the

24   operational, the visual or the store manager, that we had

25   to follow that direction for the meeting, for the morning.

Page 203

1     Q    During the time that you were a manager on duty,

2   would you also be responsible for ensuring that any bank

3   runs were carried out?

4     A    Yes.

5     Q    Who would bank runs be handled by?

6     A    I believe just the store managers, the

7   operational and the area managers.  I'm not a hundred

8   percent sure if anyone else did.  Possibly.

9     Q    Okay.  And so you would have to make bank runs

10  from time to time?

11    A    Yes.

12    Q    What about disciplining associates.  Did you

13  ever have associates that engaged in misconduct that made

14  it necessary for you to discipline them?

15    A    As far as discipline, can you be more specific

16  as far as discipline?

17    Q    Well, let's start from the top.  Did you ever

18  have associates that engaged in misconduct that made it

19  necessary in your judgment for them to be fired?

20    A    No.

21    Q    Did you ever have any associates that engaged in

22  misconduct or poor performance -- let me stop and go back.

23  I should have asked it both ways, okay.  To me, misconduct

24  means like you're acting out, you're doing something in

25  terms of the way you're behaving that's bad.

Page 204

1      A     Okay.

2      Q     And to me, poor performance means you're not

3  doing your job well.  So there's a little difference.

4            So in terms of either misconduct or poor

5  performance, did you ever have either of those occur in an

6  employee that you felt it was necessary to fire that

7  person?

8      A     No.

9      Q     Okay.  In terms of individual associates or

10 employees that you would have been responsible for --

11 strike that.

12           As to any employee in the store, did they ever

13 engage in poor performance or misconduct that made it

14 necessary for them to receive a written warning in your

15 judgment?

16     A     There were actions performed by employees that

17 deserved a written write-up.

18     Q     Okay.  Were any of them employees who were

19 assigned to your departments?

20     A     Not that I'm aware of.

21     Q     Were any of those employees where the misconduct

22 or the poor performance occurred while you were engaged as

23 a manager on duty?

24     A     I don't remember.  I don't think so.

25     Q     So you don't remember ever having to engage in

Page 205

1  written counseling or warning of an employee?

2      A    I never did -- I wouldn't say never.  But I

3  rarely, if at all, did any kind of written or verbal

4  disciplinary action to the employees.

5      Q    Did you ever participate in a disciplinary

6  meeting with an employee?

7      A    I may have sat in during a disciplinary action.

8      Q    Okay.  And who would have led that particular

9  meeting?

10      A    The store manager or the operational manager.

11  And I -- go ahead.

12      Q    Go ahead.

13      A    I'm sure this question's going to come up

14  anyway, so keep going.

15      Q    What was your role in the meeting?

16      A    Just to -- not supervise, but to witness the

17  disciplinary action.

18      Q    Okay.  And had you typically discussed what was

19  going to happen with the store manager or the operations

20  manager before that meeting?

21      A    No.

22      Q    Did you know going in that employee was going to

23  be disciplined?

24      A    If I was the one to approach the store manager

25  and let them know what happened.  I didn't know if she was

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 206

1   going to verbally or give a written disciplinary action to

2   that employee.  I didn't, I was not given a heads up what

3   was going to happen to the employee that I might have

4   approached my store manager about.

5        Q     Okay.  So you might just go to the store manager

6   and say I think we need to do something, but it would be

7   up to her to select what the ultimate discipline was.

8        A     Not to do something, but to inform my manager

9   that a situation happened, this is what happened, I want

10  to let you be aware of it, and if you want me involved,

11  that's fine.  If not, it is what it is.

12       Q     And when you reported things like that to her,

13  is it typically because you understood what you were

14  reporting was a violation of policy?

15       A     What was the question?

16       Q     When you reported things like that to the store

17  manager, was that typically because you understood it to

18  be a violation of policy or an example of poor

19  performance?

20       A     Yes.

21       Q     And did you understand that that was typically

22  likely to bring some sort of correction or discipline from

23  the store manager?

24       A     It was up to her discretion, so I was never

25  aware of what she was going to do after my --

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 207

1      Q     What about attendance.  Did you ever get
2   involved in monitoring attendance?
3      A     As far as making the schedule in the morning
4   when somebody came in, they were late or they didn't show
5   up at all.
6      Q     Then what would happen?
7      A     If they didn't show up at all, we'd cross their
8   name off the list and we would adjust from there.  If they
9   were late, inside the red book I believe, or there was
10  another book possibly, that we had to mark in a certain
11  person was late or not.
12     Q     Okay.  And once you noted that they were late,
13  if they were late a certain number of times, was there
14  discipline that would result?
15     A     If it was on a monthly or yearly basis, we would
16  record how many times they were late or absent.  And I
17  believe either in the handbook or somewhere it shows that
18  if, there's a certain percentage points that they take off
19  with a review if they have X amount of absences or
20  tardies.
21     Q     Is that information that you would have to
22  gather and report to the store manager before the review
23  was conducted?
24     A     If not just verbal saying that XYZ person was
25  late today or didn't come in, that did occur.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 208

1       Q     What if the person was a total no call/no show?

2    Was there a consequence for that?

3       A     There is, but I'm not sure what that is.

4       Q     Did that ever occur during your employment

5    there?

6       A     I'm sure.  I can't list a specific situation.

7       Q     I guess what I'm asking is do you remember any

8    times when you were let's say opening manager and an

9    employee was a no call/no show?

10      A     I'm sure there was, but I really don't remember

11   or can recall a case with specific names or specific job

12   titles they had.

13      Q     Even if you can't recall a specific case, do you

14   remember what the standard discipline was for a no call/no

15   show?

16      A     Sitting here right now, I do not remember what

17   the specific direction was.

18      Q     Did people ever get a second chance or do you

19   know if they were typically fired on the first occurrence

20   of a no call/no show?

21      A     I do not know the disciplinary action for a no

22   call/no show.

23      Q     Did you understand that was considered to be a

24   serious violation of the attendance policy?

25      A     Yes.

1      Q    And when you reported it to the manager, would

2    you expect that the manager would then engage in either

3    termination or some sort of serious corrective action?

4      A    That was up to her discretion.  I was merely

5    passing the information along.

6      Q    Okay.  And how many hours a week did you work?

7      A    It could range from 50 to 60 hours.

8      Q    Can you narrow your estimate any more than that?

9      A    Not to the best of my ability.

10     Q    Can you make it specific as to specific

11   workweeks any more than that?

12     A    If anything, closer to the 60 mark closer to the

13   seasonal times or planogram or adjacency moves.

14     Q    Did you ever take any vacation?

15     A    Yes.

16     Q    And did you typically take a day of vacation at

17   a time or did you take a week at a time?

18     A    A week.

19     Q    And would you receive vacation pay for that in

20   the payroll system?

21     A    Yes.

22     Q    Did you ever take any unpaid vacation or you

23   were given time off but didn't necessarily receive

24   vacation pay for it?

25     A    I don't recall.

Page 210

1        Q    Did you ever take any Family Medical Leave Act

2   time off?

3        A    No.

4             (Thereupon, Defendant's Exhibit Numbers 6 and

5        7 were marked for identification.)

6   BY MR. JOHNSON:

7        Q    Okay.  I'm going to hand you Exhibit 6 first and

8   then I'm going to hand you Exhibit 7 that goes with it.

9   Exhibit 7 is the signature page in which you acknowledge

10  that the answers given in Exhibit 6 are, in fact, true and

11  correct.  Do you recognize Exhibit 7?

12       A    Yes.

13       Q    Okay.  Do you recognize Exhibit 6 which is the

14  larger exhibit?

15       A    Yes.

16       Q    Okay.  If we look at interrogatory number one,

17  you were asked what tasks and responsibilities you

18  performed for Beall's during your employment as an area

19  manager.  Do you see that?  This is on page four of

20  Exhibit 6.

21       A    Which number?

22       Q    Interrogatory number one.  It asked, "Please

23  describe in detail the tasks and responsibilities that you

24  performed for Defendant during your employment as an Area

25  Manager with Defendant."  And then there's some subparts

Page 211

1   underneath that.

2         But if you go down to your response which is

3   below that, you'll see that there's a last line there

4   that's pretty lengthy and it says, "Subject to and without

5   waiving these objections, Plaintiff states that he

6   performed tasks and responsibilities that were none-exempt

7   in nature, including: unloading and processing freight;

8   placing merchandise on the sales floor; organizing

9   clothing racks; using equipment to set the sales on

10  merchandise; changing mannequins; operating cash

11  registers; and cleaning the store."  Right?  That was your

12  response?

13      A    If you can just clear up just so I'm a hundred

14  percent sure.  When it says subject and with --

15      Q    Subject to and without waiving these objections?

16      A    That and -- because it's not a part of my

17  everyday speech.  So when I hear that, maybe it just gets

18  jumbled.  Is there a shorter, non-term that you could just

19  spell out for me?

20      Q    What that means is the first three sentences of

21  your response were legal objections raised by your

22  lawyers.  Then they use the phrase "subject to and without

23  waiving these objections."  So I think the objections

24  refer to those first three sentences.  And what they're

25  essentially saying is moving past all those objections we

Page 212

1    just made, here's how we would answer the question.  So

2    they're preserving, in essence, all of the objections

3    they've made, and then they're saying without waiving our

4    right to bring those up with the judge, here is what Mr.

5    Maar says that he did.

6         A    Okay.

7         Q    Do you understand that now?

8         A    Yes, yes.

9         Q    Okay.  And so where you see that list of duties

10   and responsibilities there, was that the answer you gave?

11        A    Yes.

12        Q    Okay.  We've discussed some other duties and

13   responsibilities today; right?

14        A    Correct.

15        Q    And are those also duties and responsibilities

16   that you performed?

17        A    Yes.

18        Q    But those duties and responsibilities aren't

19   necessarily shown in your answer there; are they?

20        A    That is correct.

21        Q    Now, if we go back to Exhibit 1, if you look

22   there, you'll see under disciplines that one of them was

23   to "Partner with the Merchandise Manager or Store Manager

24   on the development of store specific presentations and

25   merchandise concepts."  Is that something you did?

Page 213

1      A    Which line, I'm sorry?

2      Q    Under disciplines.  It's the first bullet point.

3      A    In that location, there was no partnership as

4    far as what needed to be a development of the store

5    specific presentation or merchandise concepts.  You were

6    given a blueprint, a plan, the adjacency, and I was told

7    to follow it.  I didn't partner with anyone to create a

8    concept or specific presentations around the store.

9      Q    Did you ever get involved in making any

10   recommendations as to "store specific presentations or

11   merchandise concepts"?

12     A    Not really.  I mean, like I said, we talked to

13   the visual managers.  They would look at our store, look

14   at my locations and say we need to do this, this and this.

15   I said what if we did this?  They said no, we're going to

16   do this.  If they listened to my recommendation, it was

17   rare.  But --

18     Q    So sometimes they did?

19     A    They did that maybe one out of 50 times.

20     Q    Okay.  What about "Adapt Corporate Adjacencies

21   to specific division layouts."  Did you do that?

22     A    Let me see.  Well, that's saying adapt the

23   corporate adjacencies.  Me specifically, no.

24     Q    Did you ever get involved in helping to fit the

25   overall corporate adjacency that you were given to your

Page 214

1    specific store's layout or your specific area's layout?

2         A    No.

3         Q    So even though you described to me earlier

4    telling the store manager about things not fitting because

5    a shelf was too long or too short or we didn't have an

6    available rack, your testimony is that you were not

7    involved in trying to adapt that adjacency?

8              MR. GERSHBAUM:  Objection, asked and

9         answered.

10             You can answer.

11             THE WITNESS:  Well, adapting is me making the

12        decision, implementing it and putting the

13        merchandise on.  Adapting is telling her -- if

14        adapting is telling her what the problem is and

15        her telling me what to do, that's what happened.

16   BY MR. JOHNSON:

17        Q    So you did participate in that, you just didn't

18   have the final decision.

19             MR. GERSHBAUM:  Objection.  It's a

20        mischaracterization.

21   BY MR. JOHNSON:

22        Q    Is that correct?

23        A    No, I wouldn't say that.

24        Q    What's not correct about it?

25        A    I would bring her to the location, say this is

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 215

1    wrong according to your map, what do you want to do about

2    it.  She would write on the map what had to be done and

3    then we would do it.

4         Q    Did you ever "Implement divisional merchandising

5    concepts"?

6         A    No.

7         Q    Did you ever "Partner with a Merchandise Manager

8    and Store Manager to identify business opportunities and

9    create action plans to drive results"?

10        A    Like I said, we had the monthly reports that

11   showed if a product was not doing well.  I'd bring it to

12   my store manager's and the merchandise manager's attention

13   and they would either say leave it alone or do this.

14        Q    And you would identify things that were not

15   selling well; right?

16        A    That was already given to the store manager and

17   the visual managers along with myself.

18        Q    Okay.  And you would bring that to the attention

19   of your store manager; right?

20        A    If it wasn't given to me first, then I would

21   show her where a product wasn't selling.

22        Q    Okay.  And in terms of "teaching, developing and

23   empowering direct reports to interpret presentations to

24   improve customer experience," did you ever do that?

25        A    No.

Page 216

1       Q    Did you "Teach and direct your team to meet

2   Beall's standards for guest service delivery"?

3       A    For the first part?  I'm sorry, I got lost in

4   the question.

5       Q    Did you ever "Teach and direct your team to meet

6   Beall's standards for guest service delivery"?

7       A    That was partnerships with the other employees,

8   with the direction, with the training tapes.  So no.

9       Q    So you said no just because you had other people

10  that were also involved in doing that?

11      A    Correct.

12      Q    But you were involved in doing that, too;

13  correct?

14          MR. GERSHBAUM:  Objection, asked and

15      answered.

16  BY MR. JOHNSON:

17      Q    Is it your theory that if someone else did it

18  and you did it also, that the fact that someone else did

19  it means you didn't do it?

20          MR. GERSHBAUM:  Objection to form.

21          You can answer.

22          THE WITNESS:  One more time.

23  BY MR. JOHNSON:

24      Q    Okay.  I think I asked you if you did this and

25  it sounded like you just told me that "I did it in

Page 217

1   partnership with these other people."  And then you said,

2   "So no."

3             MR. GERSHBAUM:  Objection --

4   BY MR. JOHNSON:

5       Q    Why is the fact you did it in partnership with

6   someone else mean that you didn't do it?

7       A    I might have got confused on the question.  But

8   as far as teaching them guest service --

9       Q    You did that; right?

10      A    Yes.

11      Q    Okay.  "Daily merchandise presentation and

12  replenishment," did you teach and direct your team to meet

13  the standards for that?

14            MR. GERSHBAUM:  Objection to form.

15            You can answer.

16            THE WITNESS:  No.

17  BY MR. JOHNSON:

18      Q    Why not?

19      A    Because that was already dictated by the

20  adjacencies and the operational manager and the store

21  managers.

22      Q    And did your team just arrive at the store on

23  the first day of employment knowing how to do that

24  automatically?

25            MR. GERSHBAUM:  Objection to form.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 218

1           You can answer.

2           THE WITNESS:  They were partnered with

3       specific people in specific departments on how to

4       arrive at that destination on how to merchandise.

5  BY MR. JOHNSON:

6       Q    And it was also part of your responsibility to

7  make sure they understood those responsibilities?

8           MR. GERSHBAUM:  Objection to form.

9           You can answer.

10           THE WITNESS:  It was everyone's

11       responsibility to make sure that --

12  BY MR. JOHNSON:

13       Q    To make sure --

14       A    The store managers, visual managers, guest

15  service people, all those people working in those

16  departments had to make sure everyone knew what to do in

17  those departments.

18       Q    But in terms of having responsibility for it and

19  holding people accountable for it, that's something that

20  was your responsibility; right?

21           MR. GERSHBAUM:  Objection to form.

22           You can answer.

23           THE WITNESS:  I mean, in my department, if I

24       had an employee that didn't know how to fold a

25       shirt, I would show them how to fold a shirt and

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 219

```
1          how to put merchandise on a rack and follow the
2          adjacency.  That was part of my responsibility.
3   BY MR. JOHNSON:
4      Q    So you were teaching them and directing them to
5   do it the right way; right?
6               MR. GERSHBAUM:  Objection to form.
7               You can answer.
8               THE WITNESS:  The first action was brought by
9          the associates already in that department how to
10         teach new employees.  If they needed further
11         direction, I would show them the adjacencies, the
12         planograms, and then go over the technique on how
13         to fold a shirt.
14  BY MR. JOHNSON:
15     Q    "Daily recovery and rack maintenance," did you
16  teach and direct your team to do that?
17     A    No.
18     Q    Why not?
19     A    Because it was, it's folding shirts and it's
20  rack management.  It's not rocket science.
21     Q    So you didn't have to teach them?
22     A    We partnered with all the employees in the store
23  and we work as a team.  It wasn't a teachable aspect.
24     Q    Did you direct your team?
25     A    Did I direct my team to do what?
```

Page 220

1      Q    Mr. Maar, you seem to be in love with the phrase
2   "partner with."  What do you mean by "partner with"?
3      A    Can you give me an example of when I said
4   "partner with"?
5      Q    Well, there's probably a hundred we could read
6   back.  Tell me what you mean when you use the phrase
7   "partner with."
8      A    Well, again, if we get a new cashier in the
9   building, we're not going to partner them with the janitor
10  staff.  We're not going to partner a shoe department
11  person to work with the janitors.  We're going to partner
12  specific people that work in those departments where
13  they're assigned to work in those departments.
14     Q    When you describe yourself partnering with
15  others to carry out a task, what do you mean by that?
16     A    That they would be their first interaction,
17  their first training point on how to perform tasks in the
18  building.
19     Q    Is that a phrase that you commonly used when you
20  were working for Beall's, "partner with"?
21          MR. GERSHBAUM:  Objection to form.
22          You can answer.
23          THE WITNESS:  It was over three years ago.
24  I'm not sure if I used that phrase or not.
25  BY MR. JOHNSON:

                                                       Page 221

1        Q     When did you start using that phrase?

2              MR. GERSHBAUM:  Objection to form.

3              You can answer.

4              THE WITNESS:  I don't know.  I'm not aware of

5        when I started using the term "partner with."

6    BY MR. JOHNSON:

7        Q     Is that a phrase you use regularly in everyday

8    life?

9              MR. GERSHBAUM:  Objection.  Please stop

10        harassing the witness.

11             But you can answer.

12             MR. JOHNSON:  I'm trying to find out if this

13        is his normal mode of speech.

14             MR. GERSHBAUM:  Note my objection.

15             You can answer.

16             THE WITNESS:  I do use "partner with" in my

17        speech.

18   BY MR. JOHNSON:

19        Q     Okay.  Now, so "Daily recovery and rack

20   maintenance."  Is it your testimony that you never had to

21   direct your team to do daily recovery?

22        A     In the morning, we all got in, we did rack

23   recovery.  We folded the shirts if they were messy.  We

24   picked up the shirts if they were on the ground, on the

25   racks, we put them on the racks.  At closing, we did the

Page 222

1   same thing.  If there was a dirty rack, if there was

2   clothes on the ground, we would all walk around the store

3   as a team, they would all communicate to everybody if

4   there was a problem in the store and we would all go to

5   that area.

6        Q    Okay.  Is it your testimony that you never

7   directed your team when it came to daily recovery?

8             MR. GERSHBAUM:  Objection to form.

9             You can answer.

10            THE WITNESS:  No.

11  BY MR. JOHNSON:

12       Q    So you would admit that you did direct your team

13  to some extent when it came to daily recovery; right?

14            MR. GERSHBAUM:  Objection to form.

15            THE WITNESS:  Not every day.  And if I was

16       the MOD, or even the manager, there would be times

17       I would be on the cashier or putting put-backs or

18       SOS.  I can't say a hundred percent of the time I

19       always directed somebody to do something while I

20       was in the store.

21  BY MR. JOHNSON:

22       Q    Is it something that you would typically end up

23  directing someone to do at least once during each workday?

24       A    It could happen, yes.

25       Q    What about rack maintenance, is that something

Page 223

1    you would typically end up directing someone to do at

2    least once during each workday?

3        A    Yes.

4        Q    What about "Fitting room return racks," is that

5    something you would typically direct someone to do at

6    least once during the work day?

7              MR. GERSHBAUM:  Objection to form.

8              You can answer much.

9              THE WITNESS:  If it was once, yes.

10   BY MR. JOHNSON:

11       Q    Okay.  What about "Adjacency execution and

12   maintenance," did you teach and direct your team to do

13   that?

14             MR. GERSHBAUM:  Objection, asked and

15        answered.

16             You can answer it again.

17             THE WITNESS:  Yes.

18   BY MR. JOHNSON:

19       Q    And in terms of pricing, did you teach and

20   direct your team to engage in "Ad sets, price changes and

21   markdown presentation"?

22       A    Myself along with the other associates and the

23   store managers and the operational managers.

24       Q    Did you "Utilize daily and weekly sales reports

25   to track, analyze and communicate business results"?

Page 224

1     A     That's where I would see the, a product, if it

2   wasn't performing well, and approach my manager, my store

3   manager, the visual or the operational managers of that

4   item.

5     Q     Would you "Communicate merchandise and product

6   performance opportunities and observations to the

7   Merchandise Manager"?

8     A     Pretty much the same response.

9     Q     So yes?

10    A     Yes.

11    Q     Did you "Communicate hardware, fixture and

12  mannequin needs to the Merchandise Manager"?

13    A     No.

14    Q     Did you, on the next page, "Facilitate open

15  communication with the Merchandise Manager and/or Store

16  Manager on all pertinent information that relates to

17  current direction and/or opportunities to drive business

18  within the store"?

19    A     No.

20    Q     Why didn't you do that?

21    A     Because they already had the adjacencies, they

22  walked the store daily.  They saw what the direction was

23  on their end.  They made the notes on what they wanted to

24  have achieved in the store and they would lay out a game

25  plan for us to follow and implement.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 225

1        Q    You've testified to me on numerous occasions

2   today that you would take things to the store manager to

3   give the store manager the opportunity to make a decision.

4   Doesn't that fit within this?

5             MR. GERSHBAUM:  Objection.

6             You can answer.

7             THE WITNESS:  Well, if the adjacency and

8        their floor plan didn't coincide, I would approach

9        the store manager and let them know that something

10       was wrong.

11  BY MR. JOHNSON:

12       Q    So were you approaching the merchandise manager

13  and store manager all the time or were you not approaching

14  them all the time?

15            MR. GERSHBAUM:  Objection.

16            You can answer.

17  BY MR. JOHNSON:

18       Q    You've given me sort of two different answers.

19  I'm trying to figure out which one is more correct.

20       A    I wouldn't say all the time.

21       Q    Frequently?

22       A    Occasionally.

23       Q    Occasionally.  But the rest of the time you were

24  able to function without consulting with them.

25       A    With their, with the adjacencies and their plan,

Page 226

1    I was able to follow their direction.  It was rare when

2    something was not able to fit in their plan because they

3    mapped it out days, weeks, months before it was actually

4    implemented.  So it was rare when something did not fit or

5    something did not flow correctly.

6         Q    The next bullet point says "Plan and coordinate

7    execution of promotions, aisle and impulse programs and

8    events."  Did you do that?

9         A    "Promotions, execution of promotions, aisle and

10   impulse" -- those were dictated by, I know the red book

11   had the impulse programs.  So it was just a sheet that we

12   had to follow to put on each items on the programs.

13        Q    Would you agree that you coordinated the

14   execution of these programs?

15        A    No.

16        Q    Would you agree that you were involved in

17   planning any of these programs?

18        A    No.

19        Q    Did you "Maintain a current awareness and

20   knowledge of the competitive landscape"?

21        A    No.

22        Q    Do you have any idea whether other area managers

23   did these responsibilities as they were listed on this

24   particular job description?

25        A    I really can't speak for them.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 227

 1      Q    So you have no idea whether they were similar to
 2   you in terms of how they performed their job.
 3            MR. GERSHBAUM:  Objection to form.
 4            THE WITNESS:  Do I have to answer that?
 5            MR. GERSHBAUM:  Yeah, you got to answer.
 6       When I say objection, unless I directly tell you
 7       not to answer --
 8            THE WITNESS:  Okay.  Well, speaking with them
 9       over the years and getting similar circumstances
10       with their areas, with the store, I would say
11       there are similarities between my answers and what
12       I'm assuming would be theirs.
13   BY MR. JOHNSON:
14      Q    But you don't know whether they would say if
15   they did these things.
16      A    I can't speak for them.
17      Q    Okay.  Now, late last night we received some
18   supplemental production from you and I have not -- or
19   actually from your attorneys.  I have not had a chance to
20   print this page yet.  I'm going to show it to you in
21   electronic format here and let you look at it and we'll
22   send it and have it become part of the record on paper as
23   soon as I can get it printed out.  But this is an
24   electronic document that I'm showing you on the iPad here
25   that was presented last night to us.  It bears the logo at

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 228

1    the bottom corner of Maar 0001, and it goes to the next

2    page.  Do you recognize that as being a resume of yours?

3         A    Yes.

4         Q    Okay.  And when was that resume used by you?

5         A    If I did use this resume, it would have to be

6    during or after my employment with Beall's.

7         Q    Okay.  And with regard to what it says about

8    what you did at Beall's, it lists you as an area manager;

9    right?

10        A    Yes.

11        Q    And it says on the first bullet point that you

12   created the schedule for staff; correct?

13        A    Correct.

14        Q    Was that a lie?

15             MR. GERSHBAUM:  Objection to form.

16             You can answer.

17             THE WITNESS:  No.  I made a copy for the

18        staff.  If I had to cross off a name, if I had to

19        call somebody in based on the list that we already

20        talked about, I would say that's creating a

21        schedule.  Wouldn't you?

22   BY MR. JOHNSON:

23        Q    So the next bullet point says "Setting goals for

24   employees; daily solicitation goals, guest interactions,

25   online orders."  Did you do that?

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

1       A     That was dictated by the red book how many

2    emails that we had to perform, how many credits that we

3    had to perform.

4              I can't see exactly what it says.

5              "Solicitation goals, guest interactions."  So

6    those were goals that were dictated to us by the red book.

7       Q     And you would communicate that to your

8    employees.

9       A     Yes.

10      Q     It says "I am responsible for the daily recovery

11   of the store in my areas in which I manage."  And it gives

12   the names of the different departments, gift, shoes, men's

13   and the kids department; right?

14      A     Yes.

15      Q     It says "I utilize weekly department sale

16   spreadsheets to communicate low sales to my team and the

17   store management, then create and complete an action

18   plan;" right?

19      A     Correct.

20      Q     And so even though you told me you did not do

21   business plans when I asked you about it in respect to the

22   area manager job description, here in your resume you say

23   you did that; right?

24      A     Well, I mean, it's a resume.  I wanted to not

25   lie, but I have to add information that I presented it to

Page 230

1    my boss.  In my opinion, I feel that from what I already

2    spoke to you and said to you, that that reflects

3    correctly.

4         Q    Okay.  Because you told me earlier that you're

5    not someone who'd lie just to gain an advantage; right?

6              MR. GERSHBAUM:  Objection.

7              You can answer.

8              THE WITNESS:  From the response I gave you

9         previously about the items that I told my store

10        manager, I believe that that justified that

11        statement.

12   BY MR. JOHNSON:

13        Q    Okay.  And where it says you've "created

14   marketing material for events in and out of the store;

15   flyers, handouts, motivational posters," did you do those

16   things?

17        A    Well, if we're only talking about 2013 -- I

18   don't know if you want me to tell you an instance where

19   that took place.

20        Q    Did you do that ever?

21        A    In store 66.

22        Q    Okay.

23        A    For a motivational poster, if you want me to

24   elaborate, I at one point suggested that we were low on

25   the credit card totals for the year that Beall's expected

Page 231

1    us to do as a store.  What I suggested is that making a

2    poster on the break room wall, that whenever an employee

3    got a credit card, that we would give them a sticker, a

4    balloon, something to put besides their name.

5         Q    Okay.

6         A    It all fell apart.  The other managers weren't

7    participating.  The people were just throwing away their

8    pins.  I did it once, I tried, and it didn't work out.

9    But that was in the store location.

10        Q    Did you ever make any suggestions in store 23 in

11   terms of how you could increase sales or participation?

12        A    No.  Not that I recall.

13        Q    Okay.  But that certainly would have been

14   something that was within the realm of your job

15   description; right?

16             MR. GERSHBAUM:  Objection to form.

17             THE WITNESS:  To create motivational posters?

18   BY MR. JOHNSON:

19        Q    To create action plans to drive results or to

20   identify business opportunities.

21        A    I don't see how the two are the same, an action

22   plan for a report on store products and a motivational

23   poster for credit cards.  But I attempted it, it didn't

24   work out, and we moved on.

25        Q    Okay.  And that wouldn't be anything that would

Page 232

1    be involved with coordinating the execution or planning

2    the execution of a promotion?

3         A     No.

4         Q     Or an aisle or impulse program or an event?

5         A     No, I don't believe so.

6         Q     Okay.  It says here "I conduct associate reviews

7    on a monthly and quarterly basis in which goals and

8    conduct are discussed."  Did you do that?

9         A     I completed the forms, the ones that you

10   presented to me.  I gave them to my store management.

11   Sometimes they were already filled out and given to me.  I

12   went over those items with the employee.  We both signed

13   it and I put them in their folder that had their name in

14   it.

15        Q     Were those always uniformly positive reviews or

16   were some negative reviews?

17        A     I can't recall.

18        Q     If they were negative reviews, would you discuss

19   how the associate could improve their performance to meet

20   expectations?

21        A     Well, if it said that they were late, I would

22   say you have a negative review because you were late, you

23   need to not be late.  That would be one aspect of a

24   negative review.

25        Q     All right.  Here it says "I have conducted phone

Page 233

1   and in store interviews for potential candidates for

2   employment."  Did you do that?

3        A     Well, if somebody called and said if you were

4   hiring, I would say we are at this time, have you ever

5   folded clothes before.  They said yes.  Where have you

6   done that?  I did it at Target, I did it at Wal-Mart.

7   Okay, come in for an application, you sound like somebody

8   that could work for us, fill it out and I'll give it to

9   the store manager.

10       Q     Okay.  The next one was "Daily money management

11  duties."  Was that with respect to the cash drawers and

12  the bank deposit?

13       A     Yes.

14       Q     Were there any other money management duties you

15  were referring to?

16       A     Besides the checks being entered into the system

17  as well, I can't think of any other situations.

18       Q     Okay.  It says "Working with visual

19  merchandisers to create visual impacts for new ticket

20  items."  What did that involve?

21       A     Getting direction from the merchandise managers,

22  if they wanted to put a different fish on the wall.  Let's

23  say it's Guy Harvey and they want to put a shark on the

24  wall.  I've showed them, because the adjacency called for

25  a grouper, that we had to change it because of what the

Page 234

1   adjacency called.

2        Q    Okay.  What is "Develop new team members into

3   merchandise handlers with one-on-one training"?

4        A    That was more or less just walking with the

5   team, placing them with a partner, placing them with

6   people in that department, having them be trained by them,

7   and myself working along with them as well.

8        Q    Okay.  That sounds a lot to me like facilitating

9   training for merchandise handlers; is that correct?

10            MR. GERSHBAUM:  Objection to form.

11            You can answer.

12            THE WITNESS:  That's your opinion.

13   BY MR. JOHNSON:

14        Q    Is it?

15        A    You just said I believe that this is.  That is

16   your opinion.

17        Q    Is that a true statement?

18            MR. GERSHBAUM:  Objection, form.

19   BY MR. JOHNSON:

20        Q    That it's a lot like facilitating training for a

21   merchandise handler?

22            MR. GERSHBAUM:  Objection to form.

23            You can answer.

24            THE WITNESS:  Develop new team members

25       into -- if I was to sit there and help them fold

Page 235

1        clothes, make sure everything was completed by the

2        adjacencies, that would -- if that entails

3        development and facilitate their merchandise

4        manager -- sorry -- merchandise handler skills,

5        then yes.

6            MR. JOHNSON:  Okay.  Let's take a break.

7        It's 3:48 by my watch.

8            (Thereupon, there was a break from 3:48 p.m.

9        to 4:00 p.m.)

10            (Thereupon, Defendant's Exhibit Number 8 was

11        marked for identification.)

12   BY MR. JOHNSON:

13       Q    Mr. Maar, will you look at Exhibit 8 that's in

14   front of you.  Can you just confirm whether that's the

15   same resume that we looked at on the iPad that has the

16   same Maar 001 and Maar 002.

17       A    Yes.

18       Q    Okay.  Thank you.

19            MR. JOHNSON:  And just for the record, the

20        court reporter was kind enough to be able to print

21        out the document and give us a paper copy.  I'm

22        just making sure we have it correctly identified

23        for the record.

24   BY MR. JOHNSON:

25       Q    Okay.  Is my understanding correct that you have

Page 236

1    spoken about this lawsuit with a couple of other area

2    managers?

3        A    I didn't speak to them, I sent Facebook messages

4    to them.

5        Q    Okay.  And who are those other area managers?

6        A    Trish Cooper.  Let me think.  Ginny Bardi.  If

7    you want to get the spelling of the name --

8        Q    I think they've got them on the updated answers.

9    Is it G-I-N-N-Y B-A-R-D-I?

10            MR. GERSHBAUM:  He has those in his papers.

11       He has them.

12   BY MR. JOHNSON:

13       Q    The spellings I'm working with are coming from

14   your lawyers last night.

15            MR. GERSHBAUM:  You gave us the spelling;

16       correct?

17            THE WITNESS:  Yes.

18            MR. GERSHBAUM:  So we put it on the paper we

19       sent to him.  He has it.

20            THE WITNESS:  Marylynn Bozenbury.

21   BY MR. JOHNSON:

22       Q    That's B-O-Z-E-N-B-U-R-Y.  That's Marylynn, one

23   word, M-A-R-Y-L-Y-N-N.

24       A    Whatever was provided.

25       Q    Right.  I'm just doing it for her benefit.

Page 237

```
 1      A     Yeah.

 2      Q     Okay.  And then Jeannie Saltmarsh was the other?

 3      A     Yes.

 4      Q     Were there any others that you recall other than

 5   those four?

 6      A     No.

 7      Q     Did any of those respond to your Facebook

 8   message?

 9      A     Yes.

10      Q     Who responded?

11      A     All four.

12      Q     Okay.  And what was the substance of your

13   communication with each of them?

14            MR. GERSHBAUM:  Let me just -- you're asking

15       what he said to them and what they said back?

16            MR. JOHNSON:  Yes.

17            MR. GERSHBAUM:  Okay.  So I'm going to object

18       to the line of questioning.  I think it's

19       attorney-client privilege.

20            MR. JOHNSON:  You think it's a communication

21       between the lawyer and the client?

22            MR. GERSHBAUM:  I think it's subject to

23       attorney-client privilege.

24            One second.  You want to go off the record

25       for a second?
```

1            MR. JOHNSON:  Sure.

2               (Discussion held off the record)

3            MR. GERSHBAUM:  After an off-the-record

4        discussion, we're going to allow you to ask about

5        the content and some substance of the conversation

6        subject to and without a waiving of my

7        attorney-client privilege, defense, and --

8            MR. JOHNSON:  Defense is in agreement with

9        that.  We won't assert that this question and

10       answer sequence here is a waiver of the

11       attorney-client privilege.

12           MR. GERSHBAUM:  All right.  Subject to that.

13   BY MR. JOHNSON:

14       Q    Okay.  So can you tell me generally what you

15   were talking about with each of those four.

16           MR. GERSHBAUM:  Subject to my objection.

17           THE WITNESS:  That I received an email, or it

18       might have been a letter, from the law group

19       stating that there was a pending class action suit

20       against Beall's for unpaid overtime that was due

21       to area managers.

22   BY MR. JOHNSON:

23       Q    And did you share that you had received that

24   with each of them?

25       A    My -- yes, that I was engaged in proceeding, and

Page 239

1    I asked if they would like to join the lawsuit as well.

2        Q    And how did they respond?

3        A    Jeannie Saltmarsh and Trish Cooper responded

4    that they would like more information and that they would

5    want to possibly contact Charlie.

6        Q    How long ago was that communication?

7            MR. GERSHBAUM:  Just I have a continuing

8        objection.

9            Keep going.

10           THE WITNESS:  It was the first or second week

11       of June, or July.

12   BY MR. JOHNSON:

13       Q    Of which year?

14       A    This year.

15       Q    Do you remember telling them that you had

16   received a letter from Mr. Gershbaum's law group telling

17   you about the existence of a lawsuit?

18           MR. GERSHBAUM:  Objection to form.

19           You can answer.

20           THE WITNESS:  Yes, either it was an email or

21       a letter that I received.

22   BY MR. JOHNSON:

23       Q    When did you first hear from Mr. Gershbaum's law

24   practice about the existence of a potential collective

25   action?

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 240

1          MR. GERSHBAUM:  Note my objection, subject to

2     attorney-client privilege.

3          You can answer.

4          THE WITNESS:  After I received the letter or

5     email, I contacted Charlie I believe first and

6     inquired about the lawsuit to get more information

7     about it.

8  BY MR. JOHNSON:

9     Q    So this was before the lawsuit was filed or

10 after the lawsuit was filed?

11    A    I'm not sure how that works.  But I received a

12 letter or email saying that there was a class action suit

13 happening and I reached out to the law group to get more

14 information.

15    Q    Okay.  Your lawsuit was filed April 5th of this

16 year.  Do you know that?

17    A    I do not.

18    Q    Okay.

19    A    I do now.

20    Q    Was the letter or email that you received one

21 that invited you to join the lawsuit or did it represent

22 to you that a lawsuit was already pending?

23         MR. GERSHBAUM:  I'm going to object,

24    attorney-client privilege.

25         You can reply.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 241

```
 1            THE WITNESS:  I believe it did have my name
 2       on the actual wording, "Hello Eric."  So I assume
 3       that it was directed to me and I assumed that
 4       other area managers from Beall's received the same
 5       information.
 6  BY MR. JOHNSON:
 7       Q    Okay.  As you sit here today, do you understand
 8  that you are one of the two named plaintiffs in this
 9  lawsuit?
10       A    Yes.
11       Q    To the best of Beall's knowledge, no one was
12  suing Beall's about area manager status in 2016 until you
13  and Linda Wess sued.  Do you understand that you're the
14  first two to have sued with this group?
15       A    Yes.  After looking at the communication from
16  Charlie, yes.
17       Q    Okay.  And so you knew you were signing up to
18  bring the action, not just to join the action; right?
19            MR. GERSHBAUM:  Objection to form.
20            You can answer.
21            THE WITNESS:  Correct.
22  BY MR. JOHNSON:
23       Q    Okay.  And at what point did you reach out to
24  these other four area managers?
25            MR. GERSHBAUM:  Objection, asked and
```

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 242

1      answered.

2           You can answer again.

3           THE WITNESS:  I'll have to check the

4      messages, but it was either the first week of June

5      or July.  First or second week in one of those

6      months.

7   BY MR. JOHNSON:

8      Q    So after the lawsuit was filed.

9      A    That is correct.

10     Q    All right.

11     A    That I just found out when you said it was in

12  April.

13     Q    Have you had any further communications with

14  Ginny or Trish after those Facebook messages were

15  exchanged?

16     A    No.

17     Q    What is the last thing you've heard from Ginny

18  or Trish?

19     A    Trish Cooper said that she would reach out and

20  get more information from the law group.  And Ginny, she

21  did not respond after I let her know what my position was.

22          But there's Ginny and Jeannie.  Jeannie

23  Saltmarsh -- I don't know which one you said or which one

24  we're talking about.

25     Q    Well, tell me which one you meant to talk about

1   when you said Ginny did not respond further.

2       A    Ginny Bardi did not respond further.  Jeannie

3   Saltmarsh responded that she would be interested in

4   getting more information about the lawsuit.

5       Q    Did you provide more information to her?

6       A    Just a text stating that she could reach out to

7   the law office at any time, that had the number of the law

8   group.

9       Q    Have you had any further conversations with her

10  to determine whether she is still interested?

11      A    No.

12      Q    Do you have any other personal knowledge as to

13  whether she is interested in joining this lawsuit?

14      A    No.

15           And the last one, Marylynn Bozenbury, I did not

16  hear further communication.

17      Q    So as it stands today, you don't have any

18  personal knowledge of whether she's interested in joining

19  this lawsuit.

20      A    Correct.

21      Q    And other than what we've discussed today, do

22  you have any personal knowledge of whether Ginny Bardi is

23  interested in joining this lawsuit at present?

24      A    I do not know if she would like to join.

25      Q    And other than what we've discussed so far, do

Page 244

1    you have any other personal knowledge of whether Trish

2    Cooper would like to join this lawsuit?

3        A    From today, no, I do not know.

4        Q    As you sit here today, are you aware of anyone

5    else who intends to join this lawsuit if the court

6    certifies it as a collective action?

7        A    I'm sure if there's other area managers out

8    there that feel the same way.  Personal names, I mean, I

9    could just rattle off a couple area managers, like

10   Jennifer, I forgot her last name.  If she was reached out

11   to and she feels like it's appropriate -- I mean, I don't

12   know.

13       Q    But you don't have personal knowledge as you sit

14   here today.

15       A    Oh, no, no.

16       Q    When you received the initial letter from Mr.

17   Gershbaum's firm, were you told that there was some other

18   plaintiff that intended to bring this lawsuit?

19            MR. GERSHBAUM:  Objection to form.

20            You can answer.

21            THE WITNESS:  I'm not a hundred percent sure

22       if Linda was mentioned in the document or the

23       email.

24   BY MR. JOHNSON:

25       Q    What did that communication ask you to do?

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 245

1           MR. GERSHBAUM:  Objection to form.

2           You can answer.

3           THE WITNESS:  To reach out to the law group

4       to get more information about the class action.

5   BY MR. JOHNSON:

6       Q    Did it contain any suggestions as to what the

7   possible recovery would be?

8           MR. GERSHBAUM:  Object to the form.

9           THE WITNESS:  I don't believe so.  It just

10      said unpaid overtime.  That's my recollection.

11  BY MR. JOHNSON:

12      Q    Did it make any representations to you about

13  whether Beall's was in violation of the law?

14      A    Not to my recollection.

15      Q    Do you know anything about who Mary Hawkins is?

16      A    Mary Hawkins.  I'm bad with names.  If I saw a

17  picture maybe.  But the name doesn't ring a bell.

18      Q    All right.  If I told you she hasn't worked for

19  Beall's for a number of years, do you have any personal

20  knowledge of her?

21      A    Without seeing a picture, I'm not sure who Mary

22  Hawkins is.

23      Q    I'll now read three additional names to you and

24  ask you if you have any personal knowledge of them:

25  Martina Guzman, Gail Kreyeski and Silvia Oziah.  Do you

Page 246

1    have personal knowledge of any of those?

2         A    I'm really bad with names.  Silvia possibly, but

3    I would have to see a picture of all the names you

4    mentioned.

5         Q    Okay.  To the best of my knowledge, none of them

6    ever worked with you at either the Port St. Lucie store or

7    the Stuart store.  Do you have any specific recollection

8    of those names?

9         A    The names I'm horrible with, so no.  Today, no.

10        Q    All right.  I want to go back to the duties that

11   are listed in response to interrogatory number one on page

12   four.  Do you have the ability to estimate how much time

13   you spent performing those duties as opposed to any of the

14   other duties we've talked about today?

15        A    I'm kind of lost where we're at.

16        Q    So it's these duties in the last line of your

17   response to interrogatory number one.

18        A    And we're on page four?

19        Q    We're on page four, yeah.  We talked about this

20   earlier.  Those are what you said your duties were.

21        A    Okay.

22        Q    Do you have the ability to make any kind of

23   estimate as to how much of your time you spent doing those

24   as opposed to any other duties that were also things that

25   we agreed on that you were responsible for?

Page 247

1      A    It was random times, and if I was in the store,

2   I was told to do this, this and this task.  So I didn't

3   have set percentages for each individual item.

4      Q    So as you sit here today, can you say "I spent

5   60 percent of my time doing these and 40 percent of my

6   time doing the others," or any other percentage?

7           MR. GERSHBAUM:  I'm just going to object.  I

8        don't think he understands the question.

9           MR. JOHNSON:  Well, let him tell me that,

10       please.  I don't want you to suggest an objection

11       or an answer to him.

12          MR. GERSHBAUM:  All right, I'm not

13       suggesting.

14          MR. JOHNSON:  Okay.  Let him answer.

15          MR. GERSHBAUM:  All right, all right.  The

16       record speaks for itself.

17  BY MR. JOHNSON:

18     Q    Can you tell me as you sit here today that "I

19  spent 60 percent of my time doing these and 40 percent of

20  my time doing the rest of it," or any other percentage?

21     A    If this is relating to 2013, that was very

22  random where I couldn't give you a percentage because it

23  changed every single day what your duties were or what the

24  plan was for that day.

25     Q    So sometimes it was these duties and sometimes

Page 248

1    the other duties we talked about; right?

2              MR. GERSHBAUM:  Objection to form.

3              THE WITNESS:  Correct.

4    BY MR. JOHNSON:

5       Q    Okay.  And even when you were doing these

6    duties, you sometimes still had to be available to take

7    requests on the walkie-talkie; right?

8              MR. GERSHBAUM:  Objection to form.

9              You can answer.

10             THE WITNESS:  Correct.

11             MR. JOHNSON:  All right.  Let's take a short

12        break.  I'm not sure how much else I have, but I

13        need to wrap it up.

14             (Thereupon, there was a break from 4:17 p.m.

15        to 4:23 p.m.)

16             MR. JOHNSON:  Okay.  So back on the record.

17        I don't have any further questions.

18             MR. GERSHBAUM:  All right.  I need five

19        minutes to take a look and then we'll finish up.

20             (Thereupon, there was a break from 4:23 p.m.

21        to 4:26 p.m.)

22                         CROSS-EXAMINATION

23   BY MR. GERSHBAUM:

24      Q    Good afternoon, Mr. Maar.  I have two sets of

25   questions.  One set is really maybe clarifying stuff that

Page 249

1   you had testified about or items you testified about

2   earlier and the second one might be questions you might

3   not have been asked.

4         You mentioned before that if there's an

5   accident, that you're able to tell an associate, instruct

6   an associate to call I guess the store manager or anyone

7   that needs to be called; is that correct?

8   A    Yes.

9   Q    If an associate is dealing with the accident,

10  are they able to direct another associate to call?

11  A    Yes.

12  Q    You also mentioned at one point that if you

13  were, one of the ways that people can improve the

14  performance of the store is they can walk over to a

15  customer and ask them if they want to purchase anything

16  else.

17  A    That's everyone's responsibility, yes.

18  Q    Okay.  So an associate is also supposed to do

19  that?

20  A    Yes.

21  Q    And an area manager?

22  A    Yes.

23  Q    And a store manager?

24  A    Yes.

25  Q    All right.  I'm going to direct your attention

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

1   to Exhibit Number 4, the acknowledgment statement.

2         A    Yes.

3         Q    Okay.  It's got your initials?

4         A    It does.

5         Q    And your signature?

6         A    Yes.

7         Q    Did you read it before you signed it?

8         A    Not every single line.

9         Q    Was this given to you with a bunch of other

10  documents to sign when you first were hired?

11        A    When I was hired, there was a bunch of stuff put

12  in front of me.  I was told sign here, here, here and

13  here.  I signed it.

14        Q    You mentioned earlier if you saw a violation of

15  company policy, you would report it to the store manager;

16  is that correct?

17        A    Yes.

18        Q    Did you have any discretion in whether you could

19  report a violation of company policy to a store manager?

20        A    Did I have discretion to -- I'm sorry?

21        Q    Did you have any discretion whether you were

22  able to report a violation of company policy to a store

23  manager?

24        A    No, there was no discretion.

25        Q    So, for example, if someone came in late, could

Page 251

1  you just say let it slide and not report it to the store

2  manager?

3       A    No.

4       Q    All right.  Exhibit Number 6, which is your

5  interrogatories, I'm going to direct your attention to

6  response number one.  The last sentence, it lists a whole

7  bunch of tasks and responsibilities that were performed.

8  I direct your attention to unloading and processing

9  freight.  I'm not going to ask you about what percentage

10 of your day you did each item, what percentage you did

11 unloading, what percentage you did merchandise, what

12 percentage you did organizing and so on.  My question to

13 you is different.  If you lump all those together, all

14 those tasks, how much of your time was spent doing these

15 type of tasks?

16            MR. JOHNSON:  Objection, asked and answered.

17            THE WITNESS:  Over 90 percent.

18 BY MR. GERSHBAUM:

19      Q    All right.  As an area manager, did you stock

20 the shelves?

21      A    Yes.

22      Q    Okay.  Did you run the register?

23      A    Yes.

24      Q    Did you unload the freight trucks?

25      A    Yes.

Page 252

1        Q       Did you unpack merchandise and stock?

2        A       Yes.

3        Q       Did you move merchandise and stock to the sales

4    floor?

5        A       Yes.

6        Q       Did you set up the sales floor according to the

7    adjacencies?

8        A       Yes.

9        Q       I think you've already defined what an adjacency

10   is.  I won't reask that.

11               Did you recover, neaten and straighten up the

12   sales floor?

13       A       Yes.

14       Q       Did you clean the store?

15       A       Yes.

16       Q       Clean the bathrooms?

17       A       Yes.

18       Q       Did you collect shopping carts in the parking

19   lot?

20       A       Yes.

21       Q       Did you fold clothing?

22       A       Yes.

23       Q       Did you sort and separate returns?

24       A       Yes.

25       Q       Did you put price tags on items?

Page 253

```
 1        A     Yes.

 2        Q     Did you put security tags on items?

 3        A     Yes.

 4        Q     Did you reticket items that were missing prices?

 5        A     Yes.

 6        Q     Did you post and take down signage?

 7        A     Yes.

 8        Q     Did you do customer service?

 9        A     Yes.

10        Q     What are go-backs?

11        A     They're items at the fitting rooms and the

12  registers that customers no longer wanted that we had to

13  put back in the correct position.

14        Q     And did you do go-backs?

15        A     Yes.

16        Q     Okay.  Were there mannequins in the store?

17        A     Yes.

18        Q     Did you change clothing on the mannequins?

19        A     Yes.

20        Q     What is an SOS?

21        A     It's an online order placed by Beall's customers

22  to send and pack the items from our store and ship them

23  off to those individual addresses for the customers.

24        Q     Did you yourself do SOSes?

25        A     Yes.
```

Page 254

```
 1       Q     All right.  With this list of tasks, how much of

 2   your time did you spend performing these type of tasks?

 3       A     Ninety percent.

 4       Q     Okay.  Now I'm going to ask you a little bit

 5   different question.  As an area manager, were you able to

 6   determine the training materials?

 7       A     No.

 8       Q     Could you approve vacation or time off?

 9       A     No.

10       Q     Did you direct the work of employees?

11       A     No.

12       Q     Did you authorize, could you authorize overtime?

13       A     No.

14       Q     Could you change corporate policy?

15       A     No.

16       Q     Did you set the prices to charge in the store?

17       A     No.

18       Q     Did you create the weekly sales ad?

19       A     No.

20       Q     Did you decide what products to sell in the

21   store?

22       A     No.

23       Q     Did you decide where to place signs in the

24   store?

25       A     No.
```

Page 255

```
 1        Q     Did you set the labor budget?

 2        A     No.

 3        Q     Did you set the rate of pay for hourly

 4   employees?

 5        A     No.

 6        Q     Did you set the dress code?

 7        A     No.

 8        Q     Could you decide whether to close the store in

 9   the event of bad weather?

10        A     No.

11        Q     Did you decide what music to play in the store?

12        A     No.

13        Q     Did you decide what temperature to maintain in

14   the store?

15        A     No.

16        Q     Were you ever asked to provide input to any of

17   Beall's corporate policies?

18        A     No.

19        Q     Could you negotiate on behalf of Beall's?

20        A     No.

21        Q     Could you enter into a contract on behalf of

22   Beall's?

23        A     No.

24        Q     Do you know if other area managers could do any

25   of these things that we just listed?
```

Page 256

1       A    They could not to the best of my knowledge.

2       Q    In your experience, was the store understaffed?

3       A    Yes.

4       Q    Is that why you worked longer hours and

5    performed mostly non-exempt tasks?

6       A    Yes.

7            MR. JOHNSON:  Object to the form of the

8       question.

9            MR. GERSHBAUM:  All right.  I have nothing

10      further at this time.

11                    REDIRECT EXAMINATION

12   BY MR. JOHNSON:

13      Q    Mr. Maar, did something change in your memory

14   over the last five minutes?

15           MR. GERSHBAUM:  Object to form.

16           You can answer.

17           THE WITNESS:  Can you be more specific?

18   BY MR. JOHNSON:

19      Q    Did something change in your ability to make an

20   estimate over the last five minutes?

21      A    No.

22      Q    The last question I think I finished with, or

23   one of the last ones, had to do with whether you could

24   look at that very same line on interrogatory number one

25   that your attorney pointed you to and whether you could

Page 257

1    make an estimate as to how much percentage of your time

2    you spent performing those duties as any others and you

3    told me no, you couldn't.  When he asked you that same

4    question, you whipped right out with 90 percent.  What

5    changed?

6              MR. GERSHBAUM:  Objection to form.

7              You can answer.

8              THE WITNESS:  I was under the understanding

9         from your question, misunderstanding from your

10        question, that you wanted an individual percentage

11        on every single day of individual tasks from that

12        list, which I cannot give you a breakdown of each

13        individual item.

14   BY MR. JOHNSON:

15        Q    You thought I was asking about individual task

16   percentages?

17        A    That was my understanding when you asked it.

18        Q    Okay.  We can go back and read that question and

19   see how clear it was and I'll be happy to do that.

20             Now, in terms of this, when you were doing the

21   things there, why aren't those the things that you put on

22   your resume?

23             MR. GERSHBAUM:  I'll object, beyond the scope

24        of redirect.

25             You can answer.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 258

1          THE WITNESS:  It was just I didn't have, I

2      didn't want a 15-page resume.  I just --

3  BY MR. JOHNSON:

4      Q    But you picked one, two, three, four, five, six,

5  seven, eight, nine, ten bullet points; right?

6      A    Correct.

7      Q    Why did you pick the things that you chose to

8  put down for those ten bullet points as opposed to the

9  things that you said in your answer to number one?

10          MR. GERSHBAUM:  I'm going to object, beyond

11      the scope of redirect.

12          You can answer.

13          THE WITNESS:  This is my resume.  I looked at

14      other online resumes of area managers, managers

15      that had similar circumstances to me.  If I copied

16      and pasted a couple things that were relevant to

17      my situation that, you know, helped my resume,

18      maybe helped hiring managers look at it, that's

19      what I was trying to do.

20  BY MR. JOHNSON:

21      Q    Okay.  Did you try to pick out the most

22  significant or the most important duties?

23          MR. GERSHBAUM:  Objection, form.

24          You can answer.

25          THE WITNESS:  Not necessarily.

Page 259

1    BY MR. JOHNSON:

2         Q    What basis were you using to choose these?

3         A    Really short sentences, something that would

4    catch the eye.

5         Q    Why did you choose those tasks to tell future

6    employers about?

7              MR. GERSHBAUM:  Objection, asked -- well,

8         it's beyond redirect.

9              You can answer.

10             THE WITNESS:  It was more or less if it could

11        help catch a future employer's eyes, and that if

12        spellchecks or resume checks came up with certain

13        key words, I thought it would help my cause

14        better.

15   BY MR. JOHNSON:

16        Q    Okay.  And in terms of whether you did any of

17   these things at the same time as you were doing the things

18   you listed in interrogatory number one, did you ever

19   perform these duties at the same time that you were doing

20   the tasks in number one?

21             MR. GERSHBAUM:  Objection.  It's totally

22        beyond the scope of redirect.

23             You can answer over my objection.

24             THE WITNESS:  I mean, if this has ever

25        happened -- I mean, I believe I answered each

Page 260

1       individual bullet point of where I might have done

2       each item between our interview.

3   BY MR. JOHNSON:

4       Q    Here's what I'm trying to figure out.  You said

5   90 percent of your time was doing things in number one.

6       A    Correct.

7       Q    During that 90 percent, were you also doing some

8   of the things you listed in your resume?

9       A    But like I mentioned, I only made one

10  motivational poster throughout my three years, two and a

11  half years with Beall's.

12      Q    But you thought it was important to tell a

13  future employer about that; right?

14           MR. GERSHBAUM:  Objection, asked and

15      answered, beyond the scope.

16           You can answer.

17           THE WITNESS:  It's a resume.  I wanted to put

18      words that would pop out and help my cause to get

19      a future job.

20  BY MR. JOHNSON:

21      Q    Okay.  And in terms of the other things on here,

22  did you perform those during the same 90 percent of your

23  time you say you spent on the duties in number one?

24           MR. GERSHBAUM:  Objection, asked and answered

25      three times, beyond the scope of redirect.

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

Page 261

1          You can answer.

2          THE WITNESS:  If it was, if it happened the

3      90 percent, the one time I made a poster, it was

4      the 90 percent fell into that, that could have

5      been the 10 percent that I was talking about.

6  BY MR. JOHNSON:

7      Q    Okay.  So are you saying all of these duties

8  fell within the 10 percent of your time that was left?

9          MR. GERSHBAUM:  Objection, beyond the scope

10      of redirect.

11          You can answer.

12          THE WITNESS:  Yes.

13  BY MR. JOHNSON:

14      Q    Okay.  But yet that's the 10 percent you chose

15  to tell future employers about; right?

16          MR. GERSHBAUM:  Objection, beyond redirect,

17      asked and answered.

18          You can answer.

19          THE WITNESS:  Well, these are, again, items I

20      found online that reflected similar circumstances

21      that I performed as an area manager.  And again,

22      it was a resume.  I'm trying to get a new job by

23      putting in certain tasks that I wanted to put into

24      my resume.

25  BY MR. JOHNSON:

Page 262

1        Q    And that you thought would be the most important

2    things you could tell a future employer about; right?

3             MR. GERSHBAUM:  Objection,

4        mischaracterization.  That's not his testimony.

5        Beyond the scope.

6             You can answer.

7             THE WITNESS:  No.

8    BY MR. JOHNSON:

9        Q    You didn't think these were the most important

10   things to tell the future employer about?

11            MR. GERSHBAUM:  Objection, beyond the scope.

12            You can answer.

13            THE WITNESS:  I didn't want to make my resume

14       15 pages.  I picked what, out of the 90 percent

15       and this list, and randomly chose what I wanted to

16       put in my resume.

17   BY MR. JOHNSON:

18       Q    Randomly.  Is it your testimony this was

19   randomly chosen?

20            MR. GERSHBAUM:  Objection, beyond the scope.

21            You can answer.

22            THE WITNESS:  Well, I came up with a list of

23       what I did in the store.  I wasn't trying to make

24       it 15 pages.  I looked at the best possible -- I

25       looked at my options, what I wanted to put on

1        here, and then I put it on there according to what

2        I thought would best reflect a resume that future

3        employers would want to take a look at.

4   BY MR. JOHNSON:

5        Q    And would that resume -- let me go back.  You

6   weren't lying to those employers; were you?

7             MR. GERSHBAUM:  Objection.  That's beyond the

8        scope.  If you're going to go like that, we'll

9        just call it a day.  It's beyond the scope.

10            THE WITNESS:  No.

11  BY MR. JOHNSON:

12       Q    Okay.  And in terms of what's on here, you

13  thought that would best reflect what you actually did at

14  Beall's; right?

15            MR. GERSHBAUM:  Objection, asked and

16       answered, mischaracterization.

17            THE WITNESS:  Again, it was to make a resume

18       where I would hope future employers would see

19       responsibilities like their management shifts that

20       they had that would gain their attention where I

21       could gain an interview from that company.

22  BY MR. JOHNSON:

23       Q    Okay.  Let me follow up on two other things you

24  mentioned in your cross.  You said you didn't set the

25  dress code.  But you certainly enforced it; right?

Page 264

1           MR. GERSHBAUM:  Objection to form,

2       mischaracterization.

3           THE WITNESS:  If I saw something or an

4       associate saw something or multiple people said

5       anything, we would approach the associate.

6       Everyone had that right to do it and say don't

7       wear this.

8   BY MR. JOHNSON:

9       Q    Okay.  And you said you didn't have any

10  discretion on reporting violations to the store manager if

11  someone came in late; right?

12      A    Correct.

13      Q    What if they came in late with a good excuse?

14          MR. GERSHBAUM:  Objection.

15          You can answer.

16          THE WITNESS:  Regardless.  That's an opinion

17      if it's a good excuse or not.  It still had to be

18      documented because I could not ignore an employee

19      coming in late.  They can explain it to the store

20      manager.

21  BY MR. JOHNSON:

22      Q    So if someone came in five minutes late and said

23  my cell phone battery was dead so I couldn't call you, but

24  I was held up because there was a cop that was blocking

25  the road and wouldn't let me go, is that something you

Page 265

1    would still report to the store manager?

2              MR. GERSHBAUM:  Objection, calls for

3         speculation, beyond the scope.

4              You can answer.

5              THE WITNESS:  I would document anytime a

6         customer was late, I mean an employee was late or

7         tardy.

8    BY MR. JOHNSON:

9         Q    All right.  In your 90 percent estimate you gave

10   on Exhibit 1, is it your testimony -- let me strike that.

11             We talked a lot about the responsibility you had

12   to serve as a representative of management if people

13   wanted to report violations of policy to you, whether it

14   was an ethics code, whether it was a sex harassment

15   violation.  Do you remember that?

16        A    Yes.

17             MR. GERSHBAUM:  Objection.

18   BY MR. JOHNSON:

19        Q    And were you only available for those reports

20   10 percent of your time or were you available for those

21   reports a hundred percent of your time?

22             MR. GERSHBAUM:  Objection.

23             THE WITNESS:  I was available a hundred

24        percent of the time.

25   BY MR. JOHNSON:

Page 266

1        Q    Okay.  And when it came to security and your

2   responsibility to make sure the store was safe and secure,

3   is that a responsibility that you only had 10 percent of

4   the time or was that a responsibility you had a hundred

5   percent of the time?

6        A    A hundred percent of the time.

7        Q    When it came to your responsibility to make sure

8   the store is not suffering a loss or shrink, was that a

9   responsibility that you only had 10 percent of the time or

10  a responsibility that you had a hundred percent of the

11  time?

12            MR. GERSHBAUM:  Objection, asked and

13       answered.

14            THE WITNESS:  That was a responsibility that

15       the entire store, every employee had in the store

16       a hundred percent of the time.

17  BY MR. JOHNSON:

18       Q    Okay.  And when it came to your responsibility

19  to be available to store associates to deal with customer

20  complaints and resolve customer experience issues, was

21  that something you had to be available to do 100 percent

22  of the time?

23            MR. GERSHBAUM:  Objection to form, beyond the

24       scope.

25            You can answer.

Page 267

1          THE WITNESS:  If I was the area manager, if I

2      was the manager on duty, there would be an

3      assigned person they needed to speak to, Maria,

4      the visual team members.  An associate could

5      approach multiple people besides managers.

6  BY MR. JOHNSON:

7      Q    Okay.  But if they came to you, you couldn't say

8  "Well, you can only talk to me about that between three

9  and four"; right?

10         MR. GERSHBAUM:  Objection.

11         You can answer.

12         THE WITNESS:  It's situational.  I don't know

13     what kind of situation you're talking about.

14  BY MR. JOHNSON:

15     Q    If they chose you to deal with a customer

16  experience issue and asked you to resolve it for them, you

17  had to deal with that.  You couldn't just say it's not the

18  hour I have to deal with that; right?

19     A    I wouldn't put it as blunt as that, but I would

20  use the walkie and say "MOD, can you please speak with

21  Mary and talk to her about the situation."

22         MR. JOHNSON:  Okay.  That's all I have.

23         (Thereupon, at 4:44 p.m., the above-entitled

24     deposition was concluded.)

25

Page 268

1    STATE OF FLORIDA        )
                            :SS
2    COUNTY OF INDIAN RIVER)

3

4                    CERTIFICATE OF OATH

5          I, PATRICE C. HENSLEY, Registered Professional

6    Reporter, in my capacity as a Notary Public of the State

7    of Florida at Large authorized to administer oaths,

8    certify that on this 2nd day of August, 2016, ERIC MAAR

9    personally appeared before me and took an oath or

10   affirmation for the purpose of giving testimony in the

11   matter of:

12              MAAR, ET AL. VS. BEALL'S, INC.

13   PERSONALLY KNOWN:
     TYPE OF IDENTIFICATION PRODUCED:  Florida Driver's License
14

15

16            _____
              PATRICE C. HENSLEY
17            My Commission Expires 4-4-2017
              Commission No. EE 884064
18            THIS TRANSCRIPT IS DIGITALLY
              SIGNED.  SHOULD THERE BE ANY
19            CHANGE MADE, THE SIGNATURE WILL
              DISAPPEAR.
20

21

22

23

24

25

Page 269

1    STATE OF FLORIDA        )
                             :  SS
2    COUNTY OF INDIAN RIVER)

3                    CERTIFICATE OF REPORTER

4           I, PATRICE C. HENSLEY, Registered Professional

5    Reporter, a Machine Shorthand Reporter and Notary Public

6    of the State of Florida at Large, certify that the

7    foregoing deposition of ERIC MAAR was stenographically

8    reported by me and is a true and accurate transcription of

9    said deposition of ERIC MAAR, and that a review of the

10   transcript was requested.

11          I certify further that I am neither attorney nor

12   counsel for, nor related to, nor employed by any of the

13   parties to the action in which the deposition is taken,

14   and, further, that I am not a relative or an employee of

15   any attorney or counsel employed in this case, nor am I

16   financially interested in the outcome of this action.

17

            DATED this 3rd day of August, 2016.
18

19

20        _____
          PATRICE C. HENSLEY
21        THIS TRANSCRIPT IS DIGITALLY
          SIGNED.  SHOULD THERE BE ANY
22        CHANGE MADE, THE SIGNATURE WILL
          DISAPPEAR.
23

24

25

1f0cf1a7-e219-4dfa-9f6e-94e31316a031

# BEALLS                                         JOB DESCRIPTION

**Position: Area Manager**                    **Exempt/Non-Exempt: Exempt**

**Date Prepared: April 27, 2012**

**Function: To oversee daily operations, merchandising and customer experience.**

**Interaction:**

- Extensive interaction with customers, associates and management team.
- Some interaction with vendors and corporate visitors.

**Summary of Duties and Responsibilities (Essential Functions):**

**People:**

- Facilitate training for Merchandise Handlers and Visual Merchandisers on merchandising standards, product flow, inventory flexing and signage to ensure consistency of Brand experience.
- In partnership with Merchandise Manager or Store Manager, actively participate in the talent selection process for Merchandise Handlers and Visual Merchandisers.

**Disciplines:**

- Partner with Merchandise Manager or Store Manager on the development of store specific presentations and merchandise concepts.
- Adapt Corporate Adjacencies to specific division layouts.
- Implement divisional merchandising concepts - shop concepts, trend ideas, lifestyle concepts.
- Partner with Merchandise Manager and Store Manager to identify business opportunities and create action plans to drive results.
- Continually teach, develop and empower direct reports (if applicable) to interpret Store, Divisional and/or Brand presentations to improve customer experience and drive top line sales.
- Teach and direct team to meet Bealls standards for:
  - Guest Service delivery (storewide)
  - Daily merchandise presentation and replenishment
  - Daily recovery and rack maintenance
  - Fitting room return racks
  - Adjacency execution and maintenance
  - Pricing: Ad sets, price changes and markdown presentation

**Process:**

- Utilize daily and weekly sales reports to track, analyze and communicate business results to determine strategies and maximize sales.
- Communicate merchandise and product performance opportunities/observations to Merchandise Manager.
- Communicate hardware, fixture and mannequin needs to Merchandise Manager.



500249

- Facilitate open communication with Merchandise Manager and/or Store Manager on all pertinent information that relates to current direction and/or opportunities to drive business within their store.
- Plan and coordinate execution of promotions, aisle and impulse programs, and events.
- Maintain current awareness and knowledge of the competitive landscape.

**Supervisory Responsibilities:**

- Supervises department associates on a daily basis.

**Physical Demands:**

- Must have adequate vision, speech, hearing and physical ability to perform essential job duties.
- Must be able to stand/walk 95% of the day to perform the essential job duties.
- Must have full body rotation (i.e., bending, stooping, twisting, etc.)
- Must be able to lift at least 20lbs.

**Qualifications:**

- Some college.
- Minimum of 2 years of retail management experience.
- Ability to work well with all levels of management, build partnerships and influence teams.
- Highly organized and able to adapt to quickly changing priorities.
- Proven ability to plan, organize, prioritize, and manage multiple tasks efficiently.
- Excellent written and verbal communication skills.
- Proven ability to conduct effective Store walk-through's
- Schedule flexibility to include evenings and weekends to meet demands of the business.
- Must have a valid Florida Driver's License.
- Ability to travel based on business need.

**Affirmation:**
I have read and understand the responsibilities listed on this job description.
I understand that the duties listed in this job description could change at any time.

Name: _____   Date: _____

Manager: _____   Date: _____

500250